UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 19-10117 |
| v. | Violation: |
| (1) GREGORY ABBOTT, | Count One: Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud (18 U.S.C. § 1349) |
| (2) MARCIA ABBOTT, | |
| (3) JANE BUCKINGHAM, | |
| (4) GORDON CAPLAN, | |
| (5) ROBERT FLAXMAN, | |
| (6) FELICITY HUFFMAN, | |
| (7) AGUSTIN FRANCISCO HUNEEUS, | |
| (8) MARJORIE KLAPPER, | |
| (9) PETER JAN "P.J." SARTORIO, | |
| (10) STEPHEN SEMPREVIVO, and | |
| (11) DEVIN SLOANE, | |
| Defendants | |

U.S. DISTRICT COURT
DISTRICT OF MASS.
2019 APR -8  PM 2: 08
FILED
IN CLERKS OFFICE

INFORMATION

At all times relevant to this Information:

General Allegations

1.      Defendant GREGORY ABBOTT ("GREGORY ABBOTT") was a resident of New York City and Aspen, Colorado.

2.      Defendant MARCIA ABBOTT ("MARCIA ABBOTT") was a resident of New York City and Aspen, Colorado.

3.      GREGORY ABBOTT and MARCIA ABBOTT (together, "the ABBOTTS") were a married couple.

4.      Defendant JANE BUCKINGHAM ("BUCKINGHAM") was a resident of Los Angeles, California.

5.     Defendant GORDON CAPLAN ("CAPLAN") was a resident of Greenwich, Connecticut and New York, New York.

6.     Defendant ROBERT FLAXMAN ("FLAXMAN") was a resident of Beverly Hills, California.

7.     Defendant FELICITY HUFFMAN ("HUFFMAN") was a resident of Los Angeles, California.

8.     Defendant AGUSTIN FRANCISCO HUNEEUS ("HUNEEUS") was a resident of San Francisco, California.

9.     Defendant MAJORIE KLAPPER ("KLAPPER") was a resident of Menlo Park, California.

10.    Defendant PETER JAN "P.J." SARTORIO ("SARTORIO") was a resident of Menlo Park, California.

11.    Defendant STEPHEN SEMPREVIVO ("SEMPREVIVO") was a resident of Los Angeles, California.

12.    Defendant DEVIN SLOANE ("SLOANE") was a resident of Los Angeles, California.

<u>Other Relevant Persons and Entities</u>

13.    The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

14.    The Key Worldwide Foundation ("KWF") was a non-profit corporation founded in or about 2012 and based in Newport Beach, California. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal

Revenue Code, meaning that KWF was exempt from paying federal income tax, and that individuals who contributed to KWF could deduct those contributions from their taxable income, subject to certain limitations.

15.     ACT, Inc. was a non-profit organization headquartered in Iowa City, Iowa that administered the ACT, a standardized test that is widely used as part of the college admissions process in the United States.

16.     The College Board was a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board developed and administered the SAT, a standardized test that, like the ACT, is widely used as part of the college admissions process in the United States. The College Board and ETS also developed and administered SAT subject tests, which are also used as part of the college admissions process.

17.     Georgetown University ("Georgetown") was a highly selective private university located in Washington, D.C.

18.     The University of San Diego ("USD") was a selective private university located in San Diego, California.

19.     The University of Southern California ("USC") was a highly selective private university located in Los Angeles, California.

20.     William "Rick" Singer was a resident, variously, of Sacramento and Newport Beach, California. Singer founded and, together with others, operated The Key and KWF.

21.     Mark Riddell was a resident of Palmetto, Florida. Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

22.     Igor Dvorskiy was a resident of Sherman Oaks, California. Dvorskiy was employed as the director of a private elementary and high school located in West Hollywood, California (the "West Hollywood Test Center"). Dvorskiy also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

23.     Niki Williams was a resident of Houston, Texas. Williams was employed as an assistant teacher at a public high school in Houston (the "Houston Test Center"). Williams also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

24.     Gordon Ernst was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts. Until January 2018, Ernst was employed as the head coach of men's and women's tennis at Georgetown.

25.     Martin Fox was a resident of Houston, Texas. Fox was employed as the president of a private tennis academy and camp in Houston.

26.     Steven Masera was a resident of Folsom, California. Until December 2017, Masera was employed as an accountant and financial officer for The Key and KWF.

27.     Donna Heinel was a resident of Long Beach, California. Heinel was employed as the senior associate athletic director at USC.

28.     Jovan Vavic was a resident of Rancho Palos Verdes, California. Vavic was employed as the water polo coach at USC.[1]

---

[1] The individuals identified in paragraphs 20 through 28 have been charged separately in connection with the conduct set forth herein.

### General Background on Standardized Testing and the College Admissions Process

29.     Most selective colleges and universities in the United States require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages. When submitted, standardized test scores are a material part of the admissions process.

30.     The ACT includes sections on English, mathematics, reading, and science, and is scored on a scale of 1 to 36

31.     The SAT includes sections on writing, critical reading, and mathematics. Between 2005 and January 2016, the SAT was scored on a scale of 600 to 2400. As of March 2016, the SAT has been scored on a scale of 400 to 1600.

32.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for testing accommodations, including extended time, and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

33.     Compensated ACT and SAT administrators owe a duty of honest services to ACT, Inc. and/or the College Board.

34.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and that they will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

35.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT

test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

36.     The ACT tests are typically sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

37.     The SAT tests are typically sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

38.     The ACT and SAT tests, and the scores students earn on those tests, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

39.     The athletic teams of Georgetown, USD, and USC (collectively, the "Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

40.     Many selective colleges and universities in the United States, including all of the Universities, recruit students with demonstrated athletic abilities, and typically apply different criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Universities' athletic teams once enrolled. Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach of a sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

41.     University athletic coaches and administrators owe a duty of honest services to the Universities where they are employed.

42.     At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University.

### The Conspiracy

43.     From in or about 2011 through in or about February 2019, the defendants conspired with others known and unknown to the United States Attorney to use bribery and other forms of fraud to facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere.

### Objects and Purposes of the Conspiracy

44.     The principal objects and purposes of the conspiracy were to commit mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346, by, among other things:

    a.  Cheating on college entrance exams, including in many instances by bribing exam administrators to permit such cheating;

    b.  Bribing university athletic coaches and administrators to designate applicants as purported athletic recruits—regardless of their athletic abilities, and in some cases, even though they did not play the sport they were purportedly recruited to play;

    c.  Having a third party take classes in place of the actual students, with the understanding that grades earned in those classes would be submitted as part of the students' college applications; and

    d.  Submitting falsified applications for admission to universities in the District of Massachusetts and elsewhere that, among other things, included the

fraudulently obtained exam scores and class grades, and often listed fake awards and athletic activities.

<u>Manner and Means of the Conspiracy</u>

45.    Among the manner and means by which the defendants and others known and unknown to the United States Attorney carried out the conspiracy were the following:

a.  Seeking extended time for their children on college entrance exams, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time;

b.  Changing the location of the exams to one of two test centers: the West Hollywood Test Center or the Houston Test Center;

c.  Bribing college entrance exam administrators at the West Hollywood Test Center and the Houston Test Center to permit cheating, in violation of their duty of honest services to ACT, Inc. and/or the College Board;

d.  Paying Riddell or another third party to pose as an ACT or SAT exam proctor, or as a student purportedly taking the exam, so that he could secretly provide students with answers during the exam, replace the students' exam responses with his own, or simply take the exam in place of the students;

e.  Submitting the fraudulently obtained ACT and SAT scores as part of the college admissions process, including to colleges and universities in the District of Massachusetts.

f.  Bribing university athletic coaches and administrators to designate students as purported athletic recruits or as members of other favored admissions categories;

g.  Fabricating athletic "profiles" containing falsified athletic credentials— including fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' college applications; and

h.  Explaining to clients and prospective clients of The Key that these fraudulent schemes were tried-and-true methods of improving exam scores and gaining admission to college that had been successfully employed by many other clients.

<u>Acts in Furtherance of the Conspiracy</u>

46.     On various dates from in or about 2011 through in or about February 2019, the defendants and others known and unknown to the United States Attorney committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

<u>GREGORY ABBOTT and MARCIA ABBOTT</u>

47.     In or about 2018, GREGORY ABBOTT and MARCIA ABBOTT agreed to pay Singer an amount, ultimately totaling $125,000, to participate in the college entrance exam cheating scheme for their daughter.

48.     On or about March 13, 2018, MARCIA ABBOTT e-mailed Singer her daughter's ACT registration form and admission ticket, in preparation for her daughter taking the ACT at the West Hollywood Test Center.

49.    On or about April 9, 2018, Singer caused a KWF employee to e-mail GREGORY ABBOTT an invoice for $50,000, with a note thanking him for his purported "generous donation to the Key Worldwide Foundation." Singer was copied on the e-mail, and later forwarded it to MARCIA ABBOTT.

50.    On or about April 12, 2018, GREGORY ABBOTT caused a wire in the amount of $50,000 to be sent from a brokerage account in the name of the Abbott Family Foundation to a bank account in the name of the KWF charity.

51.    On or about April 13, 2018, Riddell flew from Tampa to Los Angeles to proctor the ACT exam for the ABBOTTS' daughter and another student at the West Hollywood Test Center.

52.    On or about April 14, 2018, the ABBOTTS' daughter took the ACT at the West Hollywood Test Center. After she completed the exam, Riddell corrected her answers.

53.    On or about April 17, 2018, Singer caused KWF to pay Dvorskiy $20,000, representing a bribe of $10,000 for administering the ACT exam and permitting Riddell to cheat on the exam for the ABBOTTS' daughter and $10,000 for permitting Riddell to cheat on the exam for the other student who took the test the same day.

54.    On or about April 18, 2018, Dvorskiy sent the ACT exams corrected by Riddell from California to ACT, Inc. in Iowa, via Federal Express.

55.    On or about May 14, 2018, Singer caused KWF to pay Riddell $20,000 representing a payment of $10,000 for purporting to proctor the ACT for the ABBOTTS' daughter and $10,000 for the other student who took the test the same day.

56.    The ABBOTTS' daughter received a score of 35 out of a possible 36 on the ACT corrected by Riddell.

57.     On or about June 6, 2018, MARCIA ABBOTT called Singer to inquire, in substance, whether he could arrange for someone to correct her daughter's answers on the SAT subject tests in order to increase her score. Singer replied, "[GREGORY ABBOTT] would have to be willing to pay for it." MARCIA ABBOTT responded, "Yeah, well he can donate, I mean, whatever the donations are."

58.     On or about August 3, 2018, MARCIA ABBOTT called Singer to inquire, in substance, how cheating on the subject tests would work. MARCIA ABBOTT asked: "What is the situation with subject tests? Is it basically the same that happened with the SATs?" Singer replied: "Yeah, it's a little more a little more expensive because now you gotta have somebody which, you gotta make sure that you do well on both of those areas.   It's not like the SATs. They're much harder." During the call, MARCIA ABBOTT asked: "And what would be, the donation be for, if you found someone for October? Because the other one was, what, $50,000?" Singer answered: "It was, I think it was [$]50[,000]. It will be at least [$]75[,000]." MARCIA ABBOTT replied: "Yeah, that's fine."

59.     On or about September 13, 2018, the Abbott Family Foundation made a purported donation of $75,000 to the KWF charity.

60.     In a phone call on or about September 28, 2018, Singer told MARCIA ABBOTT that the SAT subject tests would occur at the West Hollywood Test Center. Singer said: "We'll get 750 and above," to which MARCIA ABBOTT replied: "That's fabulous."

61.     On or about October 2, 2018, Singer mailed Riddell a $10,000 check from Boston, Massachusetts, drawn on a KWF account located in the District of Massachusetts, for purporting to proctor the SAT subject exams for the ABBOTTS' daughter.

62.     On or about October 5, 2018, Singer mailed Dvorskiy a $10,000 check from Boston, Massachusetts, drawn on a KWF account located in the District of Massachusetts, for administering the SAT subject tests and permitting Riddell to cheat on them for the ABBOTTS' daughter.

63.     On or about October 6, 2018, the ABBOTTS' daughter took the SAT subject tests at the West Hollywood Test Center. After she completed the exams, Riddell corrected her answers.

64.     On or about October 8, 2018, Dvorskiy mailed the SAT subject tests corrected by Riddell from California to ETS in New Jersey via UPS.

65.     On or about October 18, 2018, Singer called GREGORY ABBOTT to advise him, in substance, that "it was a good move" for him to pay $75,000 to have Riddell take the SAT subject exams for his daughter. GREGORY ABBOTT asked: "Do you know how she did on her own?" Singer replied: "Do I know how she did on her own? Yeah, I do. She scored in the mid-600s."

66.     The ABBOTTS' daughter received a score of 800 out of a possible 800 on the math subject test and 710 on the literature subject test on the exams corrected by Riddell.

## JANE BUCKINGHAM

67.     In or about 2018, BUCKINGHAM agreed to pay Singer $50,000 to participate in the college entrance exam cheating scheme for her son.

68.     On or about July 2, 2018, BUCKINGHAM submitted a test location change request to ACT, Inc., to allow her son—who had already been granted extended time on the exam—to take the ACT on July 14 and 15, 2018 at the Houston Test Center.

69.     On or about July 12, 2018, BUCKINGHAM informed Singer that her son had developed tonsillitis and that his doctor had advised against allowing him to travel to Houston to take the ACT. BUCKINGHAM asked Singer whether it would be possible for her to obtain a copy

of the ACT exam that she could have her son take at home—so that he would believe he had taken the test—while Riddell took the actual exam on his behalf in Houston.

70.    Singer contacted Williams, who agreed to BUCKINGHAM's proposed plan.

71.    On or about July 13, 2018, Singer informed Riddell that BUCKINGHAM's son would not be taking the exam in Houston the following day and that Riddell would therefore have to complete the essay portion of the exam for him. Riddell asked Singer for a handwriting sample from BUCKINGHAM's son so that Riddell could attempt to match his handwriting on the exam.

72.    That same day, at Singer's request, BUCKINGHAM e-mailed Singer a photograph of her son's handwriting. That evening, Riddell flew from Tampa to Houston to take the ACT on behalf of BUCKINGHAM's son.

73.    On or about July 14, 2018, Riddell took the ACT in his room at a Houston-area hotel, where Williams had dropped off the exam for him. Riddell earned a total score of 35 out of a possible 36 for BUCKINGHAM's son. After the exam, Riddell returned to Tampa.

74.    On or about July 14, 2018, Singer caused a $5,000 check to be mailed, via Federal Express, to Williams in Houston.

75.    On or about July 17, 2018, BUCKINGHAM asked Singer, via e-mail, "[D]o you think we could get a copy of the ACT for [my son] to take? Later that same day, an employee of The Key e-mailed BUCKINGHAM a copy of an ACT practice test.

76.    On or about July 18, 2018, BUCKINGHAM wired $35,000 to a KWF charitable account as a partial payment toward the agreed-upon fee of $50,000 for Riddell taking the ACT on behalf of BUCKINGHAM's son. BUCKINGHAM advised Singer that she would seek to have her former spouse pay the remaining $15,000 she owed.

77. On or about July 25, 2018, Singer caused KWF to issue a payment of $10,000 to Riddell for taking the ACT on behalf of BUCKINGHAM's son.

78. In or about September and October, 2018, the ACT score Riddell obtained on behalf of BUCKINGHAM's son was submitted as part of his applications to various colleges and universities in California, Indiana, Washington, D.C., Texas, and elsewhere.

GORDON CAPLAN

79. In or about 2018, CAPLAN agreed to pay Singer $75,000 to participate in the college entrance exam cheating scheme for his daughter.

80. In a telephone call on or about June 15, 2018, Singer told CAPLAN: "It's 75,000 to get any test scores you would like to get on the SAT or ACT." CAPLAN replied: "Explain to me how that works." Singer then explained to CAPLAN, in sum and substance, how the college entrance exam cheating scheme worked. Among other things, Singer told CAPLAN: "You get extended time, you gotta get the extended time first. Then you're going to fly to L.A. . . . . So you come to my school, take the test on a Saturday. She'll be in the room for six, six and a half hours taking this test. My proctor would then answer her questions, and by the end of the day, she would leave, and my proctor would make sure she would gets [sic] score that would be equivalent to the number that we need to get." CAPLAN replied: "Okay."

81. On or about July 21, 2018, CAPLAN and his daughter flew to Los Angeles to meet with a psychologist recommended by Singer in order to obtain the medical documentation required to receive extended time on the ACT exam.

82. On or about November 6, 2018, ACT, Inc. notified CAPLAN's daughter that she had been approved for extended time on the ACT exam.

83. In a telephone call on or about November 8, 2018, CAPLAN told Singer that his daughter had received extended time on the ACT exam. CAPLAN asked Singer, in sum and

14

substance, whether anyone involved in the college entrance cheating scheme had ever been caught. Singer replied: "Nobody. We've done this for four or five years and had probably 20-plus people do it."

84. In the same call, Singer instructed CAPLAN to wire SINGER $25,000 if he wanted to ensure Ridell's and Dvorskiy's availability to participate in the cheating scheme.

85. On or about November 13, 2018, CAPLAN wired $25,000 to a bank account in Boston, Massachusetts in the name of the KWF charity.

86. On or about November 15, 2018, CAPLAN e-mailed ACT, Inc.: "I am the father of [daughter's name]. [My daughter] was approved for special testing accommodations and location. We would like to change the location to [the West Hollywood Test Center]."

87. On or about November 15, 2018, CAPLAN and Singer discussed the score Riddell would obtain for CAPLAN's daughter on the ACT exam. CAPLAN said: "I'm thinking 30, 31 is all we need to do here."

88. On or about November 29, 2018, Singer mailed $10,000 checks from the District of Massachusetts to Riddell in Florida and to Dvorskiy in California.

89. On or about December 7, 2018, Riddell flew from Tampa to Los Angeles to proctor the ACT exam for CAPLAN's daughter on December 8, 2018. After CAPLAN's daughter completed the exam, Riddell corrected her answers.

90. On or about December 10, 2018, Dvorskiy mailed the ACT exam corrected by Riddell from California to Iowa via Federal Express.

91. On or about December 20, 2018, CAPLAN wired an additional $50,000 into the KWF bank account in Boston.

92.     CAPLAN's daughter received a score of 32 out of a possible 36 on the ACT exam corrected by Riddell.

## ROBERT FLAXMAN

93.     In or about 2016, FLAXMAN agreed to pay Singer $75,000 to participate in the college entrance exam scheme for his daughter.

94.     In or about April 2016, FLAXMAN's daughter took the ACT and received a score of 20 out of a possible 36.

95.     On or about September 12, 2016, FLAXMAN e-mailed Singer that his daughter took the "ACT this weekend and thought she did better than the last time. She actually finished the exam." FLAXMAN's daughter received a score of 24 on the September test.

96.     On or about October 4, 2016, Singer e-mailed FLAXMAN that his contact at ACT "has the paperwork and will put [your daughter] into [the Houston Test Center] for Oct." FLAXMAN replied: "Ok. I will need details soon. Address. Who and where to check in and what instructions we need to give [my daughter] to use at the test."

97.     Singer contacted Fox, who arranged with Williams to permit Riddell to purport to proctor the test for FLAXMAN's daughter and another student at the Houston Test Center.

98.     On or about October 6, 2016, Singer e-mailed FLAXMAN the address of the Houston Test Center and contact information for Williams.

99.     On or about October 15, 2016, Singer directed Masera to send invoices to FLAXMAN and another client in the amount of $75,000 each. Singer further instructed Masera to send $50,000 to Fox and $20,000 to Riddell.

100.    On or about October 20, 2016, at FLAXMAN's direction, his company wired $75,000 to KWF.

16

101.    On or about October 22, 2016, FLAXMAN's daughter and the child of another client of Singer both took the ACT at the Houston Test Center with Riddell.   Riddell assisted FLAXMAN's daughter and the other student to answer questions on the exam, and instructed them to answer different questions incorrectly so that they would not have the same incorrect answers on their tests, and the ACT would therefore not suspect cheating.

102.    FLAXMAN's daughter received a score of 28 on the ACT exam corrected by Riddell.

103.    On or about January 27, 2017, FLAXMAN's daughter's fraudulent ACT score was transmitted to various colleges in California and elsewhere.

### FELICITY HUFFMAN

104.    In or about 2017 and 2018, HUFFMAN agreed to pay Singer an amount (at least $15,000) to participate in the college entrance exam scheme for her oldest daughter.

105.    On or about August 28, 2017, HUFFMAN e-mailed a psychologist: "I think it would be really helpful for [my oldest daughter] to get 100% time on her testing . . . so that it is in place when we need to do the College Board thing next year."

106.    On or about October 16, 2017, HUFFMAN received an e-mail from the College Board advising that her older daughter had been approved for 100 percent extended time.

107.    On or about October 17, 2017, HUFFMAN forwarded the College Board's accommodation approval e-mail to Singer and a counselor at HUFFMAN's daughter's high school with the note, "Hurray! She got it. What's the next step?"

108.    On or about October 18, 2017, a counselor at HUFFMAN's older daughter's high school e-mailed HUFFMAN: "Now you will register [your daughter] for the December 3rd SAT . . . Collegeboard [sic] considers double time a school based exam, so [our high school] is the test center. I will proctor test on Dec 4th & 5th and that's the process in nutshell."

109.    On or about October 20, 2017, HUFFMAN forwarded the October 18th e-mail from the counselor to Singer with the note: "Ruh Ro! Looks like [my daughter's high school] wants to provide own proctor." Singer responded: "We will speak about it."

110.    On or about October 26, 2017, Dvorskiy completed paperwork requesting that HUFFMAN's daughter's SAT exam be moved from her high school to the West Hollywood Test Center.

111.    On or about October 31, 2017, HUFFMAN e-mailed Singer that she would tell a counselor at her older daughter's high school: "we will take it [*i.e.*, the SAT] on Dec. 2nd and 3rd – so [her older daughter] won't miss school – which is good because it's final prep – I assume."

112.    On or about December 1, 2017, Riddell flew from Tampa to Los Angeles to proctor HUFFMAN's daughter's exam on December 2, 2017.   After HUFFMAN's daughter completed the exam and left the test center, Riddell corrected her answers.

113.    HUFFMAN's daughter received a score of 1420 on the SAT, an improvement of approximately 400 points over her PSAT, which she took without Riddell one year earlier.

114.    On or about December 19, 2017, Singer caused KWF to pay Dvorskiy $40,000 for administering the SAT to HUFFMAN's daughter and three other students.

115.    On or about December 27, 2017, Singer caused KWF to pay Riddell $35,000 for purporting to proctor the exam for HUFFMAN's daughter and for several other of Singer's clients.

116.    On or about February 27, 2018, HUFFMAN made a purported contribution of $15,000 to KWF.

117.    On or about March 21, 2018, Masera sent HUFFMAN and her spouse a letter thanking them for the purported donation and falsely stating that it would "allow us to move

forward with our plans to provide educational and self-enrichment programs to disadvantaged youth." The letter falsely stated that "no goods or services were exchanged" for the $15,000.

### AGUSTIN FRANCISCO HUNEEUS

118.    In or about 2017 and 2018, HUNEEUS agreed with Singer to pay $300,000 to participate in both the college entrance exam scheme and college recruitment scheme for his daughter.

119.    On or about May 25, 2017, Singer directed HUNEEUS and a psychologist selected by Singer to "[p]lease connect." In that e-mail, Singer also noted that HUNEEUS's daughter "needs testing for 100 percent time with multiple days."

120.    In or about August 2017, a psychologist provided HUNEEUS's daughter with documentation recommending that she receive extended time on the SAT.

121.    On or about October 7, 2017, the College Board granted HUNEEUS's daughter extended time to take the exam over successive days.

122.    On or about January 22, 2018, HUNEEUS forwarded Singer an e-mail he had received from an employee at his daughter's high school, indicating that she planned to proctor his daughter's test at the school on March 10th and March 11th. HUNEEUS wrote, "Here is the email." Singer replied, "You can tell her you are going to be out of town and have found a location to provide the test so [your daughter] does not have to miss school. The school is [the West Hollywood Test Center] for your use."

123.    On or about February 16, 2018, an employee at the high school wrote to HUNEEUS that HUNEEUS's executive assistant "had mentioned trying to arrange for [his daughter] to take the exam in L.A. If that is the case, please make sure the [College] Board knows where to send the exam."

124.     On or about February 16, 2018, Dvorskiy e-mailed Singer confirmation that the College Board had shipped SAT materials for HUNEEUS's daughter to the West Hollywood Test Center. Singer then forwarded the confirmation to HUNEEUS.

125.     On or about March 9, 2018, Riddell flew from Tampa to Los Angeles to proctor HUNEEUS's daughter's exam on March 10, 2018.

126.     On or about March 10, 2018, HUNEEUS brought his daughter to the West Hollywood Test Center for the exam. Riddell corrected answers on HUNEEUS's daughter's test.

127.     On or about March 12, 2018, Dvorskiy mailed the SAT exam corrected by Riddell from California to ETS in New Jersey via UPS.

128.     On or about April 3, 2018, HUNEEUS wired $50,000 as a purported charitable contribution to KWF. Singer, in turn, paid Dvorskiy and Riddell $10,000 each.

129.     HUNEEUS's daughter received a score of 1380 out of a possible 1600 on the SAT corrected by Riddell.

130.     On or about August 30, 2018, HUNEEUS and Singer discussed the college entrance exam scheme. HUNEEUS told Singer "I know your system well," and said, "if you had wanted to, I mean [my daughter's] score could have been 1550, right?" Singer responded, "No. 'Cause I would have got investigated for sure based on her grades."

131.     In the same call, HUNEEUS and Singer also discussed the college recruitment scheme. HUNEEUS asked Singer to "walk me through the whole, kinda, water polo thing again and how it works." Singer then described that they would put together "water polo profile" for HUNEEUS's daughter and that Heinel would present HUNEEUS's daughter to USC's subcommittee for athletic admissions. Singer added that HUNEEUS would pay $50,000 to Heinel for securing the conditional admission of his daughter and $200,000 to the KWF after USC sent

the official admissions packet in March 2019. As to this second payment, HUNEEUS inquired whether "all of those funds go to USC, or do some go to stay in your foundation?" Singer replied, "No, they go to USC in different ways," including to Jovan Vavic, the USC water polo coach, "'Cause he's the guy giving up the spot." HUNEEUS also told Singer "you understand that [my daughter] is not worthy to be on that team."

132.    On or about September 18, 2018, shortly before Heinel intended to present HUNEEUS's daughter to the admissions subcommittee, Singer asked HUNEEUS to provide a photo of his daughter playing water polo. HUNEEUS agreed to prove the photo.

133.    On or about September 20, 2018, Singer sent Heinel an e-mail that included HUNEEUS's daughter's high school transcripts, her fraudulent SAT score, and a fabricated athletic profile that falsely identified her as a "3-year Varsity Letter winner" in water polo and "Team MVP 2017," along with a photograph of someone other than HUNEEUS's daughter playing water polo.

134.    On or about September 22, 2018, Singer told HUNEEUS on a telephone call that since his daughter had not sent a photograph in time, he had to use a photograph of someone else in the profile. HUNEEUS responded, "Okay, does that mean her chances change in any way?" Singer responded it meant HUNEEUS's daughter would have to be submitted at a later date to the subcommittee for athletic admissions.

135.    On or about November 2, 2018, using a falsified profile that depicted her as a competitive water polo player, Heinel presented HUNEEUS's daughter to the USC subcommittee for athletic admissions.

136.    On or about November 7, 2018, Heinel e-mailed Singer a conditional acceptance letter for HUNEEUS's daughter stating that she was being admitted to USC because "[y]our

records indicate that you have the potential to make a significant contribution to the intercollegiate athletic program." Singer forwarded the letter to HUNEEUS and requested that he "[p]lease send 50K check . . . made payable to USC Women's Athletic Board . . . to USC Women's Athletic c/o Donna Heinel."

137.  On or about November 19, 2018, HUNEEUS caused his executive assistant to send a $50,000 check to Heinel by FedEx, payable to "USC Women's Athletics Board" with the memo line referencing his daughter.

### MARJORIE KLAPPER

138.  In or about 2017, KLAPPER agreed to pay Singer $15,000 to participate in the college entrance exam cheating scheme for her son.

139.  On or about March 1, 2017, KLAPPER e-mailed Singer that she had learned from another client of Singer's that the other client's daughter was planning to take the ACT in Los Angeles. KLAPPER asked if her son could do so as well. Singer replied: "it is not a definite as there [is] a financial consideration to take it there. They will only do with a donation."

140.  On or about June 10, 2017, KLAPPER forwarded to Singer a letter from the College Board that granted her son 50 percent extra time. KLAPPER wrote: "Another failed attempt at 100%. We have it for ACT. What should we do? Do these accommodations mean alternate location? Still debating our conversations too." Singer replied: "As long as you have ACT with 100 percent time we can take the test at an alternate site."

141.  On or about September 13, 2017, KLAPPER forwarded ACT registration instructions for her son to Singer, who forwarded them to Dvorskiy. Dvorskiy, in turn, notified ACT, Inc. that KLAPPER's son would take the ACT on October 28, 2017 at the West Hollywood Test Center.

142.    On or about October 27, 2017, Riddell flew from Tampa to Los Angeles to proctor the ACT exam for KLAPPER's son at the West Hollywood Test Center on October 28, 2017. After KLAPPER's son completed the exam, Riddell corrected his answers.

143.    On or about October 29, 2017, Singer directed Masera in an e-mail to invoice KLAPPER $15,000 through the KWF.

144.    On or about November 1, 2017, KWF paid Riddell $18,000 for proctoring the ACT exam for KLAPPER's son and another student.

145.    On or about November 2, 2017, Dvorskiy mailed the ACT exam corrected by Riddell from California to Iowa via Federal Express.

146.    On or about November 2 and 3, 2017, KLAPPER made a purported charitable contribution totaling $15,000 to KWF.

147.    On or about November 6, 2017, KWF paid Dvorskiy $13,000 for administering the ACT exam for KLAPPER's son and another student.

148.    KLAPPER's son received a score of 30 out of a possible 36 on the ACT exam corrected by Riddell.

149.    On or about November 20, 2017, KLAPPER e-mailed a copy of her son's ACT score report to Singer, noting: "Omg. I guess he's not testing again." Singer replied: Yep he is brilliant."

150.    In or about 2017 and 2018, the ACT score Riddell obtained on behalf of KLAPPER's son was submitted as part of his applications to various colleges and universities in Arizona, California, Colorado, and elsewhere.

### PETER JAN "P.J." SARTORIO

151.    In or about 2017, SARTORIO agreed to pay Singer $15,000 to participate in the college entrance exam cheating scheme for his daughter.

152.    On or about May 8, 2017, ACT, Inc. notified SARTORIO's daughter and spouse via e-mail that SARTORIO's daughter had been approved for extended time on the ACT exam. SARTORIO's spouse forwarded the notification to SARTORIO and Singer, noting, "Yay, she was approved!"

153.    On or about May 18, 2017, Singer forwarded SARTORIO's daughter's ACT information to Dvorskiy, writing, "New student." Dvorskiy responded by attaching a completed form requesting that SARTORIO's daughter be permitted to take the ACT at the West Hollywood Test Center instead of at her own high school. ACT, Inc. authorized the move on or about May 31, 2017.

154.    On or about June 9, 2017, Riddell flew from Tampa to Los Angeles to proctor the ACT exam for SARTORIO's daughter and another Singer client on June 10, 2017. After SARTORIO's daughter completed the exam and left the center, Riddell corrected her answers.

155.    SARTORIO'S daughter received a score of 27 on the ACT corrected for her, which placed her in approximately the 86th percentile.

156.    On or about June 5, 2017, Singer caused KWF to pay Dvorskiy $40,000 for administering the ACT to SARTORIO's daughter and various other Singer clients.

157.    On or about June 12, 2017, Singer caused KWF to pay Riddell $15,600 for purporting to proctor the ACT for SARTORIO's daughter and another Singer client.

158.    Shortly thereafter, SARTORIO paid Singer $15,000 in cash.

159.   In or about November and December, 2017, the ACT score Riddell obtained on behalf of SARTORIO's daughter was submitted as part of her applications to various colleges and universities in California, Florida, and elsewhere.

### STEPHEN SEMPREVIVO

160.   In or about 2015 and 2016, SEMPREVIVO agreed to pay Singer $400,000 to participate in the college recruitment scheme for his son in order to facilitate his admission to Georgetown.

161.   On or about August 19, 2015, Singer e-mailed SEMPREVIVO and his son, instructing them, "[P]lease send this note and a PDF of transcripts and test scores to Gordie Ernst Mens' Tennis at Georgetown U from your email-then let me know it is done." The note drafted by Singer included fabricated representations about SEMPREVIVO's son's purported tennis experience and prior contacts with Ernst. SEMPREVIVO's son e-mailed the note to Ernst later that same day, along with his high school transcript and SAT scores.

162.   The following day, Ernst forwarded the e-mail to a member of the Georgetown admissions staff. Ernst then e-mailed the admissions officer to "confirm" that he had used three of his allocated admissions "spots"—one for SEMPREVIVO's son and, unbeknownst to the admissions officer, two for other clients of Singer.

163.   On or about October 11, 2015, Singer e-mailed SEMPREVIVO a final "activity" essay for inclusion in SEMPREVIVO's son's Georgetown application. The essay included fabricated representations about SEMPREVIVO's son's purported tennis experience.

164.   On or about that same day, SEMPREVIVO's son's application was submitted to Georgetown. The application included the above-referenced essay, as well as other fabricated representations about SEMPREVIVO's son's purported tennis experience.

165.    On or about November 6, 2015, Georgetown sent SEMPREVIVO's son a letter noting that "[t]he Committee on Admissions has conducted an initial review of your application to the Class of 2020 at the request of Mr. Gordie Ernst, Tennis Coach" and that "the Committee has ranked your admission as 'likely.'" The letter explained that candidates rated "likely" have a greater than 95 percent chance of being admitted to Georgetown and that SEMPREVIVO's son would receive a final decision by April 1, 2016.

166.    On or about April 22, 2016, after SEMPREVIVO's son was granted formal admission to Georgetown, a KWF employee e-mailed SEMPREVIVO an invoice in the amount of $400,000 for his purported "Private Contribution" to KWF.

167.    On or about April 28, 2016, the SEMPREVIVO Family Trust issued a check to KWF in the amount of $400,000.

168.    Between on or about September 11, 2015 and November 30, 2016, Singer caused KWF to issue checks to Ernst totaling $950,000, representing payments for the purported recruitment of SEMPREVIVO's son and the children of other clients of Singer. Typically, Singer caused the checks to be mailed to Ernst via U.S. Mail.

<u>DEVIN SLOANE</u>

169.    In or about 2017 and 2018, SLOANE agreed with Singer to pay $250,000 to participate in the college recruitment scheme for his oldest son.

170.    On or about January 4, 2017, SLOANE e-mailed Singer: "Should we start thinking of a short list of schools to tour now?" Singer responded, in substance, that a short list typically required "SAT and Subject test scores," but SLOANE could begin to create a list if "you are ready to commit to the notion of the financial side door. Your thoughts?" SLOANE replied three minutes later that he and his son would "come up with schools to visit."

171.    On or about June 5, 2017 and June 16, 2017, SLOANE purchased water polo gear, including a ball and cap, from Amazon.com.

172.    On or about June 27, 2017, SLOANE e-mailed Singer a photograph of his son purporting to play water polo—using the items SLOANE purchased from Amazon.com a few weeks earlier—with his right arm and upper torso exposed above the water line. In the e-mail, SLOANE asked: "Does this work?" Singer responded: "Yes but a little high out of the water- no one gets that high."

173.    On or about June 28, 2017, SLOANE e-mailed Singer another photograph of his son, in which his son appeared to be lower in the water, with his torso and arm now mostly submerged. In the e-mail, SLOANE wrote: "Hope this works. . . ." Singer replied: "perfect."

174.    On or about July 16, 2017, Singer e-mailed SLOANE to request biographical details for SLOANE's son's water polo profile. In the email, Singer indicated that the profile would falsely present SLOANE's son as a "Perimeter Player" who played for the "Italian Junior National Team" and the "LA Water Polo" team. The following day, SLOANE replied with the personal information for the profile.

175.    In or about November 2017, Heinel presented SLOANE's son to the USC subcommittee for athletic admissions using a fabricated athletic profile that falsely identified him has playing in the "European Water Polo Championships" for the "Italian Youth National Team" and a "Starting Attach Player-3 year[s]" for the LA Water Polo Club.

176.    On or about November 26, 2017, Heinel e-mailed Singer a conditional acceptance letter for SLOANE's son, indicating that his admission was premised upon "records [that] indicate that you have the potential to make a significant contribution to the intercollegiate athletic program."

177.    On or about November 29, 2017, Singer e-mailed SLOANE: "Devin can you send a 50k check to USC and the address is below. Additionally the rest of the 200K will be paid to our foundation a 501 3c [sic] after [your son] receives his final letter in March."

178.    The same day, on or about November 29, 2017, SLOANE sent Heinel, by Federal Express, a $50,000 check payable to "USC Women['] s Athletics."

179.    On or about January 29, 2018, one of Singer's employees e-mailed SLOANE an invoice from KWF in the amount of $200,000 and wrote: "Thank you for your generous donation."

180.    On or about March 22, 2018, USC mailed SLOANE's son a formal acceptance letter.

181.    On or about April 11, 2018, SLOANE wired $200,000 to KWF.

Other Co-Conspirators

182.    In addition to the exams Singer paid Riddell to take for the defendants' children, as set forth above, Singer likewise paid Riddell to cheat on the SAT and ACT for the children of other co-conspirators known and unknown to the United States Attorney and, in many of those instances, bribed exam administrators Dvorskiy and Williams to permit Riddell to do so. As examples:

   a.  In or about October 2011, Riddell provided Student 1, a high school student in Florida, with answers to her SAT subject tests while purporting to proctor Student 1's exams.

   b.  On or about October 3, 2015, Riddell secretly corrected SAT answers for Student 2, a high school student in California, who later submitted those scores to Boston University, Boston College, and Northeastern University, all of which are located in the District of Massachusetts.

      c. On or about December 9, 2017, Riddell corrected SAT answers for Student 3, a high school student in California, who later submitted those scores to Northeastern University.

183. Singer likewise bribed athletic coaches and university administrators on behalf of other co-conspirators known and unknown to the United States Attorney to designate the children of those co-conspirators as athletic recruits. As an example:

      a. Between 2012 and 2018, Singer paid Ernst bribes falsely labeled as "consulting" fees totaling more than $2.7 million.

      b. Singer typically made the payments to Ernst from one of the KWF charitable accounts and sent them to Ernst via U.S. Mail, including in at least one instance to Ernst's residence in Falmouth, Massachusetts.

      c. In exchange for the bribes, Ernst designated at least 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to Georgetown.

<u>COUNT ONE</u>
Conspiracy to Commit Mail Fraud
and Honest Services Mail Fraud
(18 U.S.C. § 1349)

The United States Attorney charges:

184.    The United States Attorney re-alleges and incorporates by reference paragraphs 1-183 of this Information.

185.    From in or about 2011, and continuing through in or about February 2019, in the District of Massachusetts and elsewhere, the defendants,

(1)    GREGORY ABBOTT,
(2)    MARCIA ABBOTT,
(3)    JANE BUCKINGHAM,
(4)    GORDON CAPLAN
(5)    ROBERT FLAXMAN,
(6)    FELICITY HUFFMAN,
(7)    AGUSTIN FRANCISCO HUNEEUS,
(8)    MARJORIE KLAPPER,
(9)    PETER JAN "P.J." SARTORIO,
(10)    STEPHEN SEMPREVIVO, and
(11)    DEVIN SLOANE,

conspired with others known and unknown to the United States Attorney to commit mail fraud and honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did, for the purpose of executing and attempting to execute the scheme, deposit and cause to be

deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346.

All in violation of Title 18, United States Code, Section 1349.

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:     _____
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant United States Attorneys

Date: April 8, 2019

31