```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA         )
                                       )
 5                                     )
      vs.                              )  CR No. 19-10117-IT
 6                                     )
                                       )
 7    FELICITY HUFFMAN and             )
      DEVIN SLOANE                      )
 8

 9

10

      BEFORE:  THE HONORABLE INDIRA TALWANI
11

12

13                            PLEAS

14

15

16
                  John Joseph Moakley United States Courthouse
17                          Courtroom No. 9
                            One Courthouse Way
18                          Boston, MA 02210
                           Monday, May 13, 2019
19                             2:28 p.m.

20

21                    Cheryl Dahlstrom, RMR, CRR
                          Official Court Reporter
22          John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3510
23                        Boston, MA 02210
            Mechanical Steno - Transcript by Computer
24

25
```

1    APPEARANCES:

2    ON BEHALF OF THE GOVERNMENT:

3         OFFICE OF THE UNITED STATES ATTORNEY
          By:  Eric S. Rosen, AUSA
4              Justin D. O'Connell, AUSA
               Leslie Wright, AUSA
5         One Courthouse Way
          Boston, Massachusetts 02210
6

7    ON BEHALF OF THE DEFENDANT FELICITY HUFFMAN:

8         FOLEY HOAG LLP
          By:  Martin F. Murphy, Esq.
9              Julia G. Amrhein, Esq.
          155 Seaport Boulevard
10        Boston, Massachusetts 02210

11

ON BEHALF OF THE DEFENDANT DEVIN SLOANE:
12
          GREENBERG TRAURIG
13        By:  A. John Pappalardo, Esq.
          One International Place
14        Boston, Massachusetts 02110

15        MORGAN LEWIS
          By:  Nathan J. Hochman, Esq.
16        2049 Century Park East
          Los Angeles, California 90067
17

18

19

20

21

22

23

24

25

                        P R O C E E D I N G S

1          THE CLERK:  This is Case No. 19-cr-10117, United

2   States v. Felicity Huffman and Devin Sloane.  Will counsel

3   please identify themselves for the record.

4          MR. ROSEN:  Good afternoon, your Honor.  Eric Rosen,

5   Justin O'Connell, and Leslie Wright for the government.

6          THE COURT:  Good afternoon.

7          MR. MURPHY:  Good afternoon, your Honor.  Martin

8   Murphy for Ms. Huffman.

9          MS. AMRHEIN:  Good afternoon, Julia Amrhein, also for

10   Ms. Huffman.

11          MR. HOCHMAN:  Good afternoon, your Honor.  Nathan

12   Hochman, on behalf of Devin Sloane, who's present on bond.

13          MR. PAPPALARDO:  John Pappalardo on behalf of Mr.

14   Sloane.

15          THE COURT:  Good afternoon.

16          MR. PAPPALARDO:  Good afternoon, your Honor.

17          THE COURT:  So we are here for two pleas.  I have to

18   tell you, I don't normally combine a plea colloquy.  We have a

19   large number of defendants in this case, and so I have set up

20   the plea colloquies in groups of two or three.  The way I

21   intend to proceed is to go through the part that is perhaps

22   more formalistic and make sure that both of you understand all

23   of your rights.  And I will, for that part, ask my questions

24   and ask the defendants in turn to make sure that they

1    understand the rights.  And then I will proceed with one

2    defendant and then the other for the particular specifics of

3    the case.  And of the different defendants in this case, I

4    don't have actually any particular paring of the two of you.

5    It's by happenstance and schedule.  So that's how we are

6    proceeding here.

7            Let me start with the clerk administering the oath,

8    please, to the defendants.

9    (Defendants sworn.)

02:32 10           THE CLERK:  Please state your name for the record,

11   spelling your last name, Ms. Huffman.

12           MS. HUFFMAN:  Felicity Huffman, H-u-f-f-m-a-n.

13           THE CLERK:  Mr. Sloane.

14           MR. SLOANE:  Devin Sloane, S-l-o-a-n-e.

15           THE CLERK:  Thank you.

16           THE COURT:  So I'm going to proceed with this

17   colloquy, and I'll ask you each to answer the questions in

18   turn, and it probably will proceed smoother here going front to

19   back just so the court reporter can get both of you down.

02:32 20           First of all, is there any reason that you may not be

21   able to understand the nature and consequences of these

22   proceedings today?

23           MS. HUFFMAN:  No, your Honor.

24           THE COURT:  You may consult with your counsel at any

25   time during these proceedings.

1              MS. HUFFMAN:  Yes, your Honor.

2              THE COURT:  Mr. Sloane, same question.  Is there any

3        reason, as you stand here, that you may not be able to

4        understand the nature and consequences of these proceedings?

5              MR. SLOANE:  No, your Honor.

6              THE COURT:  And you may consult with your counsel at

7        any time during these proceedings.

8              Have each of you received a copy of the Information,

9        the written charges against you in this case?

02:33 10              MS. HUFFMAN:  Yes, your Honor.

11              MR. SLOANE:  Yes, your Honor.

12              THE COURT:  And Count 1 charges each of you with

13        conspiracy to commit mail fraud and honest services mail fraud,

14        in violation of 18 U.S.C. Section 1349.

15              Ms. Huffman, do you understand the charges?

16              MS. HUFFMAN:  Yes, your Honor.

17              THE COURT:  Do you understand that you're represented

18        by counsel?

19              MS. HUFFMAN:  Yes, your Honor.

02:33 20              THE COURT:  Have you fully discussed the charges

21        against you and the facts and circumstances of this case with

22        counsel?

23              MS. HUFFMAN:  Yes, your Honor.

24              THE COURT:  Are you fully satisfied with counsel,

25        representation, and advice given to you in this case by your

1     attorneys?

2              MS. HUFFMAN:  Yes, your Honor.

3              THE COURT:  Mr. Sloane, do you understand the charges?

4              MR. SLOANE:  Yes, your Honor.

5              THE COURT:  Do you understand that you are represented

6     by counsel?

7              MR. SLOANE:  Yes, your Honor.

8              THE COURT:  Have you fully discussed the charges

9     against you and the facts and circumstances of this case with

02:34 10    counsel?

11             MR. SLOANE:  Yes, I have, your Honor.

12             THE COURT:  Are you fully satisfied with counsel,

13    representation, and advice given to you in this case by your

14    attorneys?

15             MR. SLOANE:  Yes, very satisfied.

16             THE COURT:  And to counsel, starting first with Ms.

17    Huffman's counsel, have you communicated all formal offers from

18    the prosecution to accept a plea on terms and conditions that

19    may be favorable to the accused?

02:34 20             MR. MURPHY:  I have, your Honor.

21             THE COURT:  And to Mr. Sloane's counsel, have you

22    communicated all formal offers from the prosecution to accept a

23    plea on terms and conditions that may be favorable to the

24    accused?

25             MR. HOCHMAN:  We have, your Honor.

1           THE COURT:  So both of you are here, I've been

2      informed, are prepared to waive Indictment.  I have to advise

3      you of your rights.  So I'm going to go through a list of

4      rights here that you would be waiving if you want to proceed

5      here just on the Information.  So I'll go through the list of

6      rights, make sure you understand them.

7           You do have a constitutional right to be charged by an

8      Indictment of a grand jury, but you can waive that right and

9      consent to being charged by information of the United States

02:35 10     Attorney.  Instead of an Indictment, in this case these felony

11     charges against you have been brought by the U.S. Attorney by

12     the filing of an Information.  Unless you waive Indictment, you

13     may not be charged with a felony unless a grand jury finds that

14     there is probable cause to believe that a crime has been

15     committed and that you committed it.

16           If you do not waive Indictment, the government may

17     present the case to the grand jury and ask it to indict you.  A

18     grand jury is composed of at least 16 and not more than 23

19     persons, and at least 12 grand jurors must believe -- must find

02:36 20     that there is probable cause to believe you committed the crime

21     with which you're charged before you may be indicted.  The

22     grand jury may or may not indict you.  If you waive Indictment

23     by grand jury, the case will proceed against you on the U.S.

24     Attorney's Information just as though you've been indicted.

25           So, Ms. Huffman, do you understand your right to

1  Indictment by a grand jury?

2           MS. HUFFMAN:  Yes, I do, your Honor.

3           THE COURT:  Have you discussed waiving your right to

4  Indictment by a grand jury with your attorney?

5           MS. HUFFMAN:  Yes, your Honor.

6           THE COURT:  Have any threats or promises been made to

7  induce you to waive Indictment?

8           MS. HUFFMAN:  No, your Honor.

9           THE COURT:  Do you wish to waive your right to

02:36 10  Indictment by a grand jury?

11           MS. HUFFMAN:  Yes, your Honor.

12           THE COURT:  And to counsel, is there any reason that

13  Ms. Huffman should not waive Indictment?

14           MR. MURPHY:  No, your Honor.

15           THE COURT:  And same questions to Mr. Sloane.  Do you

16  understand your right to Indictment by a grand jury?

17           MR. SLOANE:  Yes, I do, your Honor.

18           THE COURT:  Have you discussed waiving your right to

19  Indictment by a grand jury with your attorney?

02:37 20           MR. SLOANE:  Yes, I have, your Honor.

21           THE COURT:  Have any threats or promises been made to

22  induce you to waive Indictment?

23           MR. SLOANE:  No, your Honor.

24           THE COURT:  Do you wish to waive your right to

25  Indictment by a grand jury?

1          MR. SLOANE:  Yes, I do, your Honor.

2          THE COURT:  And to your counsel, is there any reason

3     Mr. Sloane should not waive Indictment?

4          MR. HOCHMAN:  No, your Honor.

5          THE COURT:  So do I have the signed waivers?

6          MR. MURPHY:  We provided them to the clerk, your

7     Honor.

8          THE COURT:  For each of you, that's your signature on

9     the waivers that I have?

02:37 10          MS. HUFFMAN:  Yes, your Honor.

11          MR. SLOANE:  Yes, your Honor.

12          THE COURT:  I find that Mr. Sloane and Ms. Huffman

13     have knowingly and voluntarily waived their right to

14     Indictment, and each waiver of Indictment is accepted by the

15     Court.

16          Question now for each of you on pretrial rights.  Do

17     you understand that there may be legal challenges to the

18     charges brought against you such as challenges to venue in the

19     District of Massachusetts or a motion to suppress evidence or a

02:38 20     challenge that there is a legal defect in the Information, and

21     you will have waived all such challenges if I accept your plea

22     of guilty?

23          MS. HUFFMAN:  Yes, your Honor.

24          MR. SLOANE:  Yes, your Honor.

25          THE COURT:  And now I'm going to go through the trial

1    rights that each of you will be waiving if I accept a plea of

2    guilty here.  I think I'll ask each question and get an answer

3    from each of you.

4          Do you understand that you have the right to plead not

5    guilty to the offense charged against you and to go to trial?

6          MS. HUFFMAN:  Yes, your Honor.

7          MR. SLOANE:  Yes, your Honor.

8          THE COURT:  Do you understand you have the right to a

9    trial by jury?

02:39 10          MS. HUFFMAN:  Yes, your Honor.

11          MR. SLOANE:  Yes, your Honor.

12          THE COURT:  Do you understand that a jury is composed

13   of 12 jurors who must find beyond a reasonable doubt that you

14   committed the crime with which you're charged before you may be

15   found guilty?

16          MS. HUFFMAN:  Yes, your Honor.

17          MR. SLOANE:  Yes, your Honor.

18          THE COURT:  Do you understand that at trial you would

19   be presumed to be innocent, and the government would have to

02:39 20   prove your guilt beyond a reasonable doubt?

21          MS. HUFFMAN:  Yes, your Honor.

22          MR. SLOANE:  Yes, your Honor.

23          THE COURT:  Do you understand that at the trial you

24   would have the right to the assistance of counsel for your

25   defense?

 1          MS. HUFFMAN:  Yes, your Honor.

 2          MR. SLOANE:  Yes, your Honor.

 3          THE COURT:  Do you understand you would have the right

 4     to see and hear all the witnesses against you and have them

 5     cross-examined in your defense?

 6          MS. HUFFMAN:  Yes, your Honor.

 7          MR. SLOANE:  Yes, your Honor.

 8          THE COURT:  Do you understand that you would have the

 9     right, if you chose to exercise it, to testify and to put on

02:40 10     evidence in your defense?

11          MS. HUFFMAN:  Yes, your Honor.

12          MR. SLOANE:  Yes, your Honor.

13          THE COURT:  Do you understand that you would have the

14     right to require witnesses to come to court to testify in your

15     defense?

16          MS. HUFFMAN:  Yes, your Honor.

17          MR. SLOANE:  Yes, your Honor.

18          THE COURT:  Do you understand that you would have the

19     right to refuse to testify and refuse to put on evidence unless

02:40 20     you voluntarily elected to do so?

21          MS. HUFFMAN:  Yes, your Honor.

22          MR. SLOANE:  Yes, your Honor.

23          THE COURT:  Do you understand that if you decided not

24     to testify or not to put on any evidence, those facts could not

25     be used against you?

1          MS. HUFFMAN:  Yes, your Honor.

2          MR. SLOANE:  Yes, your Honor.

3          THE COURT:  Do you further understand that by entering

4    a plea of guilty here today, if I accept your plea, there will

5    be no trial, and you will have waived, or given up, your right

6    to a trial as well as the rights that come with a trial that I

7    have just described?

8          MS. HUFFMAN:  Yes, your Honor.

9          MR. SLOANE:  Yes, I do, your Honor.

02:41 10         THE COURT:  So I'll have a series of questions about

11   the plea agreement, and I'll ask each of you in turn.

12         Ms. Huffman, you've entered into a plea agreement with

13   the U.S. Attorney's Office, is that correct?

14         MS. HUFFMAN:  Yes, your Honor.

15         THE COURT:  Did you sign the agreement?

16         MS. HUFFMAN:  Yes, your Honor.

17         THE COURT:  Do I have a copy of a signed version?

18   Yes, I do, from March 27th.  Is that correct?  No, April 4th

19   you signed the agreement, is that correct?

02:42 20         MS. HUFFMAN:  Yes, your Honor.

21         THE COURT:  And did you have an opportunity to read

22   the agreement and discuss it with your lawyer before you signed

23   it?

24         MS. HUFFMAN:  Yes, your Honor.

25         THE COURT:  Does the plea agreement contain all of the

1    terms to which you have agreed?

2            MS. HUFFMAN:  Yes, your Honor.

3            THE COURT:  Do you understand the terms of the plea

4    agreement?

5            MS. HUFFMAN:  Yes, your Honor.

6            THE COURT:  Do you understand that this is the only

7    agreement you have with the United States Government?

8            MS. HUFFMAN:  Yes, your Honor.

9            THE COURT:  Has anyone made any promises or assurances

02:42 10    to you that are not in the plea agreement?

11            MS. HUFFMAN:  No, your Honor.

12            THE COURT:  Has anyone made any threats or pressured

13    you in any way to persuade you to accept this agreement?

14            MS. HUFFMAN:  No, your Honor.

15            THE COURT:  And are you pleading guilty of your own

16    free will?

17            MS. HUFFMAN:  Yes, your Honor.

18            THE COURT:  I think I'll turn back to Mr. Sloane, the

19    same series of questions.

02:43 20            And you also have entered into a plea agreement with

21    the U.S. Attorney's Office that you signed on April 5th, is

22    that correct?

23            MR. SLOANE:  That's correct, your Honor.

24            THE COURT:  And did you have an opportunity to read

25    the agreement and discuss it with your lawyers before you

1    signed it?

2              MR. SLOANE:  Yes, I did, your Honor.

3              THE COURT:  Does the plea agreement contain all the

4    terms to which you have agreed?

5              MR. SLOANE:  Yes, it does, your Honor.

6              THE COURT:  Do you understand the terms of the plea

7    agreement?

8              MR. SLOANE:  Yes, I do, your Honor.

9              THE COURT:  Do you understand that this agreement is

02:43 10   the only agreement that you have with the United States

11   Government?

12             MR. SLOANE:  Yes, I do, your Honor.

13             THE COURT:  Has anyone made any promises or assurances

14   to you that are not in the plea agreement?

15             MR. SLOANE:  No, they haven't, your Honor.

16             THE COURT:  Have anyone threatened or pressured you in

17   any way to persuade you to accept this agreement?

18             MR. SLOANE:  No, your Honor.

19             THE COURT:  Are you pleading guilty of your own free

02:44 20   will?

21             MR. SLOANE:  Yes, I am, your Honor.

22             THE COURT:  Okay.  Back to you, Ms. Huffman.  Do you

23   understand the offense to which you are pleading guilty is a

24   felony?

25             MS. HUFFMAN:  Yes, your Honor.

1        THE COURT:  Do you understand that if I accept your

2   plea you will be judged guilty of that offense?

3        MS. HUFFMAN:  Yes, your Honor.

4        THE COURT:  Do you understand that by being judged

5   guilty you may lose valuable civil rights, including the right

6   to vote in many states, the right to hold public office, the

7   right to serve on a jury, and the right to possess a gun or any

8   kind of firearm or ammunition?

9        MS. HUFFMAN:  Yes, your Honor.

02:44 10        THE COURT:  You're a United States citizen, is that

11   correct?

12        MS. HUFFMAN:  Yes, your Honor.

13        THE COURT:  Okay.  Mr. Sloane, do you understand that

14   the offense to which you're pleading guilty is a felony?

15        MR. SLOANE:  Yes, I do, your Honor.

16        THE COURT:  Do you understand that if I accept your

17   plea you will be judged guilty of that offense?

18        MR. SLOANE:  Yes, I do, your Honor.

19        THE COURT:  Do you understand that by being judged

02:44 20   guilty you may lose valuable civil rights, including the right

21   to vote in many states, the right to hold public office, the

22   right to serve on a jury, and the right to possess a gun or any

23   kind of firearm or ammunition?

24        MR. SLOANE:  Yes, your Honor.

25        THE COURT:  Are you a United States citizen?

1          MR. SLOANE:  Yes, I am, your Honor.

2          THE COURT:  So I'm going to let you sit down for a

3    minute and turn to Mr. Rosen.  If you could please state the

4    maximum possible penalties provided by law.

5          MR. ROSEN:  Judge, this is a single-count Information

6    charging conspiracy to commit mail fraud and honest services

7    mail fraud.  It provides for a maximum penalty of 20 years in

8    prison; supervised release for three years; a fine of $250,000,

9    or twice the gross gain or loss; a mandatory special assessment

02:45 10    of $100; restitution; and forfeiture to the extent charged in

11    the Information.  And I note just that the Information does not

12    charge a specific forfeiture amount or count.

13          THE COURT:  So on the forfeiture, is there any

14    allegation as to -- if I read the Information correctly, it was

15    things that have been seized already, is that correct?

16          MR. ROSEN:  That is correct and, to the best of my

17    knowledge, from neither the defendants here was anything

18    seized.

19          THE COURT:  Okay.  Under the plea agreement, the

02:46 20    government has made certain recommendations, is that correct?

21          MR. ROSEN:  We have, your Honor.  For the -- for Mrs.

22    Huffman, we've agreed essentially to recommend a total offense

23    level of 9, which would be a base offense level of 7 after --

24    sorry.  It would be a total offense level of 9 after

25    acceptance, to get the two points off.  And then there would be

1    incarceration recommendation at the low end of the guidelines

2    range, as calculated in that recommendation, which would be a

3    plea -- would be four months imprisonment; and a fine of

4    $20,000; 12 months of supervised release; special assessment of

5    $100; restitution, to be determined by your Honor; and,

6    forfeiture, but, again, there's no forfeiture.

7         With respect to Mr. Sloane, the government has

8    recommended -- the parties actually agree on this.  A total

9    offense level of 14, which would translate to a 15- to 21-month

02:47 10  range.  And the U.S. Attorney agrees to recommend incarceration

11   for a period of 12 months and one day; a fine of $75,000; 12

12   months of supervised release; a mandatory special assessment of

13   $100; restitution; and forfeiture as I've described.

14        THE COURT:  Okay.  Back to you.  Do you understand

15   that the maximum penalties that Mr. Rosen began with are

16   possible consequences of pleading guilty?

17        MS. HUFFMAN:  Yes, your Honor.

18        THE COURT:  And same question, Mr. Sloane.  Do you

19   understand the maximum possible sentence as stated by Mr.

02:48 20  Rosen?

21        MR. SLOANE:  Yes, I do.

22        THE COURT:  And do you understand that the government

23   has taken a position as to what an appropriate guideline

24   sentence would be for you under the United States Sentencing

25   Guidelines?  They've taken a position.  Do you understand that?

1      MS. HUFFMAN:  Yes, your Honor.

2      THE COURT:  And, Mr. Sloane, do you understand that

3  under your agreement you've agreed to a correct sentencing

4  guideline?

5      MR. SLOANE:  Yes, I do, your Honor.

6      THE COURT:  And do you understand that the sentencing

7  guidelines, which have been issued by the United States

8  Sentencing Commission, are guidelines for judges to consider

9  when determining the sentence but are not mandatory.  Do you

02:49 10  understand that?

11      MS. HUFFMAN:  Yes, your Honor.

12      MR. SLOANE:  Yes, your Honor.

13      THE COURT:  And do you understand that under your plea

14  agreement the government has agreed to take a position as to

15  what they will recommend to me for sentencing?  In your case,

16  Ms. Huffman, four months; and in your case -- of incarceration;

17  and in your case, Mr. Sloane, 12 months and a day of

18  incarceration.  Do you understand that?

19      MS. HUFFMAN:  Yes, your Honor.

02:49 20      MR. SLOANE:  Yes, your Honor.

21      THE COURT:  And that they've taken a position that

22  they would recommend a financial penalty of $75,000 for Mr.

23  Sloane and $20,000 for Ms. Huffman and 12 months of supervised

24  release and a special assessment of $100 for each of you, do

25  you understand that?

1          MS. HUFFMAN:  Yes, your Honor.

2          MR. SLOANE:  Yes, I do, your Honor.

3          THE COURT:  And do you understand that the government

4     will also be seeking restitution in an amount to be determined

5     by me?

6          MS. HUFFMAN:  Yes, your Honor.

7          MR. SLOANE:  Yes, your Honor.

8          THE COURT:  And do you understand that I am not bound

9     by your agreement or your positions as to the appropriate

02:50 10    guideline and that I need to make those calculations myself?

11          MS. HUFFMAN:  Yes, your Honor.

12          MR. SLOANE:  Yes, I do, your Honor.

13          THE COURT:  Do you understand that I will not be able

14    to calculate an appropriate guideline sentence under the

15    sentencing guidelines until there is a Presentence Report

16    prepared by Probation, which will include information about

17    you, your criminal history, the crimes you committed, and other

18    uncharged or dismissed conduct?  Do you understand that?

19          MS. HUFFMAN:  Yes, your Honor.

02:51 20          MR. SLOANE:  Yes, your Honor.

21          THE COURT:  And so do you understand I may consider

22    all of that information in determining your appropriate

23    guideline sentence?

24          MS. HUFFMAN:  Yes, your Honor.

25          MR. SLOANE:  Yes, your Honor.

1          THE COURT:  And I need only find the facts that are in

2     the Presentence Report to a preponderance of the evidence.  I

3     don't have to find things beyond a reasonable doubt to consider

4     them.  Do you understand that?

5          MS. HUFFMAN:  Yes, your Honor.

6          MR. SLOANE:  Yes, your Honor.

7          THE COURT:  And so under this guideline system, I have

8     to consider the appropriate guideline.  I don't need to agree

9     -- I don't need to find the same guideline the government

02:51 10    calculated.  And then beyond that, I have the authority to

11    depart from the guidelines and give you a sentence that is

12    either more or less severe than the guidelines called for; do

13    you understand that?

14         MS. HUFFMAN:  Yes, your Honor.

15         MR. SLOANE:  Yes, your Honor.

16         THE COURT:  And do you understand then that I could

17    impose a sentence that may be more severe than you anticipate?

18         MS. HUFFMAN:  Yes, your Honor.

19         MR. SLOANE:  Yes, your Honor.

02:52 20    THE COURT:  And it may be more severe than your

21    lawyers have suggested is likely to occur?

22         MS. HUFFMAN:  Yes, your Honor.

23         MR. SLOANE:  Yes, your Honor.

24         THE COURT:  And do you understand that you will not be

25    permitted to withdraw your plea of guilty if your sentence is

1    different than you expected?

2          MS. HUFFMAN:  Yes, your Honor.

3          MR. SLOANE:  Yes, your Honor.

4          THE COURT:  Okay.  The next part of the plea

5    agreement, as Mr. Rosen knows, is always a part that gives me

6    some concern, but it is a provision that the government has

7    insisted on.  So I need to make sure that you understand it.

8    And this is your appeal rights.

9          Normally, but for this plea agreement, you would have

02:53 10   the right to appeal a conviction or to argue in a future

11   proceeding, collateral or otherwise, that your conviction

12   should be set aside.  Do you understand that would normally be

13   your rights?

14         MS. HUFFMAN:  Yes, your Honor.

15         MR. SLOANE:  Yes, your Honor.

16         THE COURT:  And do you understand that, if not for

17   this plea agreement, you would normally have the right to

18   appeal any sentence I impose either on direct appeal or in a

19   future proceeding, collateral or otherwise?  Do you understand

02:53 20   that?

21         MS. HUFFMAN:  Yes, your Honor.

22         MR. SLOANE:  Yes, your Honor.

23         THE COURT:  And do you understand the following appeal

24   provisions that are in your agreement:  first, that you will

25   not challenge your conviction on direct appeal or in any other

1    proceeding; second, that you will not challenge your sentence,

2    including any order of forfeiture, restitution, fines or

3    supervised release, on direct appeal or any other proceeding;

4    and that you are giving up both of those rights?  Do you

5    understand that?

6              MS. HUFFMAN:  Yes, your Honor.

7              MR. SLOANE:  Yes, your Honor.

8              THE COURT:  And in order to determine if this is a

9    knowing and voluntary plea, I do need to make sure I understand

02:54 10    what it is that the government has exchanged for your giving up

11    your appeal rights.  It states in the agreement that there are

12    concessions.  Could you please elaborate.

13              MR. ROSEN:  I think for both of the charged defendants

14    here there's concession, while for Mr. Sloane it's a sentence

15    below the applicable guidelines.  That's a recommendation from

16    the government, as well as an insertation (ph) into the plea

17    agreement that we will not bring any further charges which in

18    this case would be both tax charges as well as money laundering

19    charges, which would add, in the typical plea agreement,

02:55 20    approximately three levels.  So it's a significant concession

21    on that one.

22              And the same applies to Ms. Huffman.  She paid from

23    her account into the Key Worldwide Charitable Foundation, and

24    so it would be -- primarily money laundering would be the

25    additional charge that would not be brought, as well as we are

1    seeking a recommendation -- the government will give a

2    recommendation at the low end of the sentencing guidelines that

3    we've calculated, which in this case would be four months.  So

4    there's multiple concessions for each defendant.

5         THE COURT:  So do I understand that what you're saying

6    is that you're not bringing charges that could increase, I

7    think you said by three levels, but at that point in the

8    guidelines, we're perhaps talking about another year or so of

9    time?  And that you're recommending, for Ms. Huffman, on the

02:56 10  low end of the guidelines, as you've calculated it, and a few

11   months less than the guideline sentence for Mr. Sloane, as

12   you've calculated it.

13        And, in return, they've given up their right to appeal

14   any sentence up to 20 years that I impose?

15        MR. ROSEN:  That is correct, your Honor.

16        THE COURT:  So there is a trade here.  They've given

17   up something.  And I will accept the appeal waiver, but I will

18   remind you that you do always, in these situations, reserve

19   your right to claim ineffective assistance of counsel or any

02:56 20  serious misconduct engaged in by the prosecutor in connection.

21   That is the one appeal right that you do still have.

22        So I think with that, that's the joint part.  I am

23   going to turn now -- I'd like to start with Mr. Sloane.  So,

24   Ms. Huffman, if you'll sit down.

25        Mr. Sloane, I'm going to go through the elements that

1    the government would have to prove if this case were to go

2    forward against you and ask the government then to make sure

3    you understand those elements.  And then I'll ask the

4    government as to what they would be prepared to prove and make

5    sure you have no disagreement with the facts needed to support

6    this charge.

7         So in a little more detail about Count 1, the only

8    count here, which is a conspiracy to commit mail fraud and

9    honest services mail fraud, at trial, the government would need

02:58 10   to be -- would need to prove that there was an agreement that

11   -- substantially as stated in the Information, that existed

12   between at least two people to defraud the University of

13   Southern California.  For the mail fraud part, it would be

14   defrauding by misrepresenting or concealing a material fact to

15   obtain money or property.  For the honest services mail fraud,

16   to defraud by misrepresenting -- to defraud the University of

17   Southern California of its right to honest and faithful

18   services of its senior associate athletic director, Donna

19   Heinel.  They would have to show that the mail, including

02:59 20   postal service or private or commercial interstate carrier, was

21   to be used in furtherance of the scheme; that you willfully

22   joined in the agreement, that is to say, that you entered the

23   agreement voluntarily and intelligently and with the specific

24   intent to defraud the University of Southern California; and

25   that at least one or more of the conspirators knowingly

1    committed an overt act in an effort to accomplish some purpose

2    of the conspiracy.

3            Is that a fair statement of the elements here?

4            MR. ROSEN:  Yes, your Honor.

5            THE COURT:  Mr. Sloane, do you understand that these

6    are the elements the government would have to prove beyond a

7    reasonable doubt in order for you to be found guilty at trial

8    as to this charge?

9            MR. SLOANE:  I do, your Honor.

02:59 10         THE COURT:  So with that, Mr. Rosen, if you could

11   please tell me what the government would be prepared to show to

12   support this charge.

13           MR. ROSEN:  Your Honor, the evidence would show,

14   through recorded telephone calls, documents, emails, and

15   witness testimony, that the University of Southern California,

16   USC, is a highly selective private university located in Los

17   Angeles.  The athletic teams of USC compete in most sports at

18   the Division I level, the highest level of intercollegiate

19   athletic sanctioned by the NCAA.

03:00 20         USC also recruits students with demonstrated athletic

21   abilities and typically apply different criteria when

22   evaluating applications from such students with the expectation

23   that recruited athletes will be contributing members of USC's

24   athletic teams once enrolled.  Typically, the Admissions

25   offices at USC allot a set number of admission slots to each

1    head coach of a varsity spot for that coach's recruited

2    athletes.  At USC, students recruited for those athletic slots

3    have substantially higher admissions prospects than

4    non-recruited students with similar grades and standardized

5    test scores.  At USC, admissions slots, the determination of

6    which students to admit, and the resulting composition of

7    undergraduate classes are important assets of USC.

8         At all times relevant to this case, Donna Heinel was a

9    senior athletics administrator at USC.  She was the Admissions

03:01 10   liaison between the USC athletic coaches and the university

11   Admissions office.  Her job was to guide legitimate student

12   athletes through the university admissions process.  Coaches

13   would provide Heinel with lists of their recruited athletes,

14   and Heinel would bring the athletic profiles and admissions

15   packets of the athletes to the university Admissions Committee

16   where she would then present them for review to the Committee.

17   Heinel was not a coach.  She had no power to recruit athletes.

18   She was simply supposed to act as a liaison, a point person

19   between the coaches and university Admissions.  Instead of

03:02 20   doing her job, Heinel accepted money, both for herself and

21   university accounts that she controlled to her benefit, to

22   designate non-recruited athletes as recruited athletes.

23        THE COURT:  Wait.  You just said -- you said something

24   there a little quickly.  Hold on a minute.

25        MR. ROSEN:  Sure.

1        THE COURT:  You said she received the money for

2    herself or she received the money -- or USC received the money?

3        MR. ROSEN:  She received the money for herself as well

4    as university accounts that she controlled for her benefit,

5    accounts that would allow her to effectively exercise power

6    over the distribution of funds and increase her employment and

7    profile within the athletic department.

8        THE COURT:  Okay.  Just so I'm clear, there were some

9    checks that went directly to her or only to USC?

03:02 10        MR. ROSEN:  There were checks that went to accounts

11    that she controlled within USC.  So it wasn't checks directed

12    to the general treasury within USC.  There were checks

13    typically directed to the USC Women's Athletic Fund.

14        THE COURT:  But that would be a corporate account of

15    USC or her individual account?

16        MR. ROSEN:  It would be a corporate account, but she

17    controlled the account, and she doled out the funds, and her

18    fund-raising benefitted her and her employment.  Then she also

19    received -- there was an agreement for $400,000, and she

03:03 20    received that in $20,000 increments beginning in 2018.  She was

21    arrested prior to receiving the full $400,000.

22        THE COURT:  But $400,000 from this defendant?

23        MR. ROSEN:  Not from this defendant, no.

24        THE COURT:  Did --

25        MR. ROSEN:  This is sort of a -- she was on -- it was

1    sort of a bribery retainer, your Honor.  She would --

2         THE COURT:  Wait, wait.  This isn't the case against

3    Ms. Heinel right now.  I'm just trying to figure out the

4    evidence against -- as to this defendant here.

5         MR. ROSEN:  Right.

6         THE COURT:  So he wrote checks.  You would be putting

7    on his case; you would have checks that he wrote.  Did he write

8    checks or have Ms. Heinel on a retainer?

9         MR. ROSEN:  He wrote two checks.

03:04 10         THE COURT:  Okay.

11         MR. ROSEN:  One to the USC Women's Athletic Program.

12         THE COURT:  Okay.  So that went to the corporate

13    account.

14         MR. ROSEN:  It went to a corporate account that she

15    controlled, and that's very important, your Honor.

16         THE COURT:  Okay.  But there's two parts of the

17    sentence there.  I'm just trying to make sure.  It's a

18    corporate account that it went to, not to her individually?

19    And then you can say -- and then let's see what happens with

03:04 20    that corporate account.

21         Presumably, for example, if she's terminated and

22    there's still a million dollars in that account, it's a

23    corporate account; USC still has the money, right?  She --

24         MR. ROSEN:  They've distributed it, I believe, to --

25         THE COURT:  Am I wrong?

1          MR. ROSEN:  -- now another charity.  It's tainted

2     funds, your Honor.  So they have not kept control over that

3     money.

4          THE COURT:  Okay.  But she didn't walk away with it.

5     I'm just trying to figure out -- so he wrote a check to USC.

6          MR. ROSEN:  Yes, to the USC Women's Athletic Program.

7     It wasn't the general funds check.  It was an account that she

8     controlled, and that's important to this scheme.

9          THE COURT:  I understand that.  But it's also -- I

03:05 10     just -- I just want to be very precise here.  If you went to

11     the bank and there was a taxpayer ID number at the bank, which

12     every bank account has, the taxpayer ID number is one assigned

13     to USC, not to Ms. Heinel, is that correct?

14          MR. ROSEN:  Correct.

15          THE COURT:  Now, something happens afterward with

16     regard to what Ms. Heinel does with the money or doesn't do

17     with the money.  Are you charging that he has knowledge of what

18     happens with that money after it hits the corporate account, or

19     are you simply saying he sent the money there as to that --

03:05 20     where he was told to send it?

21          MR. ROSEN:  Your Honor, he sent two checks:  one for

22     $50,000 to the USC Women's Athletic Program; and the second for

23     $200,000 to Singer's Key Worldwide Foundation.  And I was -- as

24     I was sort of saying, in exchange for these payments, defendant

25     understood that Heinel would falsely and fraudulently designate

1   the defendant's son as a recruit to the USC women's -- men's

2   water polo team thereby facilitating his admission to USC.  The

3   government is not aware of any direct connection between the

4   defendant and Heinel.  It was all through Rick Singer.

5           Defendant undertook numerous acts in furtherance of

6   the corrupt scheme.  As examples, on or about June 5th, June

7   16th of 2017, defendant purchased water polo gear, including a

8   ball and a cap, from Amazon.  The defendant took pictures of

9   his son in his pool to make it appear that he was a legitimate

03:06 10   player.

11          This part of the scheme was memorialized over email.

12   As just an example, on or about June 26 of 2017, defendant

13   received an email from a graphic designer bearing the subject

14   line "water polo," June 26, 2017.  The designer wrote, "We

15   researched a few water polo athlete images, and the majority

16   are cropped against a background so they can use them in

17   promotional materials, and it takes out undesirable elements

18   from the crowd.  We were able to adjust the color and complete

19   a clean extraction to mimic this look."  Defendant responded,

03:07 20   "Okay.  But any chance to put him in the setting that looks

21   like an outdoor pool?"  The graphic designer replied, "We

22   looked for a few shots yesterday but could not find one that

23   was a solid fit.  We're looking within iPhoto stock for the

24   pool BG scene.  We'll keep looking and have a few final samples

25   today."

1    Defendant then took the photos he had purchased.  On

2  June 27, 2017, the defendant emailed Singer a photograph of his

3  son purporting to play water polo, with his right arm and upper

4  torso exposed above the water line.  In the email defendant

5  asks, "Does this work?"  Singer responded, "Yes, but a little

6  high out of the water.  No one gets that high."  The next day,

7  defendant sent Singer a photograph in which his son appeared to

8  be lower in the water, with his torso and arm now mostly

9  submerged.  Defendant wrote, "Hope this works."  Singer

03:08 10  replied, "Perfect."  In both photographs, defendant's son

11  appears to be using the items defendant purchased from Amazon a

12  few weeks earlier.

13    Singer then sent the photographs to his

14  co-conspirator, Laura Janke, so that she could create a fake

15  water polo profile.  Janke responded back that she needs the

16  pertinent information to get started.  Singer emailed Sloane to

17  request biographical details to the profile.  Singer indicated

18  that the profile for USC would falsely represent Sloane's son

19  as a perimeter player who played for the Italian junior

03:08 20  national team and the LA water polo team.  The following day

21  Sloane replied with the personal information for the profile.

22    Heinel presented Sloane's son to the USC Subcommittee

23  for athletic admission in or about November 2017 as a water

24  polo player.  On or about November 16, 2017, Heinel emailed

25  Singer a conditional acceptance letter for Sloane's son

1    indicating that his admission was premised upon records that

2    indicate that he had the potential to make a significant

3    contribution to the intercollegiate athletic program.

4            Singer sent the letter to Sloane.  Less than two weeks

5    later, Singer emailed Sloane directing him to send $50,000 to

6    USC Women's Athletes, care of Donna Heinel, at 3501 Wyatt Way

7    in Los Angeles.  Singer further told Sloane that the rest of

8    the 200K would pay to our foundation a 501(3)(c) [sic] after

9    your son receives his final letter in March.  That same day

03:09 10   Sloane sent Heinel, by Federal Express, a $50,000 check payable

11   to USC Women's Athletics.

12           On or about January 29, 2018, one of Singer's

13   employees emailed Sloane an invoice from the Key Worldwide

14   Foundation charity in the amount of $200,000 and wrote, "Thank

15   you for your generous donation."  Sloane forwarded the email to

16   Singer and asked, "Hi, I believe you mentioned this would be

17   due after we received the official letter from USC in March.

18   Is that correct or did something change?"  Singer responded,

19   "We are getting everyone ready.  I am trying to get money in so

03:10 20   there's no delay as SC," meaning USC, "will call the markers in

21   very soon thereafter."

22           On or about March 22, 2018, USC mailed Sloane's son a

23   formal acceptance letter, and two weeks later, on April 11,

24   2018, Sloane wired $200,000 to Singer's charity.

25           THE COURT:  Thank you.  Mr. Sloane, did you understand

1    the facts recited by the assistant U.S. attorney?

2         MR. SLOANE:  Yes, I did, your Honor.

3         THE COURT:  There were some parts that you may or may

4    not have had direct knowledge, and there are some parts there

5    that you have direct knowledge of.  I want to focus first on

6    the parts that you have knowledge of.

7         Do you have any dispute as to the content of your

8    correspondence with Mr. Singer?

9         MR. SLOANE:  I don't dispute the contents of the

03:11 10   communication.

11        THE COURT:  And do you have any dispute as to your

12   purchasing the swim cap or other water-polo-related items?

13        MR. SLOANE:  No, I don't dispute that.

14        THE COURT:  And do you have any dispute about relaying

15   the personal facts for the profile for the application?

16        MR. SLOANE:  I don't believe I responded with any

17   actual biographical information.  I recall receiving an email

18   from Singer saying that he needed the information.  I would

19   have to check the record to see if I actually had responded to

03:11 20   that email.  It's possible.  If I did respond, I would have

21   just gave name, age, address, date of birth, that type of

22   thing.  I didn't write anything about water polo in my response

23   if I had written a response.

24        THE COURT:  Okay.  And then with regard to the

25   payments, any dispute that you sent payment to Mr. Singer's Key

1       -- I'm not going to have the name on the tip of my tongue.

2               MR. ROSEN:  Worldwide Foundation.

3               THE COURT:  The Worldwide Foundation -- that you sent

4       -- or you sent a wire of the amount that was specified both to

5       Mr. Singer's entity and also to the USC account, care of Ms.

6       Heinel?

7               MR. SLOANE:  Yes.  I sent a check to USC's Women's

8       Athletic.  At the time I was just told to address it to that

9       person's name who I had never heard of before.  And, yes, I did

03:12 10  send a wire to Rick Singer's 501(c)(3) foundation.

11              THE COURT:  Okay.  Then are you guilty of the counts

12      -- count charged here?

13              MR. SLOANE:  Yes, your Honor.

14              THE COURT:  And, Counsel, is there any reason the

15      Court should not take a change of plea?

16              MR. HOCHMAN:  No reason, your Honor.

17              THE COURT:  Why don't you take the plea itself.  So

18      with that, would the clerk please take the plea.

19              THE CLERK:  Devin Sloane, do you waive a full reading

03:13 20  of the Information?  Yes or no.

21              MR. SLOANE:  Yes, I do.

22              THE COURT:  United States Attorney charges you with an

23      Information, Count 1, conspiracy to commit mail fraud and

24      honest services mail fraud, all in violation of Title 18 United

25      States Code Section 1349.  How do you plead to Count 1, guilty

1    or not guilty?

2              MR. SLOANE:  Guilty.

3              THE CLERK:  Thank you.

4              THE COURT:  The Court finds the defendant, Devin

5    Sloane, is fully competent and capable of entering an informed

6    plea, that he is aware of the nature of the charges and the

7    consequences of the plea, and that the plea of guilty is a

8    knowing and voluntary plea, supported by an independent basis

9    in fact, containing each of the essential elements of the

03:14 10   offense charged.  The plea is accepted, and the defendant is

11   now judged guilty of this offense.

12             And you may sit down for now.

13             Ms. Huffman, your turn.  Count 1 charges you also with

14   conspiracy to commit mail fraud and honest services mail fraud,

15   in violation of 18 U.S.C. Section 1349.  At trial, the

16   government would have to prove that there was an agreement

17   substantially as stated in the Information that existed between

18   at least two people to defraud the College Board; the mail

19   fraud part, to defraud by misrepresenting or concealing a

03:15 20   material fact to obtain money or property; for the honest

21   services mail fraud, to defraud by misrepresenting or

22   concealing a material fact the College Board of its right to

23   the honest and faithful services of its examination

24   administrator, Igor Dvorskiy, and an examination proctor, Mark

25   Riddell.  Mail, including postal service or any private or

1    commercial interstate carrier, was to be used in furtherance of

2    the scheme to defraud; that you willfully joined in that

3    agreement, that is to say, you entered the agreement

4    voluntarily and intelligently with the specific intent to

5    defraud the College Board; and that at least one or more of the

6    conspirators knowingly committed an overt act in an effort to

7    accomplish some purpose of the conspiracy.

8         Do you understand that these are the elements the

9    government would have to prove beyond a reasonable doubt in

03:16 10   order for you to be found guilty at trial as to this charge?

11         MS. HUFFMAN:  Yes, I do, your Honor.

12         THE COURT:  And, Mr. Rosen, if you could please state

13    the factual basis for the plea, that is, what the government

14    would be prepared to prove if the case were to go to trial.

15         MR. ROSEN:  Your Honor, the evidence would show,

16    through recorded telephone calls, in-person recorded meetings,

17    documents, emails, and witness testimony, that the College

18    Board is a nonprofit organization headquartered in New York.

19    Together, with Educational Testing Services, ETS, the College

03:16 20   Board develops and administers the SAT, a standardized test

21    used as part of the college admissions process.

22         The SAT is now scored on a scale of 400 to 1600, with

23    1600 being a perfect score.  A score of 1400 or above is in the

24    top 6 percent.  The SAT exams are sent to and from testing

25    sites via common interstate carriers, such as Federal Express

1   or UPS.

2          The College Board and ETS used paid test

3   administrators to administer the exams, and these test

4   administrators owe fiduciary duties to the College Board and

5   ETS as part of the test administration process.  Prior to

6   administering the SAT exam, test administrators must typically

7   certify they will administer the test in accordance with the

8   SAT coordinator's manual; that the SAT is the property of the

9   College Board; and that no one other than the student can open

03:17 10   the test book and see the test content.  The SAT exams and the

11   scores students earn on these exams are the physical property

12   of the College Board.

13          Defendant, Felicity Huffman, is a resident of Los

14   Angeles, California.  Huffman conspired with Rick Singer, Mark

15   Riddell, Igor Dvorskiy -- and that's D-v-o-r-s-k-i-y -- and

16   others to commit mail fraud and honest services mail fraud

17   through her participation in a scheme to cheat on the SAT in

18   order to obtain an artificially high score for her daughter

19   that would later be used as part of your daughter's college

03:18 20   applications.

21          Huffman's participation in the scheme worked as

22   follows:  In the summer of 2017, Singer told Huffman that he

23   controlled a testing center by means of a corrupt test

24   administrator, Igor Dvorskiy, and that he could arrange for a

25   third party, Mark Riddell, to purport to proctor her daughter's

1    SAT exam and secretly correct her answers afterward.  Huffman

2    agreed to the plan.

3         The SAT exam is traditionally given over one day.

4    Singer's scheme required that participating families obtained

5    100 percent extra time on the SAT exam so that the exam could

6    be administered over multiple days.  If the exam was

7    administered over multiple days, the students could switch the

8    exam location and take the exam at what they call a

9    school-based test center, such as Dvorskiy's West Hollywood

03:19 10   College Prep in West Hollywood, California.

11         Typically, 100 percent extra time was obtained by

12   first engaging the services of a psychologist who would

13   document a child's learning disabilities or purported learning

14   disabilities, then this documentation would be submitted to the

15   College Board for evaluation.  If the College Board agreed with

16   the diagnosis, extra time would be granted.

17         Here, in October of 2017, Huffman's daughter received

18   a letter advising her that she had been approved for 100

19   percent extra time.  Huffman forwarded the letter to Singer.

03:19 20   Huffman's daughter's high school in Los Angeles had made plans

21   to administer the SAT themselves on December 4th and 5th, 2017.

22   Huffman agreed with Singer to switch the testing site from

23   Huffman's daughter's high school to Singer's test center, which

24   he controlled through making bribe payments to Dvorskiy.

25   Huffman wrote in an email to Singer, "Ruh ro.  Looks like my

1    daughter's high school wants to provide own proctor."  Singer

2    responded, "We will speak about it."

3         Singer then worked with Dvorskiy over the next month

4    to complete the paperwork to move Huffman's daughter's exam to

5    West Hollywood College Prep in preparation for the December 2,

6    2017, SAT.  On or about December 1st of 2017, Mark Riddell, who

7    has pled guilty before Judge Gorton, flew from Tampa to Los

8    Angeles.  Riddell was the purported proctor who agreed, in

9    exchange for $10,000, to correct students' answers after the

03:20 10   exam in order to achieve a higher score.

11        On or about December 2, 2017, Riddell purported to

12   proctor Huffman's daughter's SAT exam at West Hollywood.

13   Riddell corrected the exam's answers after Huffman's daughter

14   completed the exam and left the building.  The next day Riddell

15   returned to Tampa.  Huffman's daughter received a score of 1420

16   on the SAT, which was obtained through the cheating scheme

17   described above.

18        On December 19th of 2017, Singer, through his fake

19   charity, the Key Worldwide Foundation, paid Dvorskiy $40,000

03:21 20   for administering the SAT exam to Huffman's daughter and three

21   other students.

22        On December 27, 2017, the Key Worldwide Foundation

23   paid Riddell $35,000 for helping to cheat on the exam of

24   Huffman's daughter and exams for several other clients of

25   Singer.

1        On or about February 27th of 2018 --

2        THE COURT:  Can I just interrupt you there for a

3    minute on these total dollar amounts?

4        MR. ROSEN:  Correct.

5        THE COURT:  Am I understanding that the numbers you're

6    giving me are combined for Ms. Huffman's daughter and several

7    other individuals?

8        MR. ROSEN:  Yes.  In December of 2017, Mark Riddell

9    took -- you know, corrected the exam answers for multiple other

03:22 10    students, and Singer paid him a lump sum.  So it's not possible

11    to just say that the money was just for Ms. Huffman's daughter.

12        THE COURT:  Okay.  But what we do know is that the

13    amounts that Ms. Huffman paid is less than the amounts you were

14    just saying here, correct?

15        MR. ROSEN:  That is correct, your Honor, absolutely.

16        THE COURT:  How much is the amount that you contend

17    that Ms. Huffman paid?

18        MR. ROSEN:  Well, we know that she paid, on February

19    27 of 2018, a purported contribution of $15,000 to the Key

03:22 20    Worldwide Foundation.  On or about March 21 of 2018, about

21    three weeks later, Steve Masera, who is Singer's bookkeeper,

22    sent a letter afterwards thanking her for the purported

23    donation and falsely stating, "It will allow us to move forward

24    with our plans to provide educational and self-enrichment

25    programs to disadvantaged youth."  The letter also falsely

1     stated that "no goods or services were exchanged for the

2     $15,000."

3            THE COURT:  Do I -- so when you calculate the

4     guidelines as being a gain or loss that's more than 15,000, is

5     there other evidence besides the 15,000 payment that you're

6     using in that calculation?

7            MR. ROSEN:  Yes, there is, your Honor.  What I would

8     consider to be a minor dispute amongst the parties is the

9     amount that was at first agreed upon between Singer and

03:24 10     Huffman.  I think Mr. Singer would state that the amount was

11     $25,000, which is generally in line with what other people paid

12     for the exam.  I think Ms. Huffman -- I don't want to speak out

13     of turn for her -- I believe thought the amount was $10,000,

14     and, ultimately, they arrived at a $15,000 amount.  But any

15     dispute --

16            THE COURT:  Wait, wait.  When you say, "Ultimately,

17     they arrived at 15,000," they being Ms. Huffman and Mr. Singer

18     or they being your investigators?

19            MR. ROSEN:  They being Ms. Huffman and Mr. Singer.

03:24 20     That's -- the evidence for that, obviously, is the check that

21     was sent from Ms. Huffman to Mr. Singer.

22            THE COURT:  With regard to the evidence you have -- if

23     I understand, if this were to go to trial, the evidence you

24     have is that you have a witness who would say that there was an

25     agreement for a larger amount of money but that, ultimately,

1    the amount that was -- the agreement was reached on was the

2    15,000?

3          MR. ROSEN:  I would say that there was -- I think he

4    would say -- and, again, I think it's early to discuss the

5    sentencing aspect.  But he would say that the amount originally

6    that he had told them -- he had told Ms. Huffman was $25,000,

7    which is in line with what other parents would pay.

8          THE COURT:  I understood that.  But at the end of the

9    day, even that was the original sale price, the contractual

03:25 10   sale price at the end of the day you would be proving would be

11   15,000, is that --

12         MR. ROSEN:  I think he would say he took $15,000.

13   But, of course, the mail fraud, it's the -- it punishes the

14   scheme and not the end result.  So I think our position would

15   be that it's the original $25,000 that drives the loss amount.

16   I'm sure Mr. Murphy will make a different --

17         THE COURT:  As you said, we're not discussing the

18   sentencing.  I'm just trying to get the facts.  The facts that

19   we have here that you would be prepared to prove is that there

03:26 20   was an agreement and that the agreement was, putting your

21   evidence in, would be a witness saying it was an agreement for

22   a larger amount but that the amount that was finally agreed

23   upon was the 15,000; is that fair?

24         MR. ROSEN:  I would say the amount that was finally

25   paid was the 15,000, your Honor, yes.

1        THE COURT:  Okay.  I may have interrupted you.  Was

2   there anything further?

3        MR. ROSEN:  No.  I'm done, your Honor.

4        THE COURT:  Okay.  Ms. Huffman, did you understand the

5   facts recited by the assistant U.S. attorney?

6        MS. HUFFMAN:  Yes, your Honor.

7        THE COURT:  Do you have information, other than what

8   the -- accepting the government's facts, but do you have any

9   independent information as to the total bundled amount that Mr.

03:27 10   Riddell received for taking the test?

11        MS. HUFFMAN:  Me?  No, no, your Honor.

12        THE COURT:  I'm just going to ask you about your part

13   of the payment.

14        MS. HUFFMAN:  Okay.

15        THE COURT:  With regard to that, do you have any

16   dispute that you reached an agreement and ultimately paid Mr.

17   Singer $15,000 to enable Mr. Riddell to change your daughter's

18   -- or correct your daughter's test, SAT test?

19        MS. HUFFMAN:  No, your Honor.

03:28 20        THE COURT:  And do you have any dispute as to the

21   content of the emails that went back and forth or your

22   communications with Mr. Singer?

23        MS. HUFFMAN:  No, your Honor.

24        THE COURT:  And with regard to the extra time that was

25   obtained, would the government be prepared to prove that the

1      extra time was inappropriately awarded or simply that it was

2      extra time that enabled it to happen?

3           MR. ROSEN:  Not in this case.  We wouldn't say it was

4      inappropriately awarded, your Honor.  There were other cases

5      where it was, and we would -- it's not directly -- I don't want

6      to say it's not relevant.  It is relevant to the case.  But the

7      crime as charged here is the SAT/ACT cheating scheme.

8           THE COURT:  So you're not making -- as part of what

9      you're claiming here, you're not claiming that Ms. Huffman

03:29 10   improperly obtained additional time for her daughter.  It's

11     what happened during the additional time.

12          MR. ROSEN:  I put that in simply to show your Honor

13     how the scheme was to operate, both for this case and the other

14     cases that are coming on, just why they needed those two days

15     of testing as opposed to simply the single-day testing where

16     they would have to take it at what they call a national test

17     center, which is a -- when you take it in a room either -- you

18     know, with many other people, that type of thing.

19          THE COURT:  Okay.  So the facts here that I'm

03:29 20   interested in are specifically the -- making the payment so

21     that Mr. Riddell could correct the test.  You have no

22     disagreement with those facts, is that correct?

23          MS. HUFFMAN:  I would like to clarify two points if

24     that's all right.

25          THE COURT:  Certainly.

1        MS. HUFFMAN:  My daughter has been -- or we have been

2    working with a neuropsychologist since my daughter was eight

3    years old, and she began receiving extra time on tests since

4    she was 11.

5        THE COURT:  I think that's what just was clarified

6    here.  Maybe that wasn't clear.  But I was trying to understand

7    because part of that extra time was being included in the

8    story.  And I think Mr. Rosen confirmed that they're not

9    accusing of wrongdoing with regarding the extra time.

03:30 10        MS. HUFFMAN:  I just didn't want the -- sorry, your

11    Honor.

12        THE COURT:  Go on.

13        MS. HUFFMAN:  I just didn't want to create the

14    impression that the neuropsychologist had any part in this

15    because she, like my daughter, didn't know about my involvement

16    with Mr. Singer.

17        THE COURT:  Okay.  I appreciate that.

18        You said there was two clarifications.  Is there --

19        MS. HUFFMAN:  I think -- sorry, sorry.

03:30 20        I think you covered it.  It was that I don't -- I had

21    no knowledge of money that Mr. Singer paid Mr. Riddell or Mr.

22    Dvorskiy.  I just had no knowledge of it.  But everything else

23    that Mr. Rosen said I did, I did.

24        THE COURT:  Okay.  Thank you.

25        With that, are you, in fact, guilty of the count

1    charged?

2              MS. HUFFMAN:  Yes, I am, your Honor.

3              THE COURT:  And to counsel, is there any reason the

4    Court should not take the change of plea?

5              MR. MURPHY:  No, your Honor.

6              THE COURT:  So with that, if the clerk can take the

7    plea, please.

8              THE CLERK:  Felicity Huffman, do you waive a full

9    reading of the Information?  Yes or no.

03:31 10            MS. HUFFMAN:  Yes.

11             THE CLERK:  The U.S. Attorney charges you with an

12   Information, Count 1, conspiracy to commit mail fraud and

13   honest services mail fraud, all in violation of Title 18 United

14   States Code Section 1349.  How do you plead to Count 1, guilty

15   or not guilty?

16             MS. HUFFMAN:  Guilty.

17             THE CLERK:  Thank you.

18             THE COURT:  The Court finds the defendant is fully

19   competent and capable of entering an informed plea, that she is

03:32 20   aware of the nature of the charges and the consequences of the

21   plea and that the plea of guilty is a knowing and voluntary

22   plea, supported by an independent basis in fact, containing

23   each of the essential elements of the offense charged.  The

24   plea is, therefore, accepted, and the defendant is now judged

25   guilty of the offense.  You may sit down.

1          So some of this I touched on earlier, but I'll just go

2     through one -- the last part of this, which is the presentence

3     investigation and report.  A written report will be prepared by

4     the Probation Office to assist me in determining your sentence.

5     You will be asked -- you may already have met with the

6     probation officer to give information for the report.  Your

7     attorney may be present if you wish.

8          It's very important that the report is accurate.  It

9     will not only affect what sentence you receive, but it also

03:33 10   affects what happens to you after you're sentenced.  For

11    example, if you're sent to prison, it will affect where you're

12    sent, what happens to you there.  So even minor mistakes should

13    be corrected.  You'll have a chance to read the report, as will

14    your counsel, and to file objections to it before the time of

15    sentencing.

16         It has been my practice, consistent with the Rules of

17    Criminal Procedure, to meet with the probation officer and

18    receive from them a specific sentencing recommendation that

19    would not be based on any facts that are not in the Presentence

03:33 20   Report.  If I do that, I do not disclose that to either side.

21    However, I will not have that ex parte conversation if either

22    side objects.  So if you do have any objection to my meeting

23    with the probation officer regarding a recommended sentence,

24    you should let my courtroom deputy know no later than the date

25    your objections to the Presentence Report are due.

1              At sentencing, you and your counsel will have the

2     opportunity to speak on your behalf at the time of sentencing.

3              I would just say, I do my plea colloquy a little

4     differently, I think, than some of my colleagues.  I don't find

5     it the appropriate time to really delve into people's thinking

6     and justifications and explanations and intentions.  I think

7     those are things that there's a lot of time to ponder between

8     now and sentencing.  But it is certainly something that I am

9     more interested in hearing about as you wish or your counsel

03:35 10   wish at the time of sentencing.

11             So with that, I refer you to the Probation Office for

12    the Presentence Report.  Have you had a chance to meet already,

13    or you've set up times?

14             THE PROBATION OFFICER:  Yes.  I spoke with both

15    counsel and we've arranged times.

16             THE COURT:  Thank you.

17             Do we have dates for sentencing?  So sentencing for

18    Ms. Huffman, September 13 at 2:30; and Mr. Sloane, September

19    10th at 2:30.

03:35 20         And under my scheduling order, sentencing memorandum

21    should be filed a week before.  If you're unable to do so at

22    that time, you need to let the clerk know.

23             Any objections to maintaining the current conditions

24    of release?

25             MR. ROSEN:  No objection, your Honor.

1    THE COURT:  So I just remind you you're under the same

2    conditions as before, and any -- if -- on release, if you

3    commit a felony, federal felony, it's punishable by a

4    additional prison term; federal misdemeanor, also prison term

5    consecutive to any other sentence you receive.  And if you

6    knowingly fail to appear, you may be prosecuted for that.

7    So do we have a signed -- I'm going to let you deal

8    with whatever paperwork needs to be done.

9    I think that's it.  Is there anything else?

03:36 10    MR. MURPHY:  No, your Honor.

11    MR. ROSEN:  No, your Honor.

12    MR. HOCHMAN:  No, your Honor.

13    THE COURT:  See everyone in September.

14    ALL:  Thank you, your Honor.

15    THE CLERK:  Court is in recess.  All rise.

16    (Whereupon, at 3:36 p.m. the hearing concluded.)

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4           I certify that the foregoing is a correct transcript

5    of the record of proceedings in the above-entitled matter to

6    the best of my skill and ability.

7

8

9

10

11

12    /s/Cheryl Dahlstrom

13    Cheryl Dahlstrom, RMR, CRR

14    Official Court Reporter

15

16    Dated:  May 15, 2019

17

18

19

20

21

22

23

24

25