# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 19-CR-10117-IT |
| | ) | |
| DEVIN SLOANE | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANT DEVIN SLOANE'S SENTENCING MEMORANDUM

Defendant Devin Sloane respectfully submits this Memorandum to the Court in preparation for his sentencing on September 24, 2019.

## I.       INTRODUCTION

There is an old adage that there are two types of individuals who commit crimes: good people who make mistakes and bad people who get caught.  Devin Sloane ("Mr. Sloane" ) manifestly falls in the former category as a good person who made mistakes -- accepted full responsibility for them, entered into a plea agreement with the government at the first opportunity to do so without the benefit of any government discovery, and pleaded guilty within days after being charged.  Mr. Sloane, 53 years old, has no prior criminal record, and with the exception of his involvement in the instant offense conduct, has led an extraordinarily honest, law-abiding, productive, hard-working, philanthropic, and community and family-centered life.

Mr. Sloane's life started at the bottom with a dysfunctional family upbringing, raised at times in poverty by a single mother and then by a verbally and emotionally abusive stepfather. From that

difficult beginning, he persevered through hard work and 14-hour days starting in high school, creating and growing over the past 35 years multiple businesses in the car wash, oil and gas, and water fields. During those 35 years, Mr. Sloane has pursued his goals and achieved his success always with an eye toward looking out for the welfare of others. From standing up to a bully on the playground in grade school to helping a defenseless fellow student to consistently coming to the aid of friends, employees and strangers in emotional and financial need, helping support the building of a hospital for the poor in rural India, developing water projects for villages in Central America, and supporting UNICEF and the Special Olympics including sponsoring the entire 157-member Italian Special Olympics team in Los Angeles, Mr. Sloane has, without hesitation, continuously engaged in extraordinary good works for others, often unseen, and never seeking the limelight.

Notwithstanding his professional and charitable accomplishments, Mr. Sloane views his most important role as a husband to his wife Cristina for almost 21 years and as a father to his four children. It was in his role as a father where Mr. Sloane, trying to do all he could to help his oldest son  through the college admission process, crossed the line, committed a crime, and will have to live with the shame of being branded with a "Scarlet F," a convicted felon for the rest of his life.

While it took over 35 years to build a stellar reputation as a businessman and community member with the highest ethics, integrity, and dedication to the well-being of his employees, the community and the world around him, it only took days to destroy that reputation. Since March 12, 2019, the day Mr. Sloane was arrested by over a dozen armed FBI agents at his home in front of his family and the story about this case broke, he has been unceasingly pilloried nationally and internationally on TV, radio, newspapers, magazines, podcasts, and all over social media. Mr. Sloane is not someone who ever sought publicity. Nevertheless, there have been over 72.5 million hits on Google concerning this case, virtually all of which, when mentioning Mr. Sloane, have castigated and heaped vitriolic scorn on him

for his actions. This prosecution and publicity have brought tremendous shame to Mr. Sloane, which he forthrightly accepts for the actions he engaged in, but it has also unfairly caused severe shame and harm to his family. The very son he misguidedly sought to help through this scheme now has an indelible black question mark on his record forever, a stain for which Mr. Sloane is solely responsible.

As Mr. Sloane has stated in his letter to the Court:

> [W]hile I have always sought to nurture and shepherd him [his oldest son Matteo], in this case, I failed miserably by doing too much, going too far, and crossing the line. I lost sight of my path. My moral compass wasn't strong enough. I compromised my value system and ignored my intuition. What I did here was the antithesis of what I set out to do. I did something that was wrong and illegal, and I sent the worst possible message to my son.
> . . .
> When I returned home [after being arrested], my son was standing in the kitchen with tears rolling down his face because of what I had done. He said: "Why didn't you believe in me? Why didn't you trust me?" He told me that I didn't need to do any of this, and that he would have been happy to go to any schools that had accepted him.  I was devastated by the hurt I had brought him and will forever carry the scar of the memory of those tears on his face.

The Probation Officer has calculated a total offense level of 5 (base offense level of 7 minus 2 levels for acceptance of responsibility), a criminal history category of I, and an advisory guideline sentencing range of 0-6 months. Presentence Report ("PSR" ¶¶ 93, 150). In the Court's Memorandum and Order dated September 13, 2019, it has agreed with the base offense level of 7.  Doc. 443 at *6.

Pursuant to the plea agreement, the parties agreed to a total offense level of 14. The plea agreement acknowledges "the Court is not required to follow this calculation." With a total offense level of 14 and a criminal history category of I, the advisory guideline range would be 15-21 months. The government has agreed to recommend a variance under this 15-21 month range to 12 months and a day, one year of supervised release, and a fine of $75,000.

Mr. Sloane respectfully submits that under all the factors set forth in 18 U.S.C. § 3553(a), instead of a sentence of additional incarceration, a sentence of time served followed by 3 years (instead of 1 year) of supervised release with conditions including up to 2,000 hours of community service and a

$75,000 fine[1] ("Recommended Sentence")[2] is "sufficient but not greater than necessary" to achieve all the aims of sentencing. Regarding community service, Mr. Sloane requests the Court order him to serve up to 2,000 hours of community service through the Special Olympics by planning, structuring, and implementing a new, cutting-edge program, the Unified Sports Initiative, described in detail below. Rather than have Mr. Sloane spend his time unproductively behind bars, he requests that he be allowed to make amends directly to society for his transgressions by using his skill set to transform lives of students with special needs and intellectual disabilities and students in independent schools, their parents, and their communities through the Unified Sports Initiative.

This case demonstrates in a compelling way why the Supreme Court rejected mandatory application of the Sentencing Guidelines and returned discretion to the district court "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted). The statutory factors supporting the Recommended Sentence are outlined below. Among other factors in this case:

● With respect to the history and characteristics of the defendant, Mr. Sloane is a 53-year-old husband and father of four children, ages 4 to 20, with no criminal history and, except for the conduct in this case, has led an exceedingly honest, ethical, productive, law-abiding, charitable, and family- and community-oriented life.  As the over 40 letters from family, friends, employees, colleagues, and charitable organizations uniformly attest, Mr. Sloane started with little and built his professional and communal accomplishments over the last three decades based on the principles of hard work, compassion

---

[1] The guideline range for a fine under § 5E1.2 for an offense level of 5 is $500 to $9,500.  Mr. Sloane will concur in the government's recommendation of a $75,000 fine which is approximately 7 to 150 times greater than the fine range.

[2] Additional conditions of supervised release are discussed further in the Under Seal Exhibits filed herewith.

and kindness, and a strong moral responsibility for improving the lives of others. The illicit actions that he undertook here are completely aberrational compared to how he has conducted his life.

● The collateral consequences to Mr. Sloane for his misconduct have already been severe. Having not sought publicity in his life, he has been vilified throughout the country and the world in every form of media. Mr. Sloane's reputation built over a lifetime has been irreparably damaged; key employees at his business have resigned; his financial institution has closed his accounts; he will be a convicted felon for the rest of his life with all the restrictions that imposes; and most importantly, he has brought shame and disgrace to his family, the very people he cares most about and wants to protect – but failed to do so.

● With respect to the nature of the offense, Mr. Sloane very timely and fully accepted responsibility for his illegal actions by entering into a plea agreement with the government at the earliest opportunity without seeing any discovery and then pleading guilty to the charge of conspiracy related to his illegal actions in a one-count Information within days of the charge being filed. As the evidence has made clear, however, the actions that Mr. Sloane was involved with represent only a small subset of those outlined in the conspiracy charged. While the conspiracy and related conspiracies have charged over 30 other parents, Mr. Sloane had no involvement with any of them. While the conspiracy charged two schemes, one centered on college entrance exam cheating and another involving college athletic recruitment, Mr. Sloane had no involvement with the former scheme nor any of the individuals in the Singer organization involved with that scheme. While the conspiracy and related conspiracies charged as victims the educational testing services and eight universities, Mr. Sloane had no involvement with any university other than USC.

● The evidence also makes clear how Mr. Sloane came to be involved with Singer in the conspiracy. The full context of evidence over a two-year period shows Mr. Sloane did not seek to commit

5

a crime and found Singer to accomplish it. Instead, Singer, a world-class schemer and manipulator, targeted, manipulated, and slowly and deliberately lured Mr. Sloane into the conspiracy. Singer came highly recommended to Mr. Sloane from a prominent businessman and a lawyer who had used him. Singer carefully cultivated the image to Mr. Sloane that he was the most experienced and successful college counselor in the country. After gaining Mr. Sloane's trust over a year by providing his son with legitimate tutoring and college counseling services, Singer proposed submitting fraudulent water polo information to get his son into USC. The line between truth and falsity was drawn, and unfortunately and very regretfully, Mr. Sloane knowingly crossed it. Once crossed, he continued following Singer's directions, made payments to USC of $50,000 and Singer's foundation of $200,000 to facilitate his son's admission into the university, and lied about it to those who asked questions. Though Mr. Sloane fully admits committing the crime, the record speaks very clearly that but for Singer coming into his life, there is absolutely no indication that Mr. Sloane would have participated in any scheme to defraud USC or any other university.  There was no need to defraud since his son received admission letters from three other universities, including a merit-based scholarship, without any improper help from Singer.

● In assessing the harm caused by Mr. Sloane's actions, the Court has found that USC did not suffer any monetary loss under the sentencing guidelines. USC itself has agreed that it did not suffer any monetary loss. On September 13, 2019, the government informed defense counsel that USC does not intend to seek restitution from Mr. Sloane. This is consistent with the fact that Mr. Sloane never intended to harm USC and has, in fact, paid USC in full for his son's tuition, room and board and made a $50,000 donation to USC that USC has never returned.

● There is no evidence at all that a sentence of imprisonment is required to specifically deter Mr. Sloane from committing future crimes nor is there any evidence that he poses a risk to the public for future criminal conduct.

- The sentencing guideline range as determined by the Court will be 0-6 months in Zone A. As a first-time, non-violent offender, the policy statements of the Sentencing Commission and Congress indicate that a non-incarceration sentence is appropriate. *See, e.g.,* 28 U.S.C. § 994(j).

- The sentence of imprisonment is not necessary to avoid unwarranted sentencing disparities with those convicted of similar conduct. For those sentenced in the 0-6 month range, statistical evidence is clear that the overwhelming majority of such defendants nationally and in this district are sentenced to non-incarceration sentences. While each side can find anecdotal cases supporting its position, the two cases sentenced to date in connection with the "Operation Varsity Blues" investigation ranged from time served, six months of home detention and two years of supervised release for John Vandemoer (the Stanford sailing coach involved in the college athletic recruitment scheme facing a 27-33 month guideline range having received $610,000 in payments) to 14 days, 250 hours of community service, and one year of supervised release for Felicity Huffman (a parent involved in the college entrance exam cheating scheme, looking at a 0-6 month range having made a $15,000 payment). Here, Mr. Sloane, a parent involved in the college athletic recruitment scheme facing a 0-6 month range having made a $250,000 in payments, the Recommended Sentence which includes time served, three years of supervised release, up to 2,000 hours of community service and other conditions[3] falls squarely within the spectrum of sentences imposed for similarly situated defendants.

- A sentence of imprisonment is not needed to provide general deterrence. If a person contemplating committing this crime in the future would not be deterred by the punishment Mr. Sloane has already received – being a life-long convicted felon, destruction of his life's reputation, enormous shame and disgrace heaped on his family, tremendous negative media coverage, significant damage to his business and financial relationships, FBI arrest at his home in front of his family – and the punishment

---

[3] *See* Defendant Devin Sloane's Under Seal Exhibits filed herewith.

he were to receive from the Recommended Sentence of three years' supervised release, up to 2,000 hours of community service and other conditions, then there is very little an additional term of imprisonment would do to deter that person. Stated differently, the Recommended Sentence obligates Mr. Sloane to serve the community directly for the next 3 years for up to 2,000 hours (essentially 2-3 days every week, full-time, for 3 years) by implementing a new Special Olympics program to benefit thousands of students in independent schools and those with special needs and intellectual disabilities. The Recommended Sentence is "sufficient, but not greater than necessary," to comply with the statutory goals of sentencing. 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

## II.   PRESENTENCE REPORT AND COURT'S MEMORANDUM AND ORDER

Under Rule 32 of the Federal Rules of Criminal Procedure, the Probation Office conducted an independent investigation and determined the base offense level was offense level 7 under USSG §§ 2X1.1(a), 2B1.1(a)(1). (PSR ¶ 84). The Probation Officer applied no enhancement for loss under § 2B1.1(b) as she determined there was "no evidence of actual financial loss or reasonably foreseeable pecuniary harm to USC, which was deprived of the honest services of its coaches and of the intangible right to control its own assets." (PSR ¶ 85).[4] Under § 3E1.1, the Probation Officer decreased the offense level by two levels based on Mr. Sloane's acceptance of responsibility for the offense, resulting in a total offense level of 5. (PSR ¶ 93). With a criminal history score of zero based on having no prior criminal

---

[4] The Probation Officer noted the Court may wish to consider whether an upward departure is warranted based on the offense level substantially understating the seriousness of the defendant's offense. (PSR ¶ 167). If the Court were to upwardly depart 3 levels to an offense level of 8, the guideline range would remain the same at 0-6 months, allowing the Court the option to sentence Mr. Sloane to the Recommended Sentence with additional conditions proposed in Defendant's Under Seal Exhibits filed herewith.

history, Mr. Sloane's criminal history category was I. (PSR ¶ 98). At a total offense level of 5, criminal history category of I, the guideline range is 0-6 months in Zone A. (PSR ¶ 150).

Under the plea agreement, the parties differ from the Probation Officer as they have stipulated to a 10-level enhancement under § 2B1.1(b)(1)(F) ( gain or loss from the offense of conviction more than $150,000 but not more than $250,000). The plea agreement acknowledges "the Court is not required to follow this calculation," and the Court has not. In its Memorandum and Order dated September 13, 2019, the Court found the base offense level should be a level 7 with no enhancements. Doc. 443 at *6. If the Court agrees with the Probation Office that Mr. Sloane accepted responsibility, then the total adjusted offense level will be level 5 for a guideline range of 0-6 months and a fine range of $500-$9,500.

**III.     ANALYSIS OF SENTENCING FACTORS**

The Court must impose a sentence consistent with the mandate of 18 U.S.C. § 3553(a). The "overarching provision" of 18 U.S.C. § 3553(a) is to impose a sentence "sufficient, but not greater than necessary" to meet the goals of sentencing established by Congress. *Kimbrough*, 552 U.S. at 101. The statutory goals include for the sentence "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." *Id.*; *see* 18 U.S.C. § 3553(a). In determining the appropriate sentence, the statute provides that the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution." *Id.*

If a sentence other than imprisonment would be sufficient to meet the statutory goals of sentencing for a first-time, non-violent offender, then the Court *must* impose such an alternative because imprisonment would be a "greater than necessary" sentence.  28 U.S.C. § 994(j) ("the guidelines reflect the general appropriateness of imposing a sentence **other than imprisonment** in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.") (emphasis added);  Pub. L. No. 98-473, § 239, 98 Stat. 1837 (1984) (Congress reasoned that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service.)[5]  Under an analysis of all Section 3553(a) factors, the Recommended Sentence is "sufficient but not greater than necessary" to accomplish all of sentencing's goals.

A.      **History and Characteristics of the Defendant (§ 3553(a)(1))**

The history and characteristics of Devin Sloane ("Devin") portray a person who started out in a very troubled environment, learned very early on about the principles of hard work, compassion for others, and love of family, friends and community, and achieved professional and communal success by applying these principles. Deeply embedded are the ideals of moral responsibility for those less fortunate, fairness, doing the right thing the right way, and leading by example. That is why his actions in this case stand in such stark contrast to all he has done and stood for during his life and represent such an aberration to a life otherwise very well lived.

1.      **Mr. Sloan Grew Up in a Dysfunctional Family, Abandoned by his Father, and Raised by a Single Mother Struggling to Pay for Food and Rent**

Devin was born in March 1966 in Los Angeles, California, into a dysfunctional family. His parents were constantly fighting, and his father drank heavily and was not faithful. By the time he was 3,

---

his father moved out of the house; by the time he was 6 and his older brother Lance was 9, his father abandoned them and their mother Gloria. Gloria, who had been a professional ice skater before he was born, did not work at the time, and the father provided no financial support. As a result, frequently during the next several years Gloria did not have enough money to buy food. One of Devin's earliest childhood memories from those times was going to McDonalds with his mother and Lance where they would buy what they could afford: a single Big Mac split three ways. Other times they would grill a few hotdogs over an open flame as that was all they had.

Gloria often did not have enough money for rent, and they were evicted from a series of apartments they lived in. After each eviction, Gloria would move to a new neighborhood and Devin and Lance would have to change schools. After several years, Gloria got a real estate license but  never made much money and their financial situation remained dire.

Lance would periodically vent his frustration at his mother and heated arguments ensued. To head off such conflicts, Devin would do what he could to calm them down. As Lance recalls:

> Devin was an angel kid. He was the peacemaker. We would argue and Devin would break it up; he would do this when he was six or seven. He would get in the middle of it, or just start crying … Devin had a way of calming everyone down.

Since Devin kept moving between schools, he had not learned the basics of reading or math; his grades were poor; and he fell further behind. His mother had no idea what to do.

### 2.    Devin's Stepfather Was Verbally and Emotionally Abusive

In 1974, when Devin was 8, his mother met and later married his stepfather, who had recently graduated from medical school. While the stepfather brought some financial stability to Devin's life, his stepfather soon became verbally and emotionally abusive to Devin, Lance and Gloria. Lance recounts their stepfather would suddenly "rage, yell and scream so loud it would be like he could blow his voice out." Other times the stepfather would go weeks without speaking to Devin. When he did speak with

him, he would often berate Devin for being stupid. The stepfather also would periodically threaten to divorce Gloria and send her and her boys back to the poverty they had come from. When Devin tried to stop the fights, Gloria would send him to his room where he was powerless to help her. Devin learned his stepfather had a gambling problem and was addicted to pain killers but that did not stop Devin from worrying about being abandoned again.

### 3. Devin Begins to Excel in School and Demonstrate the Values By Which He Will Live the Rest of his Life

Amid such challenges, Devin entered 5th grade and almost immediately began to flounder in Mrs. Hudson's class. Where other teachers might have seen a failing, chubby boy, she saw a student in need of guidance and focus. She began to work with Devin every day after school until he gradually caught up and, as he became a disciplined student, surpassed his classmates. By the end of the year, he was showing promise and resilience.

Nearly a decade later, when Devin was a student at USC, a teacher assigned him to write a paper about the most influential person in his life. He wrote about Mrs. Hudson. After getting an "A," he took the essay to her house to share it with her. Their bond has endured; when Devin opened his first one-stop car wash business in his early 20s, his mother brought Mrs. Hudson to the grand opening and Devin gave a speech that honored her.

As Devin progressed in school, he started to excel and showed signs of the person he was to become. His friend for over 30 years, William "Billy" Blindell, remembers an incident in the 7th grade when he and Devin were passing by an isolated area behind the school cafeteria where an 8th grader was picking on a younger boy who was deaf:

> The 8th grader was a bully and a big one. The bully had him pinned against the door and was teasing him, using a loud voice as if he was deaf. He was calling him "a retard." Devin ran up and shoved the bully away and yelled at the guy until he backed off. For the next two years we frequently had lunch with the other kid, and he taught us how to do some sign language.

4.    **Starting in High School, Devin Demonstrates His Tremendous Work Ethic**

When Devin turned 16, he got his driver's license. Once he earned enough money to get a car, he meticulously cared for it, detailing the vehicle himself and quickly became skilled enough to start doing it for other people for money. The summer after his sophomore year of high school, Devin printed flyers and placed them on cars in local office complexes. Soon he got one customer and then another and Precision West Detailing was born. Devin worked non-stop every day that summer building up his new business. With childhood memories of eviction and hunger,  Devin saw a path to financial independence that depended on hard work.

In the summer after his junior year in high school, Devin started working for a construction company owned by the father of a good friend. Starting at 6 a.m., Devin would replace sewage pipes, dig, and use a backhoe, staying until 6 p.m. to earn overtime for his 12-hour days.

5.    **Devin Matriculates and Graduates from USC and Continues his Strong Work Ethic**

The following year, when Devin was thinking about applying to college, his stepfather bluntly told him he would never get in, but if he somehow did, he would pay for Devin's tuition. No one had spoken to Devin about his grades or college applications; his mother was uneducated; and there were no college counselors to advise him. Devin, who graduated with a 3.5 grade point average, spoke with students who had good grades and applied to USC and Pepperdine. USC offered Devin a conditional acceptance. He had to study for a year at Chapman University, and then he could transfer to USC.  When Devin arrived at USC, he took 20 units, five more than the norm, and 22 units in his senior year, so as to avoid another year of academic bills.

While at USC, Devin got a side job on the overnight shift (midnight to 8 a.m.) at the Financial News Network. He worked 5 full night shifts per week, while also taking a full load of classes. Devin would have a 3 a.m. lunch break and sleep in his car before attending classes. In his senior year, he

invented a toy called My Creation, a paint kit that allowed people to write on fabric, which he sold to Galoob Toys. After he graduated on USC's honor role in 1988, Devin had an idea on how to invest the money he made from the sale of his toy. He would apply a multi-service concept for retail gas stations and car washes to make them one-stop shops for customers. He found a two-acre site of a bankrupted lumber yard where he integrated a massive indoor car wash, a car-detail business, a building for oil changes, one of Southern California's earliest drive-thru gourmet coffee shops, and a Del Taco franchise. Devin then negotiated a deal with Mobil Oil, worked with the city council to obtain the necessary permits, raised the funds from investors, and obtained a bank loan. Working tirelessly, Devin learned how each business worked, and his site became one of the highest volume Mobil stations in the country while his car wash employed as many as 75 people. At the age of 23, Devin obtained a second location, and then subsequent locations he could sell to others who wanted to own their own all-purpose automotive centers.

When Devin started to earn enough money, one of the first things he did was reimburse his stepfather for the entire cost of his university education.  Jason Anish, who has known Devin for over 25 years, notes that no one in their young adult social circles was like Devin:

> [Devin] would get up at 5:30am to get to his job. It took real dedication. He was always very driven. It was ingrained in him from a young age by his mom and from living in poverty. He had seen the other side of life with a single mom raising kids without enough money to feed them. He still has that in him today.

### 6.     Devin Is Introduced to Eastern Spirituality in India and Meets his Wife Cristina

While Devin's stepfather was verbally and emotionally abusive, he also introduced Devin  to Eastern spirituality in India.  Starting when he was 10 years old, the stepfather took Devin and his family several times a year to the ashram of Sathya Sai Bab, outside of Bangalore, India. There, Devin and his family would live an ascetic lifestyle, meet people from all over the world, meditate, help out at hospitals and orphanages, and study the teachings of Sai Baba. Sai Baba offered spiritual and humanistic guidance to teach people how to live a healthier, kinder and more morally responsible life.  Devin recalls when he

was young, he was invited to meet with Sai Baba, who asked him: "Where is your brother?" Devin gestured to Lance and replied: "Here is my brother." "No," Sai Baba replied, "All are your brothers." Over the next 35 years, Sai Baba guided Devin's burgeoning humanistic and spiritual awareness and encouraged him to cultivate his impulse to help others. Devin came to see it as his duty to care for each and every person.

When Devin was 31 years old, Sai Baba told Devin that he knew who Devin's wife would be. Sai Baba told him that his wife was Candiani's daughter. Mario Candiani, a successful Italian businessman, had been coming to the ashram for years with his family and had a 25-year old daughter, Cristina. Though they had not met, following Sai Baba's advice, Devin contacted Cristina and flew to Italy to meet her and her family.  In October 1998, they were married in a ceremony presided over by Sai Baba. In less than a year, they had their first child Matteo, followed in 2003 by Marco, in 2008 by Leo, and in 2015 by Emma.

### 7.      **Devin's Hard Work Remained Consistent**

During their almost 21 year marriage, Devin and Cristina started out living in California but then moved to Italy from 2005-2013 where Devin worked in his father-in-law's international oil and gas business, Petrolvalves. Devin had started back in 2000 when he became head of the U.S. operations. Devin employed the same work ethic he had demonstrated in the car wash business to help expand Petrolvalves worldwide. After his father-in-law passed away in 2012, Devin arranged to sell the business and returned to America with his family in 2013.

### 8.      **Devin Builds a Business to Address Global Water and Wastewater Challenges**

When he arrived back in Los Angeles, Devin chose to focus on an important, future-leaning industry: drinking water, water treatment and water operations. Believing that access to water is a person's moral right, Devin wanted to confront the world's greatest water and wastewater challenges.

15

The overall goal of his new company, AquaTECTURE, has been to increase water supplies and create consistent reliable sources of water for cities, municipalities, and water districts throughout the world. Toward that end, Devin has embarked on the one of the largest and most energy-efficient desalination projects in the world, the $1.5 billion Alamitos Resiliency Project in Southern California. This project will be capable of producing 108 million gallons of water per day and pipe that water through a 31-mile pipeline that will serve 10 cities and water districts, providing water agencies in Los Angeles County with access to enough water to supply over 1 million people in a drought or an emergency.

William "Bill" Blindell, Devin's close friend, comments on Devin's motivation to start a new business that would have a positive impact on the global environment:

> Devin works harder than most people I know. He is fiercely dedicated to progress and success. The amount of investment and work to build this new company [AquaTECTURE] is tremendous to say the least. . . . Devin decided to take on our world's ever-growing fresh water crisis.. . . a company that provides jobs and careers for hundreds, if not thousands of people. A company that has a positive impact on the world.

Long-time colleague Robert Bowcock, an expert in the water industry for over 25 years, describes the importance of the Alamitos Resiliency Project and Devin's crucial role in it:

> Mr. Sloane is the key person in a major water treatment and infrastructure project critical to water security in the drought-stricken West.. . .Without Devin's personal dedication, leadership, strategic vision, financial investment, and unique non-profit approach, the Alamitos Resiliency Project would not be happening, and his absence at this critical juncture when the entire Project is coming together is potentially devastating. With the economic, political and environmental stakes for the Project so high and the potential positive impact on California's water supply so great, Devin's hands-on leadership is required to navigate the complexities and provide stability to the delicate relationships among many diverse interests. A great deal of economic and political trust has been developed in the Project solely because of Devin -- which stands to be lost with his absence.

Dr. Eric M.V. Hoek, an environmental engineering professor at UCLA, writes about the power of Devin's vision:

> I believe Devin's vision, leadership and continued involvement is critical to the timely success of this seawater desalination project. He is also investing in innovative, new water technologies, which will ultimately be critical to develop innovative and cost-effective water supply solutions to Southern California's perpetual water shortage problems. The technologies that he has directed his team to

use for the Alamitos project are quite innovative, and will help to both deliver lower energy consumption at the Alamitos project and to advance the state of the art for seawater desalination.

9.     **Over 40 Character Letters Highlight Devin's Defining Characteristics**

More than 40 people, including family, long-time friends, employees, colleagues, acquaintances, and leaders and staff at charitable organizations have provided letters to the Court. These letters speak in one voice about Devin's defining characteristics: a remarkable dedication to improving the lives of others, a kind-hearted and generous soul willing to help friends and strangers alike; and an abiding dedication to and love of his family.[6]  While each letter shares an important aspect of Devin's traits, the following provide salient examples.

Joann Klonowski, Vice President-Host Town for the 2015 Special Olympics World Games in Los Angeles, writes of Devin's enormous contribution and dedication to the Special Olympics:

> My directive was to secure nearly 100 cities from San Luis Obispo to San Diego as Host Towns. Each community would agree to host up to 100 of the 10,000 Special Olympic athletes for three nights and two days prior to their Olympic competition… Mr. Sloane not only accepted the total financial responsibility but agreed to host one of the largest countries, Italy, with 157 athletes. He not only underwrote the entire three days of training, hospitality, accommodations and meals but was totally hands on. For instance, when the Organizing Committee hit a snag in the transportation of the athletes from the airport to the hotels, Mr. Sloane personally secured buses, met the Italian delegation, transported the  athletes from the airport to the hotel and even helped unload the luggage.

> Mr. Sloane had a general concern to make certain these Special Olympics athletes were treated with the utmost hospitality. It was late, the athletes were tired and hungry, and the restaurant was closed. Mr. Sloane quickly made arrangements to open the restaurant and he and his friends made cheese sandwiches for the athletes. He even encountered one athlete with Obsessive Compulsive Disorder (OCD) who was distraught because there wasn't a tablecloth. Mr. Sloane personally found placemats to cover the table which eliminated the anxiety of the concerned athlete.

> Mr. Sloane went above and beyond in all categories. He arranged and was present at every activity. The hotel and training facilities were outstanding. For their fun activities, the Special Olympic athletes visited the Getty Center, visited a fire station and toured Santa Monica Pier. On the last evening, Mr. Sloane arranged a spectacular dinner at Universal Studios complete with greetings from cartoon characters and private access to tram ride.

---

[6] Exhibit D contains the 41 letters of support. Exhibit E is a CD-ROM that contains a video of various friends, colleagues, and community organization members detailing their views of Devin's defining characteristics of compassion, kindness, loyalty, family, and love.

At the conclusion, the Special Olympic athletes and their delegates had one special request of Mr. Sloane... to walk with them into the Coliseum for Closing Ceremonies.

Karen Medved, a friend of Devin's and parent of a student who participated in the Special Olympics World Games in Los Angeles, highlights the "positive ripple effect" Devin's leadership had on others:

…Devin's stewardship of this program also had a profound transformative effect on many of the volunteers. As an example, many of the volunteer coaches subsequently enrolled their teams in programs that integrated special needs with mainstream athletes. My own daughter's team participated in games with young special needs athletes, which inspired some of the girls to get involved in related community service projects both then in middle school and now in high school. Therefore, years later the positive ripple effect continues.

Amber J. Hill, the Southern California Regional Managing Director for the United States Fund for UNICEF USA, describes Devin's significant involvement in UNICEF:

Devin has been a donor since 2010, contributing significant funds to bolster UNICEF's global programs. Devin, particularly, has been generous in supporting UNICEF USA's partnership with Special Olympics. The exciting partnership is designed to support programs around the world that look to create change for children with disabilities by championing their rights and promoting inclusion.

We were excited last year to begin exploratory conversations with Devin and his company AquaTECTURE, to help deliver clean water and sanitation systems to several districts in Peru identified by UNICEF to be the most urgent in addressing the well-being of children and their families. Devin voluntarily involved members of his team to talk through solutions and services that his company may contribute in-kind to help UNICEF make transformational impact on the ground.

Rosana Davis, a swim teacher to all of Devin's children, shares a story about Devin's generosity done without fanfare and outside the limelight:

When our son Brett applied to Dominican University, we knew the tuition was high, but even with a Lacrosse scholarship, the expense was more than we expected. Cristina and I were having lunch and she asked about my kids and I mentioned that Brett was accepted to Dominican University. Your Honor, Jeff and I have never been the kind of people to complain about our economic difficulties. But this particular day I felt very vulnerable and I told Cristina about my problem and how we made a commitment to our children that their job was to get in to a university and our job was to pay for it ... Later that afternoon, I received a call from Devin committing to pay Brett's first semester's school tuition. I was dumbfounded and in complete shock. That kind of generosity I would say only

comes from a family member, not so much a friend. No one in our respective families could or offered help. God really did perform a miracle through Devin and Cristina that day.

David Ireland, a friend of Devin's since 1980 when they met in high school, tells of a similar story of compassion, where Devin seeks nothing back for himself:

Our paths crossed only occasionally in the years after high school as we were both hard at work and pouring ourselves into our families. I would speak to Devin from time to time and it was always good to hear from him.  Recently (just under 2 years ago) Devin called to check in on me when he became aware that my son Gage was in the middle of a life-threatening battle with brain cancer. At 15, Gage had just come out of his 2nd brain surgery and was beginning another round of chemo and immunotherapy … [S]hortly thereafter, to our surprise, we received a generous check in the mail from Devin and family to help with Gage's medical expenses.  Not sure Devin realized it, but his generosity allowed our family to stay current with the added out of pocket medical expenses related to Gage's procedures and treatment without having to liquidate assets to do so.

Barbara Lamperti, a cousin of Cristina Sloane, expresses her thoughts on the compassion and kindness Devin showed her mother during a difficult time:

I'm fully aware of the gravity of the crime Devin has pleaded guilty to, but it is still difficult for me to understand. This is not the Devin I know.  Devin has always been there for me and my family, since the first day he moved to Italy. My mom is 75 years old; she is a widow and she lives by herself in our hometown in Italy as both me and my brother moved abroad. She doesn't have any family member close by. While Devin and Cristina were living in Italy, Devin always took care of my mom, paying her regular visits to check if she needed anything. He was the first responder when she discovered that thieves broke into her apartment and he kept visiting her every single day after the incident to reassure her. I didn't ask him to do it and I'm still deeply grateful that he did it. This is just a small example of the person who Devin is...More than once I witnessed Devin teaching his kids kindness, inclusion, respect of others and humility. He's a great dad and a role model. Without any doubt, I would let him be the guardian of my kids.

Mike Hamilton, a teacher and coach of Devin's three sons at the Buckley School, remarks on Devin's compassion and kind-heartedness:

Two years ago, while I was coaching [one of Mr. Sloane's sons], we won a football championship and a basketball championship. After the game, [Devin] took the entire team out and gave me this really big trophy. He had the trophy engraved and it said "COACH OF THE DECADE" on it … He was insistent that my family come to the restaurant. He presented me with this really large trophy in front of my family, the team and everyone in the restaurant.

 [Mr. Sloane's son] was not a starter on that team. He didn't play a lot. I marvel at why any parent would do something so kind and so genuine. I am a very strong and prideful person, but as I think of all of this as I write it, I begin to cry. My wife puts up with me giving so much of my time and

energy to the kids that I coach during the seasons. It meant a lot to me that she was with me the day I received the trophy. My kids will never forget what they saw and heard that day either…

Devin Sloane was at every game that I coached [his sons]. He was there before the game started and was usually the last parent there. He would often walk with me off the field, off the court and even to the parking lot. Afterwards, we never discussed the game, the way his kids played or the result. Devin would ask me, "How is your family?" "How are you?" "Are you happy?" I found this pretty unusual. I have coached a lot of kids and been around a lot of parents and no one ever asked about me or how I was.
. . .
Devin did this [be supportive, kind and caring] for five years and never asked me for anything. Frankly, I was waiting for him to ask me to play his sons more. Give his sons special treatment, or be nicer to his sons, but he never did. I truly believe Devin Sloane is an amazing man and father. I don't cut anyone any slack and see right through things that are disingenuous. I know when parents are playing angles, want or need something from me.

I no longer coach [his sons], but Devin still calls me. He sends me videos of his kids. He checks on me and asks me the same questions he always has. I realize he does these things because he genuinely cares. We have two completely different lifestyles, but yet he considers me his friend.

Jamie and Charles Meyers, Devin's neighbors in Los Angeles, write about Devin's strong connection to and compassion for their daughter Lucy, who has cerebral palsy:

Our families became friends in 2013 when the Sloanes moved to their current residence…At first, the Sloanes would invite my husband, Lucy and me for dinner -- but then after a while, Devin sensed that Lucy wanted to spend time with them without my husband or me…. I remember the first time that Devin suggested that Lucy go to their house for dinner without us. I said absolutely! He then called Lucy and asked her if she wanted to come by herself to have dinner at their house. She was so happy and her smile was so huge that I am surprised he could not see her smile from his window She came home just beaming and wearing a bracelet that one of Devin's sons had made for her. Since then, Lucy has gone to their house for dinner by herself on many occasions. Devin and his family gave her such a feeling of independence. She was so excited to have the experience of going over to a friend's house to have dinner just like other kids do.  It was huge. It may sound simple and not much -- but to Lucy this was incredible and something she had never done before -- and Devin had the empathy to know and to act on this.

Kimberly Anish, one of  Devin's close friend for over 25 years, describes him as a "trusting, loyal, giving, hardworking and family-oriented man." She explains:

[Devin] is an amazing husband and devoted father to his four children. He is always there supporting them for whatever they are involved in whether it be a swim lesson, track meet, soccer game, acrobatic show or ballet class. He is the backbone of his family. He was and is a huge support to his wife, who is Italian. It was difficult for her to move to a new country . . . He cared for his mother who had Alzheimer's until the very end of her life, making sure she was well taken care of. Devin

still cares for and supports his stepfather even though his mom and stepdad have been divorced for many years.[7]

Michele Kaplowitz and her husband Richard. friends who have known Devin for over 40 years,

describe the type of husband and father he is:

When [Devin's] mother passed, much to our sorrow, to help fill the gap and loss Devin had me act as surrogate grandmother and this allowed me to share so intimately in his family. What a great privilege Devin provided for me to share in the love of this great family. Devin is a man of sweet and good character.  He loves his wife and children with great passion and concern. I have personally witnessed Devin's interactions with his children, rehearsing speeches, helping with homework assignments, reviewing spelling tests... He provided loving support, spiritual guidance, and total dedication to ensuring his family's happiness.

Tom West, an AquaTECTURE employee, comments on how Devin as an employer always

puts family first:

As an involved father, I frequently need to leave the office in the middle of the work day to attend my girls' activities, sporting events, and school meetings. Devin has always been supportive of my time spent with family, even if it cuts into our work schedule from time to time.

Alessandra Palazzotti, the National Director of Special Olympics Italy, has worked with Devin

since 2015 and writes:

Through my work I get to know many genuine and generous people and Devin is one of the best human beings I have ever met: he has done a lot of good and has always been available to help without ever wanting anything in return. He treated our athletes as his children, and our athletes were very close to him and his family. He is a great family man, who like all good fathers tries to do the maximum for his children and his wife. Sometimes even the best of fathers, for the love of their children, make mistakes. But a good family man learns from his mistakes and becomes an even better example for his children and for the whole community. This, to me, is Devin.

---

[7] Even though Devin's stepfather was verbally and emotionally abusive to Devin growing up, Devin focuses on the positive side of his stepfather and has since reconciled with him. Since his stepfather fell on difficult financial times over 15 years ago, Devin has been assisting him financially ever since. As his stepfather writes: "For the first time in my life, I was not able to care for myself or support Gloria. Devin was supporting his mother and taking care of her. Our home of 30 years was in foreclosure. Devin showed up at my doorstep and I told him I was ashamed of what I had become. He told me how much he appreciated everything I had done for him and the family. Devin told me he would take care of everything, and he did."

Devin's life story and the letters submitted by those who know him best depict an individual who, with the exception of the instant conduct, has demonstrated over the course of his entire life the highest standards of integrity, ethics, values, and devotion to his family, friends, community and those less fortunate.  As he has fully acknowledged, Devin made a significant and very regrettable mistake when he fell prey to a serious lapse in judgment – a lapse that represents an aberrant deviation from a lifetime of honesty and hard work.

Mr. Sloan respectfully asks the Court to place his mistakes in the context of the totality of his life when determining an appropriate sentence.  As one court has stated:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

### 10.   Unified Sports Initiative

As part of the Recommended Sentence, Mr. Sloane proposes for the Court's consideration ordering him to perform up to 2,000 hours of community service by structuring, funding and implementing a new, cutting-edge program for the Special Olympics, the Unified Sports Initiative. This new program has been vetted and approved by the local and national leadership of Special Olympics who have worked with Mr. Sloane for many years on other programs, are excited about the prospect of this partnership, and are confident in Mr. Sloane's leadership and ability to successfully execute on the program's goals.

The goals of the Unified Sports Initiative are to:

(1)  create a scalable, educational program for students enrolled at independent schools ("host schools") across the United States to engage with children with special needs and intellectual disabilities ("Special Olympics athletes") in various sporting events that will instill the values of diversity, inclusion and a mutual understanding among all the participants. Unlike the over 7,500

public schools across the country which have a Unified Champion School program that brings together public school students with Special Olympic athletes, no similar program currently exists for independent schools;

(2) in coordination with Special Olympics' local chapters, engage independent school students to assume new leadership roles in their community as part of a specially designed educational and leadership development curriculum; have these students lead, participate and compete in bi-weekly sports practices with local Special Olympics athletes in basketball, volleyball, soccer, and flag football and in a community-wide Unified Sports Field Day competition and celebration; and arrange for these students to attend and participate in an exhibition competition at an official Special Olympics Games.  By having these students plan, design, implement, lead and participate in all aspects of the Unified Sports Initiative, these students will build a much greater understanding among themselves, their parents, their schools, and the greater community of people with special needs and intellectual disabilities.  These students will also be able to fulfill their high school community service hour commitment through this program in a way that will broaden their understanding of those with special needs and intellectual disabilities;

(3) partner with local public school districts and community organizations to leverage the events of the Unified Sports Initiative throughout the communities; and

(4) after the implementation of a pilot program in Los Angeles in 2019-2020, bring the Unified Sports Initiative program to 12-15 host schools across the country by 2020-2022 (potential cities include New York, Chicago, Boston, Washington D.C., and San Francisco).  Once the model has been proven by 2022, expand the program throughout all the local chapters of the Special Olympics across America and replicate the program through Special Olympics chapters throughout the world. This Unified Sports Initiative has the opportunity over the next 3-5 years to enrich and empower the lives of thousands of Special Olympics athletes and their families as well as thousands of independent school students, their parents and their communities around this country and world.

The genesis for the idea behind this Initiative comes from the fact that independent schools, where most of the parents involved in the Singer conspiracy had their children attend, have very few students with special needs and intellectual disabilities whereas the Special Olympics has no major projects involving independent schools. The Initiative is designed to introduce the Special Olympics community to the community of independent schools by setting up an efficient structure for student bodies to adopt and implement programs in which student volunteers can practice and compete with Special Olympics athletes on a regular basis throughout the school year in various sports. The goal is to fully integrate the two student populations as one on the field and change lives through sports.

Bill Shumard, the President and CEO of Special Olympics Southern California for 15 years, lays out the importance of the Unified Sports Initiative:

> Our work in the public schools over the past several years has produced a significant culture change among those student bodies, while preparing the nation's next generation of leaders in social justice.
> …
> Mr. Sloane feels that the students in independent (private) schools deserve the same opportunity to learn, despite the fact that those respective student bodies often lack students with Intellectual Disabilities. In conjunction with he and his staff, Special Olympics is designing a pilot program in Southern California in which Unified Sports will be offered to those schools and students, giving our movement an entirely new "market" to engage.
>
> Mr. Sloane's generosity and creativity will help us identify and engage young people with Intellectual Disabilities from those respective local communities. His personal commitment and engagement has been truly inspiring since this project's conception. It is his personal vision to see this pilot-program become a model to be utilized both nationally and globally as we fine tune it.

If the Court agrees to allow Mr. Sloane to perform his community service to create and implement the Unified Sports Initiative, he will essentially be performing community service 2-3 days a week, full-time, for the next 3 years. Over that time, Mr. Sloane will be in charge of structuring and implementing the overall program including the pilot program in Los Angeles in 2019-20 and then exporting the model to 12-15 independent schools in cities across America in 2020-22; acting as the bridge between the Special Olympics and the host schools; creating the budgets and infrastructure for the program; fundraising for the program whose initial budget will exceed $1 million; and most importantly, working directly with the students at the independent schools and the Special Olympic athletes to ensure that the leadership curriculum, bi-weekly sports practices, Unified Sports Field Days, participation in the Special Olympics Games, and partnerships with local Special Olympics chapters, public schools and community organizations are meeting the goals of the program. This community service obligation will represent a second, full-time job for 3 years for Mr. Sloane, one that gives back to the community directly and provides enormous value to the community in order to make amends for the crime he committed.

To monitor that community service, Mr. Sloane will keep and submit time sheets to Mr. Shumard, who has agreed to monitor and certify the accuracy of those submissions.  Those time sheets will be provided to the Probation Office, who can spot check Mr. Sloane's work at any time.

B.     **Nature and Circumstances of the Offense (§ 3553(a)(1))**

Mr. Sloane pleaded guilty to Count One of a one-count Information charging a conspiracy to commit mail fraud and honest services mail fraud under 18 U.S.C. § 1349. However, the actions that Mr. Sloane was involved with represent only a small subset of those outlined in the conspiracy charged. *See* Exhibit F (chart outlining the small subset of actions Mr. Sloane was involved in).  While the conspiracy charged as co-defendants ten other parents, Mr. Sloane had no involvement with any of them (or any of the other over 20 parents who have been charged in related Informations or Indictments). While the conspiracy charged two schemes, one centered on college entrance exam cheating and another involving college athletic recruitment, Mr. Sloane had no involvement with the former scheme nor any of the individuals in the Singer organization involved with that scheme (e.g., Mark Riddell, Igor Dvorskiy, Niki Williams). While the conspiracy and related conspiracies charged as victims the ACT, Inc., the College Board, Stanford University, Georgetown University, the University of California at Los Angeles, the University of San Diego, the University of Texas at Austin, Yale University, Wake Forest University and USC, Mr. Sloane had no involvement with any university other than USC.

For the illegal actions in which Mr. Sloane participated in connection with the improper admission of his son to USC as a water polo player, Mr. Sloane has unequivocally accepted full responsibility. In order to understand why this crime was committed by Mr. Sloane -- who at approximately 51 years old at the time had lived an otherwise very law-abiding, honest, ethical, charitable and upstanding life -- the context behind Mr. Sloane's actions is crucial. **This context helps explain Mr. Sloane's actions but in no way excuses them**.

Mr. Sloane did not go seeking to commit a crime and then found Rick Singer to accomplish it. On the contrary, Singer, a master manipulator, sociopath, fraudster, and felon, who for almost a decade had perpetrated his conspiracy involving by his own admission over hundreds of students and $25 million of payments, drew Mr. Sloane into his conspiracy by presenting his services initially to Mr. Sloane for over a year as legitimate tutoring and college counseling.  Mr. Sloane, who was unfamiliar with the college admissions process at that time and looking to do all he could to help his oldest son Matteo through it, believed he had found one of the country's most experienced and successful experts in Singer to navigate the path. This is the image Singer carefully cultivated in meetings with Mr. Sloane, his wife and Matteo and in public forums at which he spoke. The same image promoted by successful businessmen and professionals who were friends of Mr. Sloane and highly recommended Singer.

After gaining his target's trust, Singer's *modus operandi* was then to play on his client's fears and insecurities about their child not being able to get into college unless they used his "surefire strategies to gain admittance."[8]  Mr. Sloane fell into this pattern. Specifically, Singer played on Mr. Sloane's wife's anxieties about her son not being close to them to convince them to have him apply to USC.  Then, Singer told Mr. Sloane that his son was never going to get in unless he made Matteo "more interesting."[9] To

---

[8] Jennifer Levitz and Melissa Korn, "'Nope, You're Not Special.' How the College Scam Mastermind Recruited Families," The Wall St. Journal, https://www.wsj.com/articles/nope-youre-not-special-how-corrupt-college-counselor-recruited-families-11567782077 (Sept. 6, 2019) ("…former clients and parents who thought about retaining Mr. Singer said he knew just how to play on the fears of college-bound students and their parents. He scared them into thinking the teens were at a disadvantage at name-brand schools if they didn't have an angle or special access, according to parents who hired him and others who considered it. Then he made a tantalizing offer—surefire strategies to gain admittance.").

[9] *See id*. ("A Nevada chief executive says he hired Mr. Singer in 2012 to counsel his daughter, after a referral from a Bay Area CEO. He says Mr. Singer, on his first visit, asked his daughter, ranked second in her sophomore class, to talk about herself.  She told him about her grades, PSAT scores and community-service work. "Nope, you're not special," she recalls Mr. Singer saying. "It just destroyed me, and it scared my parents. He was really smart about this. He would pick at every insecurity. He would make you feel absolutely worthless and completely dependent on him to get into college.").

make Matteo "more interesting," Singer said that he needed to be presented to USC as a water polo player, a sport Mr. Sloane knew his son did not play. Singer tried to play down the deception by saying that that water polo team had players that did not play and Matteo could be an ambassador for the team since he spoke multiple languages. Nevertheless, the line between truth and falsity was set, and Mr. Sloane regretfully crossed that line. Singer's first step was for Mr. Sloane to obtain a water polo photo of his son (which he did) in connection with a false water polo profile that was going to be submitted to USC. Singer then instructed Mr. Sloane over a number of months to: (i) pay $50,000 to USC Women's Athletics, a donation that Singer never discussed in advance with Mr. Sloane until <u>after</u> Mr. Sloane's son was purportedly conditionally admitted to USC in November 2017; (ii) pay $200,000 to Singer's non-profit foundation; and (iii) lie to the high school guidance counselor using the script provided by Singer. Despite these instructions coming from Singer as part of Singer's web of manipulation, Mr. Sloane had a choice to follow them or not. He made the wrong choice, a decision that Mr. Sloane will pay for the rest of his life.

While Mr. Sloane clearly committed the criminal actions for which he has accepted full responsibility and pleaded guilty, what is also clear is that he was targeted, manipulated, and slowly and deliberately lured into the conspiracy by Singer, a world-class schemer and manipulator.[10] **The record speaks very clearly that but for Singer coming into Mr. Sloane's life, there is absolutely no indication that Mr. Sloane would have participated in any scheme to defraud USC.**

---

[10] Mr. Singer's sociopathic, manipulating mindset is so extreme that even when the government caught him and he agreed to cooperate, he tried to manipulate the government and double-cross them by secretly alerting various parents to the fact he was cooperating. The government caught him again, and he ended up pleading guilty to the additional charge of obstruction of justice

In no way does understanding the full context behind Mr. Sloane's criminal conduct excuse that misconduct, but it helps to explain why Mr. Sloane, an otherwise highly law-abiding and upstanding member of the community, aberrantly committed the crime he did.  That context is as follows:

1.    **Mr. Sloane and Family Returns from Residing in Italy to the United States and Seeks to Find Assistance in the College Admissions Process for his Oldest Son**

The context starts in 2013, the year Mr. Sloane returned from living in Italy with his wife and three boys. Upon returning, he enrolled his children in private schools in Los Angeles. Over the next several years, Mr. Sloane joined the school's Board of Trustees and began making significant financial contributions to the school.

In early 2016, Mr. Sloane was speaking to two friends, one who was the Managing Director of the Summa Group at Oppenheimer & Co., and the other who was a senior partner at a prestigious national law firm, about whether he needed to get a separate college counselor, outside of the college counselor provided by his son's high school, to assist his oldest son Matteo to navigate the college admissions process. Mr. Sloane had been on the Board of Trustees with both of them and trusted their guidance. Mr. Sloane, who had not used an outside college counselor when he himself had applied to college over 30 years before and had not been through the college admissions process before since this was his oldest child going through it at this point, took their advice.

2.    **Introduction to Rick Singer, the College Admissions Expert**

Though Matteo was only a sophomore in high school at the time, Mr. Sloane's two friends both counseled that it was imperative that Mr. Sloane get an outside college counselor since the high school's college counseling department was overburdened and would not be able to provide the individual attention or advocacy necessary given the student-to-counselor ratio. They jointly recommended one college counselor: Rick Singer. They said he was the best in the business, had the

largest college consulting company in the country with over 500 employees, was in every major market, and sometimes worked personally with the students he oversaw.

In April 2016, Mr. Sloane's friends set up a meeting between him and Singer, which they also attended. Singer discussed the comprehensive services he would provide Matteo, including providing tutoring in all different academic subjects and for the SAT/ACT tests by tutors working for him who had the highest credentials. He explained  he was the best at what he did based on his 25 years in the business developing relationships with admissions departments of colleges throughout the country. He said he knew what the colleges were looking for and what kind of students would be successful at a particular college and touted that the college admissions people trusted him when he advocated for a particular student since the students who went through Singer's program were successful in college.

Singer stated that  in some cases he also personally worked with the student, helping them with their high school course selection and college selection and meeting regularly with the student to make sure they kept on track, properly managed their time, stayed out of trouble, committed to their studies, and did not use drugs or alcohol. Singer talked about the different ways that students could get into college: the front door (based on a student's grades, scores, extracurriculars, etc.), the back door (based on a parent's large contributions to a university), and the side door (based on his personal relationships and reputation with the college admissions departments across the country that he had cultivated over 25 years).  At no point in discussing the side door at that time did Singer state the side door involved bribing anyone at a university[11] or falsifying a student's application to admit them as an athlete when they were not. At public conferences, Singer would refer to the side door in the same manner.

---

[11] In subsequent communications over eight months later, Singer alluded in an email dated January 4, 2017, to the fact that Mr. Sloane could begin to create a longer list of potential schools to tour if he was ready to commit to the notion of the "financial side door."  In an email a year after that, dated January 29, 2018, following Matteo's purported conditional acceptance by USC, Singer stated that he was trying to get money in so there was no delay as USC "will call the markers in very soon thereafter."

In May 2016, Singer came over to Mr. Sloane's house to meet with him, his wife Cristina and Matteo. At that meeting, Singer described the tutoring services he could provide, how he would personally oversee the son's program including course and extracurricular selection.  Singer told Matteo directly that he would have to study hard, stay out of trouble, not stay out late, and not use drugs or alcohol or else Singer would drop him and not work with him anymore – themes that Mr. Sloane and Cristina equally emphasized. Singer said he would meet with Matteo personally at the Sloanes' house every third Sunday of the month at which time he would, among other things, review Matteo's progress from the previous month, review the workload for the following month, work on time management skills, and overall monitor how the tutoring, grades and testing were progressing. Singer charged $7,000 a year for his services plus an hourly rate for his tutors.

Impressed with Singer's approach, Mr. Sloane agreed to hire Singer.  At no point did Singer ever discuss at these initial meetings that his services included bribing college personnel or falsifying college applications to gain admittance at a college.

3.  **Singer Requests $200,000 for his Non-Profit Foundation in the Summer of 2016, Over a Year before Matteo Applied to College**

Beginning June 2016, Singer started to come to the Sloane house every third Sunday to meet with Matteo. At one of those first meetings in the summer of 2016, Singer told Mr. Sloane that he had a non-profit 501(c)(3) charity foundation that helped underprivileged kids who did not have the resources of people like the Sloanes to get into college. Mr. Sloane shared with Singer how he supported similar non-profit organizations like UNICEF and the Special Olympics that helped underprivileged children and how this was an important piece of Mr. Sloane's philanthropy. Singer said he would be putting in a lot of his own time over the next years on Matteo's behalf, and at the end of the process Singer expected Mr. Sloane would eventually contribute $200,000 to Singer's foundation to help less fortunate students.

Mr. Sloane agreed to make this contribution then based on his belief Singer only personally worked with some families but had agreed to work with his son, Singer was going to put in a lot of time to work with his son, Singer was going to use his relationships with college admissions departments for his son's benefit, and Singer's foundation, about which Singer spoke about very passionately, was helping underprivileged children, a group which Mr. Sloane felt equally passionate to help. This agreement to make a $200,000 donation occurred well <u>prior</u> to any discussion of any particular university that Matteo may apply to. At no point in this conversation did Singer say or imply any of the funds going to his foundation would be used to bribe college personnel or go in any way other than to help underprivileged children.

4.    **Singer and his Tutors Provide Legitimate Tutoring and Counseling to Matteo for Over a Year to Help Him Study for his Courses and Prepare for the SAT Test**

Starting in the fall 2016, Singer arranged tutors for Matteo during his now junior year of high school in multiple academic subjects as well as to prepare him for the SAT test.  Singer discussed with Matteo the heavy course load he was taking, complete with three AP courses, as well as his involvement as president of the school's Diversity Club and his attendance at the Diversity Club's national conference in Atlanta. Singer's interactions with Matteo included not just meeting with him every third Sunday of the month but also regularly speaking and emailing him about issues that came up concerning classes to sign up for, extracurriculars to participate in, and SAT tests to prepare for and take.  Singer repeatedly emphasized the importance of hard work, getting good grades, and staying out of trouble, something that Matteo worked hard to accomplish.

5.    **Singer Manipulates Mr. Sloane and his Wife to Convince Them to Have Matteo Apply to USC**

In March/April 2017, Mr. Sloane arranged with Singer and Singer's staff for Mr. Sloane and Matteo to visit 4 schools on the East Coast. Singer, however, insisted Mr. Sloane have his son visit USC.

Singer had learned from numerous meetings with Mr. Sloane and his wife Cristina that Mr. Sloane was an alumnus of USC and that it was very important to Cristina to keep Matteo close to home. Singer played on Cristina's insecurities and stated to her and Mr. Sloane during a meeting at their house that if Matteo went to a school back East, he would probably end up working back East and meeting a girl back East; Mr. Sloane and Cristina would then never see him.  Matteo was not initially interested in applying to USC.  However, in May 2017, Singer convinced Mr. Sloane to have Matteo tour USC and thereafter set up a tour of USC for them.

### 6. Singer Convinces Mr. Sloane to Have Matteo Fraudulently Apply as a Water Polo Player to USC

In May/June 2017, Mr. Sloane told Singer Matteo was interested in going to USC as a result of the tour. They discussed Matteo's qualifications including his solid grades (a 3.88 adjusted GPA per USC methodology) and test scores, his ability to speak three languages fluently, his background in Italy and travels in India, his role as president of the Diversity Club, his attending a Yale University leadership program in environmental science and engineering and winning the architectural element of the competition. Singer commented there were 20,000 kids with similar backgrounds, grades, and test scores trying to get into USC and that they needed to make Matteo "more interesting" or else he would be rejected. Singer suggested to Mr. Sloane that Matteo could take up water polo to be "more interesting" in order to get admission into USC. Mr. Sloane was initially confused and said Matteo did not play water polo; Singer responded that they could get coaches to teach him and the water polo team had 40 players but only a small number of them played in the matches. Singer added that Matteo could practice with the team or be an ambassador for the team as he spoke three languages.

In June 2017, Singer said to Mr. Sloane that he was going to need a photo of Matteo playing water polo to present to USC. This is the point at which Mr. Sloane knowingly and very regretfully crossed the line. To get the  photo requested by Singer, Mr. Sloane purchased water polo equipment from

Amazon and arranged with a graphic designer to have a photo of Matteo done that made it appear he played water polo, which Mr. Sloane knew he did not. Mr. Sloane learned in July 2017 that Singer had constructed a false water polo profile of Matteo to present to USC listing him as having played for the Italian Junior National Team and the LA Water Polo Team, which Mr. Sloane knew was untrue. Nevertheless, Mr. Sloane agreed with Singer to have him present this false water polo profile and photograph to USC, an incredibly stupid decision that Mr. Sloane  deeply regrets and will make amends for the rest of his life.

7.     **Singer Conducts Public Program at Hotel Bel-Air Extolling the Benefits of his Side Door Approach**

On September 26, 2017, Singer conducted a program at the Hotel Bel-Air in California, sponsored by the Summa Group of Oppenheimer & Co., Inc. entitled "Demystifying Healthcare & College Admission in Uncertain and Challenging Times: How To Be Proactive in Gaining Access to Game Changing Guidance and Expertise for You and Your Family."  Singer and a trusted friend of Mr. Sloane invited Mr. Sloane to attend, which he did along with over 50 parents. Singer was listed as being the "CEO and Master Coach of the world's largest private College Counseling and Life Coaching Company, The Key Worldwide … with offices in 101 cities throughout the United States and in five foreign countries... [who has had] one and half million of his clients being accepted to their first or second choice schools... [and has] led the field in college admissions coaching for over a quarter of a century." Singer described and boasted of his "side door" approach to getting into college, but at no point did he describe this to include bribing athletic coaches or administrators to facilitate students' admissions.

8.     **USC Purportedly Conditionally Accepts Matteo as a Water Polo Player and Mr. Sloane Makes a $50,000 Payment to USC Women's Athletics**

On November 29, 2017, after Singer received a conditional acceptance letter purporting to be from USC admitting Matteo based on his potential to make a significant contribution to its intercollegiate

athletic program, Singer emailed Mr. Sloane and instructed him to send a "50K check to USC" as a "donation" made payable to "USC Women's Athletics." The address Singer gave for the check to be sent to was: "Donna Heinel, Senior Women's Athletic Director, 3501 Watt Way, Los Angeles, California 90089-0602." This was the first and only time Singer suggested to Mr. Sloane that he should send a donation to USC. This was also the first time that Singer had ever referenced the name "Donna Heinel." Mr. Sloane had never met with, spoken to or communicated with her at any time prior to or after this date, though Mr. Sloane was later forwarded an email by Singer in April 2018, after Matteo had been admitted to USC, where Ms. Heinel confirms to the USC Director of Admissions the false water polo profile for Matteo.  In addition, Mr. Sloane never met with, spoke to or communicated with USC's water polo coach Jovan Vavic or anyone else in USC's athletic or admission departments. Singer also stated in the email as a reminder that Mr. Sloane would need to send in the $200,000 donation to his non-profit foundation after Matteo was admitted to USC the following March.

On or about November 29, 2017, Mr. Sloane sent a $50,000 check payable to "USC Womens Athletics" addressed to Donna Heinel at the address given by Singer. USC deposited the check and has never returned the funds. Mr. Sloane subsequently paid USC the full tuition of $55,320 for Matteo's first year at USC in 2018-19 as well as fully paid Matteo's room, board, insurance and other expenses, all totaling $77,371.

9. **Matteo Is Accepted to USC and Three Other Universities Where He Received No Improper Assistance from Singer**

In March 2018, Matteo received a formal letter of admission to USC. In addition, Matteo received letters of admission from three other universities, including one that offered him a merit-based scholarship. Matteo received **no improper assistance** from Singer to get into these latter three universities.  Matteo chose to attend USC.

10. **Mr. Sloane Pays Singer's Foundation $200,000 and Provides False Information at Singer's Direction to High School Guidance Counselor**

In April 2018, following Singer's direction, Mr. Sloane paid Singer's foundation $200,000. Mr. Sloane followed Singer's direction in how to handle issues that arose with Matteo's high school counselor who had raised questions about his admission to USC based on his playing water polo. Singer emailed Mr. Sloane a script on how to answer potential questions to support the story that he was a water polo player, and Mr. Sloane followed that script when he spoke with the high school counselor.

11. **After Matteo Was Admitted to USC, Mr. Sloane Seeks to Make Significant Financial Contributions to USC on Annual and Long-Term Basis**

After Matteo was admitted and decided to attend USC in March 2018, Mr. Sloane decided he wanted to make significant contributions to USC both on an annual basis and as part of his family's long-term estate planning. This decision had nothing to do with Singer's scheme. Contributing to educational institutions had always been an important priority to Mr. Sloane and his wife. They had made significant financial donations and pledges to their children's elementary and high schools totaling over $1 million in the past and were seeking to make similar or greater contributions to USC going forward.

Toward that end, starting in the summer of 2018, Mr. Sloane initially spoke with a USC advancement person. When questioned why his $50,000 donation had gone to USC Women's Athletics, rather than state he had been instructed to send the check there by Singer as part of Singer's scheme, Mr. Sloane lied about the motivating reason being that his mother was an professional figure skater (which she was) and his son had done an essay on and interview with a female Olympic hockey figure (which he had). Mr. Sloane nevertheless asked to meet with the leaders of USC's Dornsife College of Letters, Arts and Sciences ("Dornsife") to discuss potential significant annual and long-term donations to Dornsife and its programs. These future donations were not in any way designed to help Matteo attend USC as he had already been admitted by this time. These interactions included numerous email

correspondence, telephone calls and meetings with Dornsife's Dean and Senior Associate Dean for Advancement. In addition, Mr. Sloane personally met with the heads of the Dornsife Center for the Political Future to discuss making future donations to the program.

12. **Singer Led Mr. Sloane to Believe That His Foundation Was Not a Sham but Really Sought to Help Underprivileged Children**

While Singer's non-profit foundation appears to be in large part a conduit for Singer's bribery scheme, Singer manipulated Mr. Sloane on many occasions to believe it was a real foundation helping underprivileged children. Starting in the summer of 2016 Singer described how the non-profit foundation worked to help underprivileged children get into college.  Singer continued to extol the work of the foundation  in August/September 2018, <u>five months after Matteo was accepted to USC and five months after Mr. Sloane had paid it $200,000</u>. On August 30, 2018 and September 20, 2018, in lengthy telephone calls between Singer and Mr. Sloane that were intercepted pursuant to a court-ordered wiretap <u>before</u> Singer started cooperating with the government, Singer discussed with Mr. Sloane how his non-profit foundation was going to take over all sports activities at all the parks in Oakland.[12]  Singer told Mr. Sloane he had the backing of the mayor of Oakland for the project and was looking for a way to fund the project so underprivileged kids did not lose the opportunity to play sports. Mr. Sloane responded enthusiastically that his water technology company could implement water saving recycling technology to reduce the cost of water at the parks by half, the same type of savings that Mr. Sloane's company was working on in a similar project for the Los Angeles parks. Singer said if Mr. Sloane's company's

---

[12] The transcripts from the August 30 and September 20, 2018 calls Singer had with Mr. Sloane concerning his foundation's Oakland parks project were not provided to the Probation Office by the government. Nor were the transcripts or underlying tape recordings provided to the defense, despite numerous written requests by the defense to provide them. The government only allowed defense counsel to sit in a room and listen to the tapes one time and take notes. The government has similarly refused to provide any other discovery to the defense despite numerous written requests to do so, stating that it has no <u>Brady</u> discovery or an obligation to otherwise provide discovery to a defendant who has pleaded guilty.

technology could achieve that savings, he would ask Oakland to give half of the savings to Singer's foundation to fund the sports programs it would be running. During the first call, Mr. Sloane had one of his company's experts join the call to describe to Singer the issues involved in such a water savings program. Mr. Sloane told Singer he and his company would be willing to volunteer to help address the financing issue through their water saving technology in order to assist Singer's foundation to provide sports activities for Oakland's underprivileged kids. Singer thanked Mr. Sloane for the assistance and detailed the issues they would have to deal with to make this project come to fruition. At no point did Singer tell Mr. Sloane his non-profit foundation was a sham – just the opposite.[13]

Mr. Sloane did not set out with the goal to defraud USC and found Singer to do it.  Instead, Singer expertly targeted, manipulated, and lured Mr. Sloane into his deceit, carefully cultivating Mr. Sloane's trust over a year with legitimate services and appeals to Mr. Sloane's philanthropy, playing on Mr. Sloane's and his wife's fears and insecurities, before presenting him with one step then another step then another step to cross the line. Very unfortunately, contrary to the law-abiding and honest decisions he had made during the rest of his life, Mr. Sloane knowingly crossed the line, has fully accepted responsibility for doing so, and will make amends for his aberrant and hurtful decision for the rest of his life.

---

[13] When Singer spoke with Mr. Sloane on October 25, 2018 in a consensually monitored phone call while working with the government, the ruse the government had concocted was that Singer's foundation was being audited by the IRS and Singer had to explain the $200,000 contribution Mr. Sloane had made to it. On the transcript the government provided to the Probation Office, Mr. Sloane asks Singer to meet over coffee to discuss the issue rather than over the phone (there is no indication that Mr. Sloane thought the call was being recorded when he made the request).  Mr. Sloane asks for any materials on the foundation (which Singer says he does not have) or the link to its website (which Mr. Singer says he will provide).  On the part of the call not provided to the Probation Office, Mr. Sloane asks Singer how the Oakland project was going, consistent with the conversations that Mr. Sloane had with Singer on August 30 and September 20, 2018, where he described all his foundation's efforts to take over the sports activities at the Oakland parks to benefit underprivileged children. Singer responded to Mr. Sloane (on the part of the call not provided to the Probation Office) that he was still waiting on the Oakland politicians.

C.      **The Need for the Sentence Imposed to:**

1.      **Reflect the seriousness of the offense, promote respect for the law and provide just punishment (§ 3553(a)(2)(A))**

Mr. Sloane does not dispute in any way or seek to minimize that the misconduct he committed was serious. Mr. Sloane's recognition of the seriousness of his offense was demonstrated by the speed at which he instructed his attorneys to reach a plea agreement with the government right after the criminal complaint was filed and the timeliness of his guilty plea days after the Information was charged.  The seriousness of that misconduct must be evaluated, however, in light of the entire conspiracy charged and the context in which the misconduct occurred.  Here, as described above, Mr. Sloane was involved in only a small subset of the conspiratorial acts charged. *See* Exhibit F. Significantly, Mr. Sloane did not seek out Singer to commit a crime; on the contrary, <u>but for</u> Singer targeting, manipulating and presenting the crime to Mr. Sloane, there is no evidence whatsoever that he would have otherwise participated in submitting a fraudulent application to USC. In addition, there is no evidence that Mr. Sloane intended to cause or directly caused any monetary harm to USC as a result of his actions, and USC concurs as such by not seeking restitution. That being said, Mr. Sloane offers no excuses and accepts full responsibility for the actions he did take in writing checks to USC and Singer's foundation to facilitate his son's admission to the university and participating in a fraudulent water polo application and cover-up. Mr. Sloane crossed the legal line with his eyes wide open.

However, to reflect the seriousness of the crime, promote respect for the law and provide just punishment, under the totality of the circumstances when viewing Mr. Sloane as an individual, is the Court required to impose a prison sentence? This was the same issue facing Judge Stearns in the *Prosperi* case.  *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012).  In that case, the defendant was looking at an 87-108 month guideline range based on his role in the nine years of fraud involving the "Big Dig"

project. He had been charged with 135 felony counts, convicted of all of them at trial, and found to have

caused $5.2 million in loss. The government there, like in this case, was trying to tie the defendants'

conduct to the broader culture of corruption. In that case they invoked Bernie Madoff, the BP oil spill,

and the financial crisis, and in this case the government trumpets the corrupt college admissions process,

inequality between rich and poor in the system, and white entitlement. *See id.* at 40. In sentencing the

defendants to only three years' probation, six month of home detention, and 1,000 hours of community

service, the court rejected the notion that imprisonment was the only way to accomplish these goals of

sentencing. The court believed it an abuse of its power to treat the defendants as the "poster children" for

the larger corporate culture and hold the defendants "responsible for all the excesses of modern corporate

ills." *Id*. at 40-41. The court added  "I really cannot sentence a culture. I have to sentence the defendants

as human beings, and the real choice in this case is what are the punishment alternatives." *Id*. While the

court explicitly made it clear that it thought the defendants' conduct was wrong, the court weighed a

number of factors, including the lack for recidivism, the lack of personal enrichment, the lack of intended

harm to the victim, the cost of imprisonment to the taxpayers, and the role of the defendants as caregivers

to their families in determining that prison was not warranted. *Id*. at 41-42.

Here, it is similarly wrong to treat Mr. Sloane as the "poster child" for all the inequality in the

college admissions process and hold him "responsible for the excesses" of wealth and privilege in the

system.[14]  Like in *Prosperi*, the Court cannot sentence the "culture" of college admissions and must

sentence Mr. Sloane "as a human being" and consider "punishment alternatives." Like in *Prosperi*, Mr.

---

[14] The Court described the "outrage" that many have in a college admissions system "distorted by money and privilege" with "some children having small classes, individual tutoring or counseling, homes with books and guidance and food and a roof over your head, prep classes, friends who can help find good internships in the summer, help writing college essays, college counselors along the way who can help diagnose your child's learning problems." United States v.  Huffman, No. 19-CR-10117 (Sept. 13, 2019 Sentencing Hearing), Reporter's Transcript at *39.

Sloane lacks any potential for recidivism, lacks any personal enrichment as a result of the scheme, and intended no harm to the victim. Unlike in *Prosperi*, Mr. Sloane caused zero monetary harm instead of millions of dollars of loss; Mr. Sloane pleaded guilty to one count instead of being convicted at trial of 135 counts; and Mr. Sloane faces a 0-6 month range instead of a 87-108 month range.

As for a "punishment alternative," the Recommended Sentence provides a "sufficient but not greater than necessary" punishment alternative to achieve the aims of sentencing as it did in *Prosperi*. Having Mr. Sloane serve 3 years of supervised release rather than one year and having him perform up to 2,000 hours of community service which is **200%** greater than the 1,000 hours the *Prosperi* defendants received and **800%** greater than the 250 hours Ms. Huffman received, fulfills the goals of sentencing. As importantly, having Mr. Sloane repay his debt to society directly by creating and implementing the Unified Sports Initiative to bring together independent schools students and their community with Special Olympic athletes in a way that broadens their understanding of those with special needs and intellectual disabilities will leave very few thinking that Mr. Sloane somehow "got away with this" by not going to prison. *See United States v. Defendant*, 2018 U.S. Dist. LEXIS 52091, *10 (S.D.N.Y. March 22, 2018) ("Community service sentences recognize the damage done to individuals and communities by forcing the perpetrator to directly contribute back to society.") This is particularly true when one adds in the collateral consequences already suffered by Mr. Sloane coupled with his exemplary personal history, timely acceptance of responsibility, and very low guideline range.

2.    **Afford adequate deterrence to criminal conduct (§3553(a)(2)(B))**

The sentence imposed by the Court should also be sufficient, but not greater than necessary, to adequately deter criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  There can be no question that the goal of specific deterrence has already been met in this case. In actions and words, Mr. Sloane fully understands the gravity of his misconduct and has taken every step in his power to rectify his wrong and ensure that

he will never transgress the law again. His exemplary personal history, particularly in the face of a childhood filled with significant hardships, and the scores of impassioned character references further show that he is not a threat to the public; a sentence of incarceration is not needed to further reinforce to him the perils of violating the law.

Nor is a prison sentence necessary to achieve general deterrence. *See Prosperi*, 686 F.2d at 48 (rejecting the view that "the interest in general deterrence could only be served by incarceration"). Any person contemplating the decision of whether to submit a fraudulent application to a university or make payments to facilitate an admission who views what has happened to Mr. Sloane prior to sentencing may already be deterred by (1) the life-long criminal felony conviction with all its attendant consequences (e.g., never own a firearm, sit on a jury, or vote in certain jurisdictions); (2) the destruction of one's life's reputation, (3) the enormous shame and disgrace heaped on one's family, (4) the tremendous negative media coverage, (5) the significant damage to one's business and financial relationships, (6) the FBI arrest at one's home in front of one's family; and (7) the indelible mark left on one's child's permanent scholastic record.  Adding additional punishments at sentencing under the Recommended Sentence of (8) three years of supervised release, (9) up to 2,000 hours of community service and other conditions, and (10) a $75,000 fine will further deter any would-be college defrauder who still might be thinking of following in Mr. Sloane's crooked path. Courts have found that community service may act as a general deterrent as many defendants view it as a burdensome and highly undesirable task, particularly when it involves significant hours. *See, e.g., United States v. Greene*, 707 F. App'x 445, 447 (9th Cir. 2017) (affirming imposition of 700 hours of community service over defendant's objection); *United States v. Defendant*, 2018 U.S. Dist. LEXIS 52091, *10  (denying defendant's request to reduce sentence of 300 hours of community service sentence because of "burden").  A sentence of incarceration is not needed to

further reinforce the deterrent message. Accordingly, the Recommended Sentence will achieve both specific and general deterrence in this case.

> 3.  **Protect the public from future crimes of the defendant (§ 3553(a)(2)(C))**

Mr. Sloane has no prior arrests or convictions and a previously unblemished lifelong record of honesty and integrity. Furthermore, he has demonstrated full acceptance of responsibility and remorse for the offenses that he committed. He does not pose a threat to the public.

> 4.  **Provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner (§ 3553(a)(2)(D))**

There is no need to provide Mr. Sloane with any educational or vocational training, medical care or other correctional treatment.

> D.  **The Kinds of Sentences Available (§ 3553(a)(3))**

Given that Mr. Sloane is a first-time, non-violent offender and his guideline range is 0-6 months within Zone A, the guidelines authorize the Court to impose a sentence like the Recommended Sentence. U.S.S.G. § 5B1.1. The Sentencing Commission amended the guidelines in November 2018 to highlight that courts are "to consider non-incarceration sentences" for non-violent first offenders like Mr. Sloane. *See* Amendment 811, U.S.S.G. Suppl. to App'x C (Nov. 1, 2018).  The new Application Note 4 to U.S.S.G. §5C1.1 reinforces this point: "If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment …"

> E.  **The Advisory Guideline Range (§ 3553(a)(4))**

The Recommended Sentence falls within the advisory guideline range of 0-6 months.

> F.  **Any Pertinent Policy Statement Issued By the Sentencing Commission (§ 3553(a)(5))**

With respect to pertinent policy statements, as noted above, § 5B1.1 and Application Note 4 to § 5C1.1 both provide that a sentence other than imprisonment, like the Recommended Sentence, should

be considered in this case. *See* 28 U.S.C. § 994(j)("Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence.").

G.     **The Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6))**

For those sentenced in the 0-6 month range, the statistical evidence is clear that the overwhelming majority of such defendants nationally and in this district are sentenced to non-incarceration sentences. *See United States v. Huffman*, Case No. 19-10117-IT, Doc. No. 424 at *11-17 (and related exhibits). While each side can find anecdotal cases that support its position, *see* id and Doc. 423 at *10-15, the sentences from two similar cases imposed in connection with the "Operation Varsity Blues" investigation have ranged from time served, six months of home detention and two years of supervised release for John Vandemoer (the Stanford sailing coach involved in the college athletic recruitment scheme facing a 27-33 month guideline range having received $610,000 in payments) to 14 days, 250 hours of community service, and one year of supervised release for Felicity Huffman (a parent involved in the college entrance exam cheating scheme, looking at a 0-6 month range having made a $15,000 payment). Here, for Mr. Sloane, a parent involved in the college athletic recruitment scheme, he faces a much lower guideline range than Mr. Vandemoer and a lower amount of payments relating to one student rather than multiple students. In comparison to Ms. Huffman, Mr. Sloane faces the same guideline range with a much higher amount of payments relating to a different scheme. The Recommended Sentence falls squarely within the spectrum of cases involving similarly situated defendants as it (i) increases the amount of supervised release time from one or two years to three years, (ii) greatly increases the community service hours from zero or 250 hours to up to 2,000 hours with other conditions, and (iii) significantly increases the above-guidelines fine being paid to $75,000.

H.     **The Need to Provide Restitution to Victims of the Offense (§ 3553(a)(7))**

Though USC submitted to the Probation Office a letter generally describing certain harms it experienced as a result of the entire Singer conspiracy, on September 13, 2019, the government informed defense counsel that the victim USC will not be seeking restitution from Mr. Sloane.

IV.     **CONCLUSION**

For the reasons set forth herein, Mr. Sloane respectfully requests that the Court sentence him to the Recommended Sentence of time served followed by three years' supervised release with conditions[15] including performing up to 2,000 hours of community service for the Special Olympics' Unified Sports Initiative and payment of a $75,000 fine.

Respectfully submitted,

DEVIN SLOANE

By his attorneys,

/s/ *Nathan J. Hochman*
Nathan J. Hochman (*Pro Hac Vice*)
BROWNE GEORGE ROSS LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
nhochman@bgrfirm.com
Tel: (310) 274-7100
Fax: (310) 275-5697

A. John Pappalardo (BBO# 338760)
Greenberg Traurig, LLP
One International Place
Boston, Massachusetts 02110
pappalardoj@gtlaw.com
Tel: (617) 310-6000
Fax: (617) 310-6001

---

[15] Other conditions are set forth in Defendant Devin Sloane's Under Seal Exhibits filed herewith.

Sandra R. Brown-Bodner (*Pro Hac Vice*)
Hochman Salkin Toscher Perez, P.C
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212
brown@taxlitigator.com
Tel: (310) 281-3200
Fax: (310) 859-1430

DATED:  September 17, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ *A. John Pappalardo*