UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No.: 19-10117-IT-11 |
| ) | |
| v. ) | |
| ) | |
| (11)   DEVIN SLOANE, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

### Introduction

The government respectfully submits this supplemental sentencing memorandum in connection with the September 10, 2019, sentencing of defendant Devin Sloane.

Sloane paid $250,000 to have his son fraudulently admitted to the University of Southern California ("USC") as an international water polo star, when in fact he did not even know how to play the sport. In so doing, Sloane not only conspired to deceive USC about his son's qualifications for admission, but also to bribe complicit insiders at the university to facilitate the fraud. He knew that what he was doing was wrong and he was utterly untroubled by his crime: he bragged about misleading a USC development official to cover up the *quid pro quo*—using his dead mother as a prop for a fake donation—and even expressed outrage when high school counselors dared to question why a student who did not play water polo was being recruited to play college water polo. Later, Sloane schemed to cover his tracks by lying to the IRS, even as he expressed concern to Rick Singer about discussing the fraud over the phone. For his actions,

Sloane should be sentenced to a term of one year and one day in prison, in addition to a $75,000 fine and 12 months of supervised release.[1]

Other factors underscore the need for a significant sentence in this case. To this day, Sloane has failed to fully accept responsibility for his crime—not subsidiary details at the edge of the fraud, but core aspects of his own culpability. And he continues to show a striking lack of remorse and disdain for the law. Despite pleading guilty to an Information—the accuracy of which he agreed not to dispute—he seeks to minimize his culpability in material ways, most notably by submitting a statement of offense conduct that disputes his knowing involvement in bribery and suggests that the payments he made were, in his understanding, legitimate charitable donations. Ironically, he thereby invokes the very cover story he and Singer agreed upon *during the conspiracy*, in an effort to shift responsibility for his crime.

The large payments Sloane made to facilitate the scheme also speak to his knowledge of the wrongdoing and the lengths to which he was willing to go to engage in it. While the government is of course respectful of the Court's recent ruling on issues of cognizable loss and gain, the total sums a defendant was willing to spend on fraud is still a useful, if imperfect, starting point for relative culpability. A sophisticated businessman, Sloane did not haggle with Singer over the bribe amount because, to him, what he was getting was worth it—he bought his child an illegal edge over other college applicants, thereby piling an illicit advantage on top of all the numerous advantages already available to him, including legacy status at USC and an elite private preparatory school education.

---

[1] Based on the Court's recent ruling concerning the calculation of loss or gain for Guidelines purposes, the government's recommended sentence is outside the applicable Guidelines range.

Sloane also actively engaged in the fraud, in elaborate ways, for months, going so far as to have his son pose for fake action photographs, buying water polo equipment online (to make the fake action photos look more realistic), and hiring a professional design firm to facilitate the scheme. He lied to guidance counselors at his son's high school and—an important factor distinguishing one defendant from another—enlisted his son as a knowing participant in the fraud. And afterward, as noted above, he plotted to deceive the IRS about his bribe payments and worried about talking on the phone (an apparent fear of wiretaps). In short, Sloane's sentence should reflect not only a need for just punishment and general deterrence, but also for specific deterrence and promoting respect for the law. *See* 18 U.S.C. § 3553(a).

I.  **An Overview of the Defendant's Conduct Demonstrates His Knowing, Enthusiastic Participation in the Fraud**

By late 2016, Sloane was discussing with Singer the "financial side door"—Singer's shorthand term for his scheme to bribe university officials to admit applicants as purported athletic recruits—to secure Sloane's son's admission to college. *See, e.g.*, Ex. A (September 19, 2016 e-mail in which Singer tells Sloane to have "no worries" that his son was dropping out of soccer because Singer would "creat[e] a story" for him); Ex. B (Nov. 29, 2016 email in which Singer tells Sloane that if his son applied to Georgetown "through the side door," he would not need to earn "all As"); Ex. C (Jan. 4, 2017 email in which Singer asks Sloane if he is "ready to commit to the notion of the financial side door").[2] At the time, Sloane's son was a student at the Buckley School,

---

[2] All exhibits are being submitted to the Court under seal, together with a motion to seal, pursuant to the protective order entered by Magistrate Judge Kelley in related cases. *See, e.g.*, 19-CR-10081-IT Dkt. 165.

a private K-12 school in Sherman Oaks, California that advertises an eight-to-one student-faculty ratio.[3]

By June 2017, Sloane was actively engaged in manufacturing materials falsely depicting his son as an international water polo superstar, despite the fact that his son did not play water polo. On June 5 and June 16, 2017, Sloane bought water polo equipment on Amazon: a Speedo swimsuit, a water polo ball, a water polo cap, and a vinyl Italian flag decal for the cap. *See* Ex. D (Amazon purchases made by Sloane). The purchases had one purpose: to help his son masquerade as a member of an elite Italian water polo team who merited recruitment to USC's nationally ranked squad.

Sloane then enlisted his minor son in the scheme, taking pictures of him throwing a ball in the family swimming pool, clad in the newly acquired water polo gear, pretending to be something he is not. Sloane e-mailed the photographs to a graphic designer he had hired to manipulate the images to make it appear as though his son was engaged in a real water polo match. *See* Ex. E (photographs e-mailed to graphic designer). On June 26, 2017, the graphic designer responded:

> Hello Devin!
>
> We were able to review the photos and the only issue was of course with the outdoor lighting vs. indoor.
>
> We researched a few water polo athlete images and the majority are cropped against a background so they can use them in promotional materials (and it takes out undesirable elements from the crowd etc).
>
> We were able to adjust the color and complete a clean extraction to mimic this look (attached).

---

[3] *See* "Buckley at a Glance," available at https://www.buckley.org/about/buckley-at-a-glance.

In reply, Sloane asked the designer to put his son in a picture that looks like an "outdoor polo pool." The designer responded with a revised photo based on images he had located online. Sloane, upon reviewing the images, replied, "Wow! You nailed it!!!" *See* Exhibit F (e-mails between the defendant and designer). Sloane then e-mailed Singer the picture below and asked "Does this work?"



Singer responded: "Yes but a little high out of the water- no one gets that high." *See* Ex. G (e-mails between Singer and Sloane).

> Shortly thereafter, Sloane advised the graphic designer that
>
> the feedback I got was that he's out of the water too much to look authentic. Can you look at a host of photos of actual competition and you'll see how the athletes are lower in the water because they cannot stand and they are only treading water. Therefore, is there anyway [sic] to manipulate his image to be lower in the water consistent with other photos you have access to?

Ex. H. The graphic designer replied that he had reviewed an "absolute ton of competition photos" but had difficulty finding photos that could be manipulated to insert Sloane's son "without looking

100% fake." The designer noted that this "might be the best we can do," but that he would try to "lower the image" even though it had been a "beast" to "manipulate the shots." *See* Ex. I.

The designer then created a new picture, which Sloane sent to Singer with the caption: "Hope this works . . .": *See* Ex. K.



This time, Singer replied: "Perfect." *See* Ex. K.

Singer and other co-conspirators then manufactured a falsified athletic profile to accompany the staged photographs. Ultimately, as Singer told Sloane, the profile falsely described his son as a "Perimeter Player" for the "Italian Junior National" and "LA Water Polo" teams. Sloane, of course, knew this was all a lie. *See* Ex. L.

On November 2, 2017, corrupt USC athletics administrator Donna Heinel used the falsified athletic profile to secure the admission of Sloane's son to USC as a recruited water polo player. *See* Ex. M. Three days later, Sloane asked Singer, "[W]hen does the letter come in?" referring to a letter from USC conditionally admitting his son as a recruited athlete. Singer replied, "Couple weeks." *Id.* Sloane also wrote, "I saw [my son's] college counselor . . . and had the opportunity

to update her according to our plan." *See* Ex. N. He followed up again on November 13, 2017, asking whether the letter would be sent to him or to Singer. *See* Ex. O.

Heinel e-mailed the letter to Singer on November 16, 2017. It specified that Sloane's son had been conditionally admitted to USC as a recruited athlete, noting that "you have the potential to make a significant contribution to the intercollegiate athletic program as well as to academic life of the university," and that USC would do "all that we can do to support you in achieving your goals as a student-athlete at USC." *See* Ex P.

Less than two weeks later, on November 29, 2017, Singer e-mailed Sloane a request for payment (*see* Ex. Q):

> Devin can you send a 50K check to USC and the address is below. Additionally the rest of the 200K will be paid to our foundation a 501 3C [sic] after [your son] receives his final letter in March.
>
> Made Payable to:
>
> USC Women's Athletics
>
> Send to:
>
> Donna Heinel
> Senior Women's Athletic Director
> 3501 Watt Way
> Los Angeles, California 90089-0602

That same day, Sloane mailed a $50,000 check to Heinel's attention, payable to USC Women's Athletics—the fund to which Heinel had directed Singer to have the payment sent, and over which she exercised discretion.

Notwithstanding his conditional admission as a water polo recruit, Sloane's son was required to submit a formal application to USC through the Common Application. That document, submitted on December 1, 2017, falsely described him as the "captain" of the "All Italian Under 19" water polo club—described as "one of the world's top youth water polo clubs." It also

7

included other fabricated honors, including "Italian National Youth Leadership Council – Water Polo"; "CIF Scholar Athlete – Water Polo" and "Molten Academic All American-Water Polo." *See* Ex. R. These bogus claims were also included on applications submitted to American University, New York University, Northeastern University, the University of San Diego, Santa Clara University, Loyola Marymount University, Chapman University, the University of Michigan and others.[4] At approximately the same time, administrators at Buckley warned Sloane that Singer had falsified portions of another student's college applications. Sloane assured them that he had reviewed his son's applications and that the information was accurate.

In January 2018, Singer's accountant sent Sloane an invoice from the Key Worldwide Foundation, Singer's sham charity. The invoice read: "Private Contribution – Letter of receipt will be provided upon payment." *See* Ex. T. Upon receiving the invoice, Sloane e-mailed Singer to inquire why he had been invoiced before his son had received his formal acceptance letter, writing, "I believe you mentioned this would be due after we received the official letter from USC in March. Is that correct or did something change?" Singer replied: "We are getting everyone ready – I am trying to get money in so there is no delay as [U]SC will call the markers in very soon thereafter." *See* Ex. U (emphasis added). Singer's response thus made explicit, in writing, what Sloane already knew and what his actions to that point make plain: that Sloane's fake donation was, in fact, a *quid pro quo* for his son's fraudulent recruitment to USC as a purported water polo player, and that the money would flow through Singer's foundation to the insiders at USC who had helped facilitate the fraud, and who would "call the markers in."

---

[4] In paragraph 75 of the PSR, Sloane contends that his son was admitted to Santa Clara University, Chapman University and Loyola Marymount University on his own merit. In fact, the Common Application submitted to those schools contained numerous fabrications. *See* Ex. S [applications].

On or about March 24, 2018, Sloane's son received his official acceptance letter from USC. Sloane wrote to Singer, copying his son, "We got to celebrate two times, the second being official." In a separate e-mail, sent only to Singer, Sloane thanked Singer for his "hard work and incredible strategic thinking," and asked, "Regarding payment, we are in transit to Hawaii, so is it OK if we process payment when we return on April 4?" *See* Ex. V. On or about April 11, 2018, Sloane wired $200,000 from a personal trust to KWF.

In the wake of Sloane's son's admission, officials at Buckley and USC expressed suspicion about his recruitment as a water polo player. On April 1, 2018, Singer advised Sloane to make sure that their stories were straight should anyone inquire about the admissions process:

> They know about USC. One of the counselors questioned [your son] getting in as Water Polo player this week. My folks at [U]SC called me so we could restate [your son] playing in Italy as [his high school] does not have a team.

*See* Ex. W. The email thus confirms, yet again, Sloane's awareness that co-conspirators inside the university—"[m]y folks at [U]SC"—were complicit in the scheme to admit his son as a fake water polo recruit. Sloane responded indignantly to the suggestion that high school counselors were raising questions:

> The more I think about this, it is outrageous! They have no business or legal right considering all the students privacy issues to be calling and challenging/question [my son]'s application.

Sloane, Singer and Heinel then worked together to conceal the fraud from USC admissions officers. *See* Ex. X. On or about April 11—the same day Sloane wired his payment of $200,000 to KWF—Heinel quashed an inquiry into the recruitment by the USC admissions office by falsely advising an admissions officer that the young man's athletic credentials were legitimate:

> [Sloane's son] doesn't play on the men's water polo team at Buckley because they do not sponsor water polo at his school. He plays at LA Water Polo Club during the year and travels international during the summer with the youth junior team in Italy. I don't know if the people at [his high school] are unaware of his

> participation. He participates in tournaments in Greece, Serbia (how he met Jovan [Vavic, the USC water polo coach]) and Portugal. I believe the parents do have money since he is enrolled in [his high school] plus is able to travel so extensively during the summer. He is small but he has a long torso but short strong legs plus he is fast which helps him win the draws to start play after goals are scored. He is an attack perimeter player.

*See* Ex. X. Singer forwarded Heinel's e-mail to Sloane—another explicit confirmation of the nature of the fraud and the fact that Heinel, to whose attention Sloane had sent a $50,000 check, was involved in it and was actively misleading others within the university. *See id.* In the same e-mail, Singer gave Sloane a script to use in the event of further inquiries. *See id.* The e-mail instructed Sloane to tell Buckley counselors that he had received a call from "Coach Vavic," the USC water polo coach, "asking why Buckley is pushing back on my decision to take Matteo as a member of my team – WHY?" And it suggested that he tell the school that Vavic was a "family friend for several years." *Id*.

Sloane followed the script in conversations with Buckley administrators the following day. After news of these conversations made its way back to USC, Heinel called Singer to warn him that she did not want angry parents going to "Buckley" or "Marymount" and "yelling at counselors," because that would "shut everything down."[5] *See* Ex. Y.

On May 1, 2018, Sloane received a follow-up email from his son's high school guidance counselor asking whether he had been admitted to Berkeley and UCLA. *See* Ex. AA. Sloane forwarded the e-mail to Singer, asking, "Not sure if there's anything behind this question or is a legitimate request." *Id.* Sloane then inquired about USC, writing, "I'm assuming everything's all

---

[5] Marymount is another Los Angeles-area private school that, at the time, was investigating the bogus recruitment to USC of the daughter of co-conspirators Mossimo Giannulli and Lori Laughlin, who have been separately charged.

quiet on the USC front and no more cause for concern." *Id*. Singer replied: "No noise at [U]SC – all good." *Id*.

That summer, agents monitoring Singer's phone pursuant to a Court-authorized wiretap intercepted a call in which Sloane told Singer that he had received an inquiry from the USC Advancement Office about his $50,000 contribution to Women's Athletics through Heinel. Sloane boasted to Singer about how he had misled the advancement officer about the reasons for the payment, telling USC that it was to honor his dead mother:

SLOANE: I got reached out to by the main development people at, at, [USC's senior vice president for university advancement]--

SINGER: Yup.

SLOANE: --at university advancement. But he had an underling reach out to me and then I told the underling, "Hey, I got a letter from [USC's senior vice president for university advancement] himself." She's like, "Oh, oh, okay, well maybe I need to involve him now." I don't know. But she understood it was-- but she knew we made the donation to women's sports, and she's like, "Well, I was curious-- you know, how, how did you come up with that?" *I said "Well you know, my mom, my mother was an Olympic athlete and she just passed away last year, and we as a family decided that we wanted to support women's--"*

SINGER: You're the greatest.

SLOANE: "*--women's sports, and my, my son had done a big essay, a big, a big interview with an Olympic hockey-- female hockey player. The subject was, you know, about women in sports and how they need more access, and all that stuff. So we thought it was a good way.*" And I said, "I knew it would get your guy's attention. You know, I'm a pretty subtle guy, but I knew I'd get on your radar quickly and we want to part of the community," and all that.

SINGER: That's great. You are-- you are slick.

SLOANE: So that was good.

*See* Ex. Z (emphasis added).

On October 25, 2018—after Singer began cooperating with the government's investigation—Singer called Sloane at the direction of law enforcement agents and advised him

11

that KWF was being audited by the Internal Revenue Service ("IRS"). *See* Ex. BB. During the call, Sloane expressed concern about speaking over the telephone, and suggested that he and Singer coordinate their explanations to the IRS about his payment to KWF. The following are excerpts from a draft transcript of the call:

SINGER: So I just want to let you know so my foundation right now--

SLOANE: Mm-hmm.

SINGER: --is being audited.

SLOANE: Uh-huh.

SINGER: Like everybody on the planet, right?

SLOANE: Sure.

SINGER: And so, they're looking at all of our payments so they, w-- you know, we have hundreds and hundreds of them. So one of them they asked about was the 200K that-- that you paid.

SLOANE: Yeah.

SINGER: So I just want to make sure that, [inaudible], so when the IRS talks to me, but what I'm-- what I'm not going to tell the IRS obviously is that the 2-- the 250 which was the total and 200 that went to our foundation went to get [your son] into USC through Donna Heinel for-- for men's water polo. So I'm not going to do that but I just was-- I just want to make sure we're on the same page.

SLOANE: Uh-huh, yeah.

SINGER: Uh, but I'll tell you a funny thing. Remember the profile we created?

SLOANE: Uh-huh.

SINGER: Donna calls me and says, "I love that profile that 11 you did for [the defendant's son]. And I want you any time you have somebody who wants to come to USC and isn't a water polo player…"

SLOANE: Yeah.

SINGER: "…use that profile because it was great."

SLOANE:        OK, great.

SINGER:        Uh, right, pretty cool.

SLOANE:        Yeah. Yeah, no, that's really cool.

SINGER:        Pretty cool. So what I'm going to tell the IRS is that your donation—

SLOANE:        Mm-hmm.

SINGER:        --to our foundation essentially went--

SLOANE:        Wait [inaudible], wait, Rick, let me ask you a question, *shouldn't we get together for a coffee over this as opposed to over the phone?*

SINGER:        Whatever you want to do I'm fine.

SLOANE:        *No, no, might be-- might be-- I think m-- better.*

SINGER:        Okay, okay, so—

SLOANE:        [inaudible] but-- but yeah, I think [inaudible].

SINGER:        [inaudible] I'm in Boston now.

SLOANE:        Oh, okay.

SINGER:        I'm in Boston now. So I mean whatever you want you tell me.

SLOANE:        Well, you know what the best thing would be, I'm sure you got some materials on your foundation, do you have any like marketing materials about what the foundation d--

SINGER:        Well, we don't.

SLOANE:        Okay.

SINGER:        We don't, we have a website and all that stuff. Other than that--

SLOANE:        Will you send me the link to the website?

SINGER:        Yes.

SLOANE:        *And then, maybe I can brush up on that and then—then-- then be consistent like that.*

13

| | |
|---|---|
| SINGER: | Yeah, because essentially what-- all I'm going to tell the IRS is that you made donation to our foundation for underserved kids, that's it. |
| SLOANE: | Yeah, yeah, yeah. |
| SINGER: | And I'll leave it at that. |
| SLOANE: | Okay. Yeah. Yeah, yeah. |

*See* Ex. BB. (emphasis added).

## II. <u>Sloane Deserves a Meaningful Term of Incarceration</u>

Sloane was a knowing, eager participant in the bribery and fraud scheme. From the earliest days of his involvement, to the elaborate steps Sloane later took to portray his son as an international water polo star, to the multiple communications between Singer and Sloane in which Singer discussed Heinel and his "folks at USC," Sloane understood that one or more corrupt co-conspirators inside USC were facilitating his fraud, and that they were doing so in exchange for the money he was, directly and indirectly, sending. And, of course, common sense makes clear that university officials would not engage in blatant fraud for free. Sloane is a sophisticated business executive and an experienced entrepreneur. He understood that his payments were a *quid pro quo* for Singer's "folks" at USC, who would "call the markers in" as soon as his son was admitted.

The amount of the bribe is relevant to the appropriate sentence in this case. Sloane paid a quarter of a million dollars to facilitate his son's fraudulent admission—a huge sum that, on its face, confirms his understanding that this was an illegal transaction and suggests how far he was willing to go to perpetrate this fraud. That amount may not now factor into calculation of the Guidelines offense level but, as the Court alluded to in its ruling on loss issues, it is nonetheless an aggravating factor in determining the appropriate punishment. Bribe amounts are an imperfect

measure of relative blameworthiness, but the $250,000 Sloane readily paid is an indication, however rough, of the lengths he was willing to go to obtain the illegal fruits of a fraud scheme.

From the outset, Sloane was also acutely aware of the need to cover his tracks. Even as the scheme was underway, he took steps—sometimes in consultation with Singer, but sometimes on his own initiative—to conceal the fraud, including by lying to officials at Buckley about the circumstances of his son's USC recruitment, and later by lying to a USC development official about why he had contributed $50,000 to a fund controlled by Heinel. Likewise, as the scheme unraveled, Sloane expressed concern about discussing it over the phone—plainly (and, as it turned out, justifiably) concerned about law enforcement monitoring. And he asked Singer to provide him with information about KWF—the sham charity to which he now contends he gave a $200,000 donation in good faith—so that he could "be consistent" with Singer in case the IRS came calling.

Sloane admitted to the Court his knowing and intentional involvement in this bribery scheme, both in his plea agreement and at his Rule 11 hearing, before submitting a statement of offense conduct that substantially minimizes his culpability. This persistent effort to evade responsibility bespeaks to his lack of remorse, refusal to accept full responsibility for his crime, and disdain for the law. This underscores why he deserves to be sentenced to a significant term of incarceration.

Other factors, too, demand a significant sentence. Sloane's engagement in the fraud spanned months. He went to unusual lengths to further the deception, including buying equipment and hiring professionals to doctor photos. He actively enlisted his minor child in the scheme, thereby displaying breathtaking disregard for basic principles of good parenting and common decency. He bragged about putting USC off the scent by invoking his dead mother as the rationale for his "donation" of $50,000.

Finally, Sloane's actions caused significant harm—not simply to USC, but to the qualified student who was denied admission because Sloane's son was admitted instead, and to the talented water polo player who would have been recruited to play on one of the country's elite teams, but wasn't. *See, e.g.*, Ex. CC (letter from rejected crew student-athlete). College admissions is a zero-sum game. Such harm is difficult to measure in dollars and cents, but it is real and lasting, and it demands real punishment.

### Conclusion

Sloane's moral indifference during the fraud, and his lack of remorse afterward, are not a momentary lapse but a symptom of why he committed these crimes in the first place.[6] For Sloane, this elaborate scheme was not a crime but merely an impressive example of "strategic thinking." *See* Ex. V. Sloane should be sentenced to a term of incarceration of one year and one day, in addition to a fine of $75,000 and 12 months of supervised release.

                                        Respectfully submitted,

                                        ANDREW E. LELLING
                                        United States Attorney

By:    */s/ Eric S. Rosen*
       ERIC S. ROSEN
       JUSTIN D. O'CONNELL
       LESLIE A. WRIGHT
       KRISTEN A. KEARNEY
       Assistant United States Attorneys

Date:  September 17, 2019

---

[6] *See United States v. Santiago-Gonzalez*, 825 F.3d 41, 50 n. 13 (1st Cir. 2016) ("lack of remorse" is a relevant consideration that can support an upward variance in sentencing even where a defendant shows acceptance of responsibility); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236-37 (1st Cir. 2008) (lack of remorse can disqualify a defendant from receiving a reduction for acceptance of responsibility and as a factor for determining a defendant's particular sentence within the Guidelines range).