1                     UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MASSACHUSETTS

 3     _____

       UNITED STATES OF AMERICA,

 4
                          Plaintiff,        Criminal Action
 5                                          No. 19-cr-10117-IT
       v.
 6                                          September 10, 2019
       GREGORY ABBOTT, MARCIA ABBOTT,
 7     JANE BUCKINGHAM, GORDON CAPLAN,
       ROBERT FLAXMAN, FELICITY HUFFMAN,
 8     AGUSTIN FRANCISCO HUNEEUS,           Pages 1 to 38
       MARJORIE KLAPPER, PETER JAN
 9     SARTORIO, STEPHEN SEMPREVIVO,
       and DEVIN SLOANE,
10
                          Defendants.
11     _____

12

13

14                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE INDIRA TALWANI
15                 UNITED STATES DISTRICT COURT
                  JOHN J. MOAKLEY U.S. COURTHOUSE
16                     ONE COURTHOUSE WAY
                   BOSTON, MASSACHUSETTS  02210
17

18

19

20

21                     JOAN M. DALY, RMR, CRR
                        Official Court Reporter
22                 John J. Moakley U.S. Courthouse
                    One Courthouse Way, Room 5507
23                   Boston, Massachusetts  02210
                       joanmdaly62@gmail.com
24

25

```
 1    APPEARANCES:

 2
      FOR THE GOVERNMENT:
 3
              ERIC ROSEN, AUSA
 4            JUSTIN O'CONNELL, AUSA
              Assistant U.S. Attorneys
 5            U.S. Attorney's Office
              John J. Moakley Courthouse
 6            One Courthouse Way
              Suite 9200
 7            Boston, Massachusetts 02210
              617.748.3100
 8            eric.rosen@usdoj.gov
              justin.o'connell@usdoj.gov
 9

10    FOR THE DEFENDANT GREGORY ABBOTT:

11            DANIEL L. STEIN, ESQUIRE
              Mayer Brown LLP
12            1221 Avenue of the Americas
              New York, New York 10020
13            212.506.2646
              dstein@mayerbrown.com
14

15    FOR THE DEFENDANT MARCIA ABBOTT:

16            KATHERINE P. ONYSHKO, ESQUIRE
              Covington & Burling LLP
17            620 Eighth Avenue
              New York, New York 10018
18            212.841.1000
              konyshko@cov.com
19

20    FOR THE DEFENDANT JANE BUCKINGHAM:

21            MICHAEL J. PROCTOR, ESQUIRE
              Durie Tangri LLP
22            530 Molino Street, Suite 111
              Los Angeles, California 90013
23            213.992.4499
              mproctor@durietangri.com
24

25
```

```
1    APPEARANCES (continued):

2
            JOSEPH F. SAVAGE, JR., ESQUIRE
3           YVONNE W. CHAN, ESQUIRE
            Goodwin Procter, LLP
4           100 Northern Avenue
            Boston, Massachusetts 02210
5           617.570.1204
            jsavage@goodwinprocter.com
6           ychan@goodwinprocter.com

7
     FOR THE DEFENDANT GORDON CAPLAN:
8
            JOSHUA S. LEVY, ESQUIRE
9           CHRISTOPHER J. WALSH, ESQUIRE
            Ropes & Gray LLP
10          800 Boylston Street
            Boston, Massachusetts 02199
11          617.951.7281
            jlevy@ropesgray.com
12          christopher.walsh@ropesgray.com

13          PATRICK J. SMITH, ESQUIRE
            Smith Villazor LLP
14          250 West 55th Street
            30th Floor
15          New York, New York 10019
            212.582.4400
16          patrick.smith@smithvillazor.com
            sarah.zimmer@smithvillazor.com
17

18   FOR THE DEFENDANT ROBERT FLAXMAN:

19          WILLIAM D. WEINREB, ESQUIRE
            MICHAEL T. PACKARD, ESQUIRE
20          Quinn Emanuel Urquhart & Sullivan, LLP
            111 Huntington Avenue
21          Suite 520
            Boston, Massachusetts 02199
22          billweinreb@quinnemanuel.com
            michaelpackard@quinnemanuel.com
23

24

25
```

```
 1    APPEARANCES (continued):

 2

 3    FOR THE DEFENDANT FELICITY HUFFMAN:

 4            MARTIN F. MURPHY, ESQUIRE
              Foley Hoag LLP
 5            155 Seaport Boulevard
              Seaport World Trade Center West
 6            Boston, Massachusetts 02210
              617.832.1713
 7            jamrhein@foleyhoag.com
              mmurphy@foleyhoag.com

 8

 9    FOR THE DEFENDANT AGUSTIN FRANCISCO HUNEEUS:

10            JEREMY M. STERNBERG, ESQUIRE (via telephone)
              JOHN A. CANALE, ESQUIRE
11            Holland & Knight (B)
              10 St. James Avenue, 11th Floor
12            Boston, Massachusetts 02116
              jeremy.sternberg@hklaw.com
13            john.canale@hklaw.com

14    FOR THE DEFENDANT MARJORIE KLAPPER:

15            JONATHAN M. McDOUGALL, ESQUIRE (via telephone)
              The Law Office of Jonathan D. McDougall
16            1640 Laurel Street
              San Carlos, California 94070
17            650.594.4200
              jmcdougall.law@gmail.com
18
              DANIEL K. GELB, ESQUIRE (via telephone)
19            Gelb & Gelb, LLP
              900 Cummings Center
20            Beverly, Massachusetts 01915
              617.345.0010
21            dgelb@gelbgelb.com

22

23

24

25
```

```
 1    APPEARANCES (continued):

 2

 3    FOR THE DEFENDANT PETER JAN SARTORIO:

 4            PETER K. LEVITT, ESQUIRE
              Donnelly, Conroy & Gelhaar, LLP
 5            260 Franklin Street
              Suite 1600
 6            Boston, Massachusetts 02110
              617.720.2880
 7            pkl@dcglaw.com
              njr@dcglaw.com

 8

 9    FOR THE DEFENDANT STEPHEN SEMPREVIVO:

10            ALVIN E. ENTIN, ESQUIRE
              Entin Law Group, PA
11            633 South Andrews Avenue, Suite 500
              Fort Lauderdale, Florida 33301
12            954.761.7201

13            STEVEN C. BOOZANG, ESQUIRE
              439 Washington Street
14            Dedham, Massachusetts 02026
              781.251.9991
15            sboozang@boozanglaw.com

16            DAVID E. KENNER, ESQUIRE
              Kenner and Greenfield
17            16633 Ventura Boulevard
              Encino, California 91436
18            818.995.1195
              brett@kennergreenfield.com
19            david@kennergreenfield.com

20    FOR THE DEFENDANT DEVIN SLOANE:

21            A. JOHN PAPPALARDO, ESQUIRE
              Greenberg Traurig, LLP
22            One International Place, 20th Floor
              Boston, Massachusetts 02110
23            617.310.6072
              pappalardoj@gtlaw.com

24

25
```

1   APPEARANCES (continued):

2

3           NATHAN H. HOCHMAN, ESQUIRE
            Browne George Ross LLP
4           2121 Avenue of the Stars, Suite 2800
            Los Aneles, California 90067
            310.274.7100
5           nhochman@bgrfirm.com

6

7   ALSO PRESENT:  Martha Victoria, U.S. Probation

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1                 THE CLERK:  Good afternoon.  This is Gail

2    Marchione.  Who is on the line, please?

3                 MR. McDOUGALL:  Jonathan McDougall on behalf of

4    Marjorie Klapper.

5                 THE CLERK:  Thank you.  Who else?

6                 MR. FRANKEL:  This is Steve Frankel at the U.S.

7    Attorney's Office.  I'm just listening in.

8                 THE CLERK:  Gentlemen, you are own an open mic in

9    an open and very filled courtroom.  If you speak we're going

10   to be able to hear you because I'm unable to mute you because

11   this proceeding is being live-streamed into another

12   courtroom.

13                Until we have Mr. Sternberg on the line, we will

14   wait a minute and then I'll call the case and read the names

15   of counsel into the record.  Is that very clear.

16                I think what we'll do, counsel, instead of waiting

17   for Mr. Sternberg to join us, I will ask you to please stand

18   and identify yourself and who you represent.  Counsel on the

19   telephone --

20                MR. STERNBERG:  This is Jeremy Sternberg.  I am on

21   the line.

22                THE CLERK:  I'm so grateful.  If after you speak

23   your name to be counted on the record as being in attendance,

24   could you please mute your telephones unless the Judge

1    addresses you and asks you to speak.  Okay?

2           MR. STERNBERG:  Yes.

3           THE CLERK:  I'm going to call the case for the

4    record.  This is case number 19-cr-10117, United States v.

5    Gregory Abbott, Marcia Abbott, Jane Buckingham, Gordon

6    Caplan, Robert Flaxman, Felicity Huffman, Agustin Francisco

7    Huneeus, Marjorie Klapper, Peter Jan Sartorio, Stephen

8    Semprevivo and Devin Sloane.

9           Will counsel please state their names for the

10   record.

11          MR. ROSEN:  Good afternoon, Your Honor.  Eric Rosen

12   and Justin O'Connell for the government.  Sorry.  Gail.

13          MR. STEIN:  Good afternoon.  Daniel Stein for

14   Gregory Abbott.

15          MS. ONYSHKO:  Good afternoon.  Katherine Onyshko

16   for Marcia Abbott.

17          THE CLERK:  Thank you.

18          MR. SAVAGE:  Good afternoon.  Joe Savage, Michael

19   Proctor and Yvonne Chan for Jane Buckingham.

20          THE CLERK:  Thank you.

21          MR. LEVY:  Good afternoon.  Joshua Levy and

22   Christopher Walsh for Gordon Caplan.

23          THE CLERK:  Thank you.

24          MR. WEINREB:  Good afternoon.  William Weinreb and

25   Michael Packard for Robert Flaxman.

```
1                THE CLERK:  Thank you.
2                MR. MURPHY:  Good afternoon.  Martin Murphy
3      for Felicity Huffman.
4                THE CLERK:  Thank you.
5                MR. CANALE:  Good afternoon.  John Canale for
6      Agustin Francisco Huneeus.
7                THE CLERK:  Thank you.
8                MR. McDOUGALL:  Jonathan McDougall and Daniel Gelb
9      on behalf of Marjorie Klapper.
10               THE CLERK:  Thank you.
11               MR. LEVITT:  Good afternoon.  Peter Levitt for
12     Peter Sartori.
13               MR. BOOZANG:  Steven Boozang for Mr. Semprevivo.
14               MR. KENNER:  Counsel David Kenner for
15     Mr. Semprevivo.
16               MR. ENTIN:  Alvin Entin also on behalf of
17     Mr. Semprevivo.
18               THE CLERK:  I'm sorry.  You are Mr. Alvin Entin?
19               MR. ENTIN:  Yes.
20               THE CLERK:  Thank you.
21               MR. HOCHMAN:  Nathan Hochman and John Pappalardo on
22     behalf of Devin Sloane.
23               THE CLERK:  Also on the telephone we have one more.
24               MR. STERNBERG:  Jeremy Sternberg also on behalf of
25     Agustin Francisco Huneeus.
```

1          THE CLERK:  Thank you very much.  I am going to

2     call the Judge and have her come down.  Until then we can

3     talk amongst ourselves.  Thank you.

4          (The Honorable Indira Talwani enters.)

5          THE CLERK:  All rise.  You may be seated.  United

6     States District Court is now in session.  The Honorable Judge

7     Indira Talwani presiding.  This is case number 19-cr-10117,

8     United States versus Abbott, et al.  Counsel have previously

9     identified themselves for the record.

10          THE COURT:  Good afternoon.

11          ALL COUNSEL:  Good afternoon, Your Honor.

12          THE COURT:  So let me just start with a few

13     logistics.  This hearing is really designed to address

14     questions of law only.  For that reason the individual

15     defendants were permitted to appear through counsel and not

16     required to be present.

17          When you speak, please come to the podium.  And for

18     defense counsel, I guess for everyone it would be easier for

19     the court reporter, but for defense counsel, please identify

20     not just your name but also your client.

21          Please don't feel that everyone is obligated to

22     speak.  I will not hold it against anyone if you make the

23     decision that what you were going to say has already been

24     said by someone.  Okay?

25          So let me just explain for a few minutes briefly

1  why we're having this hearing and what I hope to have people

2  have an opportunity to speak on.  And in order to do that, I

3  just want to briefly talk about the sentencing process.  I'll

4  then talk about why we're proceeding this way in this case

5  and what we're covering today.

6      So as all the attorneys in the room know, since

7  *United States v. Booker* in 2005, the guidelines developed by

8  the United States Sentencing Commission are no longer

9  considered mandatory, but they are advisory.  I am required

10  to consider the range set by the sentencing commission.  I

11  may then tailor the sentence in light of sentencing factors

12  set forth under the statute, but I must consider in doing

13  that the applicable category of offense committed by the

14  applicable category of the defendant under the guidelines.

15      And so today what we're talking about is an

16  applicable category of offense under the guidelines.  I am

17  not looking today to determine what the right sentence is for

18  any individual defendant.  I am also not looking, if the

19  upshot of today is that a particular guideline doesn't apply,

20  that doesn't mean at sentencing you can't argue by reference

21  that that gives us useful information.

22      What I am trying to figure out today, because I am

23  required to make that determination as part of my duty here,

24  is I am trying to find out what the guidelines themselves set

25  as the appropriate sentence or way of figuring out the

1    sentence.  Obviously there are 12 different defendants, and

2    there will be different, potentially different, guidelines

3    for the different defendants.  But I am trying to address the

4    legal concept here under the guideline scheme.

5            Under 18 U.S.C. 3553, if there is no applicable

6    guideline or if there's an aggravating or mitigating

7    circumstance that's not adequately taken into consideration

8    by the guidelines, I'm allowed to consider how the sentence

9    compares -- how this crime compares to other things

10   considered in the guidelines and so forth.  All of that is

11   really not for today.  Today I'm just trying to figure out

12   what the applicable category offense is here.

13           So part of the way that I will normally do this and

14   that I'm required to do this is that the probation office

15   prepares a presentence report for me.  And that again there's

16   directions in the statutes and the rules of how that should

17   happen.  The probation officer works for the courts.  She,

18   the office, is not an adjunct of either side but is here to

19   assist the Court by gathering information from the

20   government, from the defendant, from collateral sources, and

21   preparing the presentence report for me.

22           Under Rule 32(d), the presentence report is

23   required to figure out what the applicable sentencing

24   guidelines should be, and the presentence report is required

25   to identify the applicable guidelines, calculate the offense

1    level and criminal history category and state the resulting

2    sentencing range and identify any factors under the

3    guidelines that I should be considering.

4           So under the rules a draft of the presentence

5    report goes to the defendants and the government.  And the

6    way it happens in practice is that goes there without coming

7    to me.  So in this case all of the parties and the government

8    got copies of draft presentence reports or will be.  I guess

9    at this point all the drafts have gone out.  And there's an

10   opportunity to file an objection, file objections.

11          And once those objections are there under the

12   rules, the probation officer is required to consider those

13   objections.  She may meet with the parties, talk about it

14   with them, investigate further.  But then she's obligated to

15   convey in the final presentence report her resolution of

16   those objections in her view.  And that gets prepared into a

17   final presentence report.

18          So in the sentencing process, that's the first time

19   I see the material.  It's the first time I see the victim

20   impact statements.  It's the first time -- and I don't see

21   any material at that point other than the final report which

22   includes objections and the probation officer's response to

23   it and the victim impact statements and any other material

24   that the probation officer has reviewed that is available if

25   I request it or need it.  But that's not part of the

1     customary process.

2          The rules here also allow the probation officer to

3     make a specific sentencing recommendation.  This part isn't

4     the guideline calculation.  This is the what should a judge

5     do at the end of the day.  And the rules allow that that can

6     be made confidentially; that the Court may direct the

7     probation officer not to disclose that confidential

8     recommendation.

9          The First Circuit has explained that the reason

10    that the court may have these kind of ex parte communications

11    with the probation officer is that those communications are,

12    in the First Circuit's words, "fundamentally different from

13    communications with third parties as the probation officer is

14    an extension of the court itself and functions as an arm of

15    the Court."  And so a court has the right to confer ex parte

16    with the probation officer for advice or analysis.

17         There are, however, other rights that could be and

18    should be considered.  And in particular the courts have

19    noted the due process rights of defendants.  But the final

20    rule is that the judges and the probation officers are

21    permitted to discuss sentencing, but the probation officer

22    may not relay any facts that are not known to either side

23    without it being disclosed to the party and giving them an

24    opportunity to respond.  That's a basic due process

25    requirement.

1          So I have made it my practice, after realizing that

2     people wouldn't know that that had happened unless someone

3     announced it, I've started making it my practice that if --

4     that I alert people that it's my usual practice to meet with

5     the probation officer, and if there's an objection to not do

6     so.

7          And the reason is I don't want people to be nervous

8     or concerned that there are facts being conveyed to me that

9     aren't known.  That certainly has not happened in this case.

10    The government objected to my having any conversations with

11    the probation officer, any further conversations in this

12    matter.  And I understood the reason for that is that we want

13    to -- this is a case with a lot of attention on it, and it's

14    important that the public understand what is going on.

15         So the purpose of this hearing is really to flesh

16    out those legal issues.  I am not going to put the probation

17    officer on the spot to have her have to verbally present her

18    findings.  But I am going to suggest, unless there is any

19    objection from any party, which I'd be happy to consider, but

20    I am going to suggest that the portion of the presentence

21    report and I think the final -- I now have three final ones

22    -- and perhaps the last of the three that I've received,

23    which was the presentence report in Ms. Huffman's case, that

24    the probation officer's response to government's objection

25    one be made public.  And I'm just looking for that legal

1    argument so we have the legal arguments fully there.  I don't

2    think there's anything in there that's confidential.  There

3    is reference to the identity of victims, but I think that's

4    all publicly disclosed in the government's brief.

5             Unless there's any objection, when this proceeding

6    is done, I am going to ask the probation officer to file --

7    to docket that portion of the presentence report.

8             MR. ROSEN:  No objection, Your Honor.

9             THE COURT:  And also I think some of the defendants

10   have not yet received final presentence reports.  So then

11   they'll have the same information.  So that's how we got

12   here.  I think what we need to now do is turn to the task at

13   hand, which is to determine the appropriate application of

14   the guidelines.

15            I'm happy to have the government start in.  As you

16   know from some of my other hearings, I sometimes tend to go

17   back and forth with parties, but let's start here with the

18   government.

19            MR. ROSEN:  Where would you like me to address the

20   Court, from here or the podium?

21            THE COURT:  You're actually fine right there.

22   We'll make defense counsel move around, but you're fine

23   there.

24            MR. ROSEN:  I'd like to first, Judge, thank

25   probation and the probation officers for the absolutely

1    tremendous work they've put in for this case and for really

2    every other case I've worked with them on.  I've worked with

3    Ms. Victoria, especially, over the years in this case and

4    also a couple of others that we deal with in the securities

5    fraud realm, and her work is exemplary.

6         I don't know of a single harder worker than she.

7    It's great that she's assigned to this case.  I realize some

8    sharp elbows have been thrown throughout the recent

9    proceedings, but I just want her to know and the probation

10   officers to know that at least myself, and I think I speak

11   for the rest of my colleagues, truly appreciate the hard work

12   that they've put in here.  We come in peace to the hearing,

13   Your Honor, and I want to make sure that the Court

14   understands that.

15        THE COURT:  I want to thank you for that

16   acknowledgment.  And I do want to just suggest that part of

17   my thinking in putting the probation officer's response in is

18   it's a very considered response.  No matter how I end up at

19   the end of this hearing, I think it's important for everyone

20   to understand is what we're trying to figure out here is a

21   legal question.

22        MR. ROSEN:  Absolutely.

23        THE COURT:  Thank you.

24        MR. ROSEN:  Judge, the government respectfully

25   submits that the only issue this Court really can decide or

1    should decide is whether the victims here, the five victims

2    mentioned, suffered even a single penny of loss.  Because if

3    you so find, and consistent with the evidence and submissions

4    by the government and the victims, that the specific amount

5    cannot reasonably be determined under the guidelines, then we

6    must use gain from the offense.

7            THE COURT:  I'm going to back you up a little bit

8    slower here.  Start me out with what section of the

9    sentencing guidelines you think we should be looking at.

10           MR. ROSEN:  Judge, the government together with

11   defense counsel have applied 2B1.1 here, and we're fully

12   prepared to proceed under that guideline.

13           THE COURT:  Let's just go slowly because I'm

14   working here on needing to assure myself that whatever we're

15   doing is the right guideline regardless of the parties'

16   agreement.  So I don't disagree with you that the right

17   guideline is 2B1.1, but I do want to make sure of how we get

18   there because I don't think it's merely by agreement of the

19   parties.

20           MR. ROSEN:  I think that, well, a couple different

21   things.  Obviously we get there first through the appendix

22   and the parties here have pled guilty to mail fraud and

23   conspiracy -- conspiracy to commit mail fraud as well as

24   conspiracy to commit honest services mail fraud.  1341, I

25   believe, is in the appendix and it goes back to 2B1.1.

1          1346 is not in the appendix.  Hence numerous courts

2     have looked at that and have applied the commercial bribery

3     guideline under 2B1.1.

4          THE COURT:  Let me just stop you there.  Here's how

5     I'm going through it.  See if you disagree with me.  I start

6     out under 1B1.1, and 1B1.1 tells me that the first thing I

7     need to do is to go look at the appendix.  Sorry.  1B1.2

8     tells me to go and look at the appendix.  And when I get to

9     the appendix, as you said, I get 1341 there.  And 1346 is

10    merely a statute that says a term in 1341 can include honest

11    services as part of that fraud.  So I'm looking there, and

12    I'm thinking, okay, so that's why we go with the guideline

13    for 1341.  And that gets me to 2B1.1.

14          You may have had the argument in your brief that it

15    would be appropriate to use the commercial bribery statute.

16    And I just want to make sure because, again, I am supposed to

17    be making this determination, not merely on agreement.

18          MR. ROSEN:  Judge, I think the point of our brief

19    is not to say we should use the commercial bribery statute,

20    but simply to say that the proper method of calculating the

21    case here, and we call it the stipulated gain/loss as

22    appropriate and reasonable, can be looked at based on other

23    guidelines.

24          THE COURT:  And I guess my point is that that is

25    absolutely an argument that's made in sentencing that I could

1    look at that.  And that it's, in fact, if I don't have a good

2    guideline that works, it would be a way to look at it, and

3    I'm required to do it under the statute.  But I first want to

4    find what's the right guideline.

5              MR. ROSEN:  Sure.

6              THE COURT:  And you make the argument that 2B4.1

7    has been used by other courts.  So I went through all of

8    those.  That's your footnote 25 in your brief.

9              MR. ROSEN:  Correct.

10             THE COURT:  All of them except for one predate

11   changes to the guidelines that are relevant here.  They're

12   all old guidelines.  So, for example, the oldest ones are

13   from when you weren't required to go to the appendix and find

14   the one that's there.  You were allowed to look at what

15   guideline was most appropriate.  And the 2B1.1 isn't even

16   referenced in the guideline until I think 2004 or 2005.  And

17   the only one that references 2B4.1 as the guideline for 18

18   U.S.C. 1331 is the *United States v. Kelly*, a May 2018

19   decision, but it's just a sentence.  There's no analysis.

20   It's another district judge who simply says look at it.

21             So what that means is -- I assume you did a fairly

22   diligent search.  My takeaway from that is I think we're

23   stuck with 2B1.1 for better or for worse and not 2B4.1.

24             MR. ROSEN:  Your Honor, I would point the Court

25   also to it -- we're going forward on the 2B1.1 pursuant to

1    the plea agreement.  There's no dispute about that.  I think

2    the Court in *Jerome Allen*, it's a related case to this case

3    in the Southern District of Florida, used the underlying

4    offense as 2B4.1, commercial bribery, to calculate the money

5    laundering guideline.

6              THE COURT:  But we don't have the money laundering

7    charge here.

8              MR. ROSEN:  But money laundering you look at the

9    calculation based on the underlying offense.

10             THE COURT:  The guidelines, as I read them, require

11   me to look up the statute that they're charged with and then

12   look up the part of the guideline that works.  If it doesn't

13   help us here, I am not in any way stopping you from making

14   arguments in this or any other case that that would be the

15   right thing to look at because we don't have a good number.

16             But what I'm trying to find today is what guideline

17   am I supposed to look at.  And when I read the 2B1B1.2, it

18   doesn't say find the most promising guideline, which it used

19   to say in the '80s, that's what it said.  It doesn't say that

20   anymore.  It says find the guideline that we've listed in the

21   appendix.

22             MR. ROSEN:  Right.  Well, a couple of things.  The

23   money laundering guidelines simply ask you to look at the

24   base offense level for the underlying crime.  So it's the

25   same issue.  It's the same issue.  They use 2B4.1.  And I

1    really think, Judge, we're making a distinction here between

2    2B4.1 and 2B1.1, but the difference is extremely narrow.

3    It's a one point difference.  One takes a look at the amount

4    of bribe paid, and the other takes a look at the loss or, if

5    you cannot reasonably determine it, the gain, which in this

6    case is also the bribe paid.

7          So either way we're arriving at the same conclusion

8    which is that you enhance the base offense level by the

9    amount of the bribe paid.

10         THE COURT:  And I'm not disagreeing with you that

11   that might be where we are at step two.  All I'm asking you

12   is that for today what I'm trying to focus on because --

13   maybe I'm off base here, but it is my understanding of my job

14   here is to first make a correct determination of the

15   guidelines.

16         MR. ROSEN:  Right.

17         THE COURT:  Not a "this is analogous

18   determination."  That I should look at also, but that I do at

19   step two.

20         MR. ROSEN:  Judge, the government is obligated to

21   hold the plea agreement up, and we're doing that here under

22   2B1.1.  They're obviously very similar guidelines, and they

23   take into account very similar losses.  But in terms of

24   today's proceeding, we ask you to apply 2B1.1.  You can look

25   at cross references and things like that, you can look at

1    analogous situations, but I also note that we have filed plea

2    agreements in this case that use correctly 2B4.1, Jeff

3    Bizzack, who is before Judge Woodlock, and Ali Khosroshahin,

4    who is also before Your Honor in the RICO case, the

5    underlying offenses for that.

6           So there is a 2B4.1 angle here.  We're trying to

7    get this correct, but we're also trying to uphold the plea

8    agreement which we entered into and which we absolutely

9    intend to uphold during this proceeding.

10          What I want to do is dispel the notion that there's

11   this huge gulf between 2.1.1 and 2.4.1.

12          THE COURT:  I agree with you.  The difference

13   between what the result would be is very small.  I'm not

14   having -- so this may be all semantics that make very little

15   difference.  In fact, for some of the defendants here, it

16   makes zero difference, and perhaps none of this conversation

17   makes much difference for some of the defendants.  I'm just

18   trying to start in on the sentencings.  We have 12 of them

19   over the next month and a half, and I want to make sure I

20   have the guidelines correct.

21          So we're working under 2B1.1.  That seems to me to

22   be the correct guideline to be working under.  So let's

23   proceed to the next step.

24          MR. ROSEN:  Continue on?

25          THE COURT:  Yes.

1      MR. ROSEN:  Okay.  With respect to the findings in

2  the PSR, I can see if the case involved one defendant or

3  maybe a simple isolated bribe or fraud that the PSR could

4  reach a conclusion that there was no monetary loss here.  But

5  I think we have to look at in the context of the case as set

6  forth in the PSR, the charging documents, the criminal

7  complaint.

8      This was a massive nationwide fraud case fueled

9  through bribery, fraud, and corruption involving more than 50

10  people, numerous victims, causing demonstrable losses that

11  have played out nightly on the news.

12      Many coaches and administrators were involved and

13  were fired because of their involvement and abuse of their

14  position.  Students who got in through fraud and bribery have

15  been investigated to determine their involvement in the

16  scheme internally within the universities.  Universities have

17  been forced to revamp administrative and athletics policies

18  as a direct result of this case.

19      Universities have been sued both by people who did

20  not get into the schools and even by one of the defendants

21  here after he pled guilty.  And the SAT and ACT organizations

22  were particularly victimized.

23      Rick Singer and his co-conspirators took over and

24  corrupted an entire testing site in Los Angeles.  Nearly two

25  dozen scores obtained by fraud have been and continue to be

1    investigated.  And the agencies, too, have been forced to

2    beef up their security procedures.

3            All of these events that I talk about cost money,

4    money that came out of the victims' pockets, whether as

5    salary, internal investigation costs or expected future

6    damages.  These costs were expensive, and above all these

7    costs were reasonably foreseeable to the defendants who have

8    stipulated as much in their plea agreements.

9            THE COURT:  So let's break that down into parts.

10           MR. ROSEN:  Sure.

11           THE COURT:  I think 9 out of the 12 defendants in

12   this case are involved in having individual tests corrected

13   or someone sat for the exam.  So 9 out of the 12 involve test

14   taking pieces.  As to those, I don't think we have any

15   allegations that any of these parents new of the other

16   parents, do we?

17           MR. ROSEN:  By de facto being a conspiracy, Your

18   Honor, I believe that we do.  The defendants were well aware

19   that other people who came before them, who had done the same

20   cheating scam and had helped successfully get the scam off

21   the ground and perpetuate it and finesse the scam, those

22   parents were well aware of that.  That's actually in the

23   criminal complaints, in numerous portions in the calls that

24   were intercepted on the wiretap.  So yes, we do have evidence

25   for that.

1          THE COURT:  So for purposes of the difference

2     between the sentencing part of this and the guilty part of

3     this, for the guilty part we can say we're holding you guilty

4     for the whole conspiracy.  But for the sentencing part I do

5     need to make the breakdown for what the individual defendant

6     did.

7          So, for example, if we were sitting here on a drug

8     conspiracy, you would need to show which part of the drugs

9     that we can say was foreseeable for this particular

10    defendant.  Don't you have to do the same here and say which

11    part of whatever loss you're making is foreseeable to this

12    particular defendant?

13         MR. ROSEN:  I think no, Your Honor.  I think the

14    nub of the whole guidelines is that you have to take each

15    individual case as it comes.  And the reason why I set out

16    the fact that this was a large nationwide conspiracy is

17    because it's impossible to break down the costs.  Whether as

18    cost that they need to beef up security for the test, cost as

19    to find another test center, cost as to cost paid to the

20    proctors and test administrators, the mailing cost and a

21    bunch of other costs in terms of simply responding to all

22    these inquiries and the internal investigations and the

23    scores and all that stuff.

24         You can't break it down by defendant, but the

25    guidelines don't mandate that you do.  All it says is that if

1    you can't reasonably calculate it by defendant, then you look

2    to gain.  And gain here is the amount of the bribe.

3                THE COURT:  So let's not jump -- let's just do this

4    in pieces.

5                MR. ROSEN:  Sure.

6                THE COURT:  So piece one is that I need to look --

7    as I read it, I don't need to figure out first who are the

8    victims.  I need to figure out first what is the loss.

9                MR. ROSEN:  Correct.

10                THE COURT:  And then a victim is somebody who has

11    an identified pecuniary loss, correct?

12                MR. ROSEN:  That is correct, yeah.

13                THE COURT:  So, for example, you could have for

14    loss, conceptually, you can have the difference between an

15    intended or an actual loss.

16                MR. ROSEN:  Right.

17                THE COURT:  But the victim would only be considered

18    in terms of what that victim suffered, you look at their

19    actual loss.  I guess that really gets to the question at the

20    restitution stage rather than here.  The loss is the first

21    question.  The second question is the victim.

22                MR. ROSEN:  You have to attempt to calculate loss,

23    but if you can't reasonably calculate it per each person, the

24    guidelines are clear that you look to gain, Your Honor.  We

25    believe that's correct; that it's reasonably foreseeable; and

1    that it's proper.  How do you divide up major cost that

2    they've had to essentially revamp exams and security

3    processes amongst 11 defendants plus more in Judge Gorton's

4    case.  It's impossible.

5            THE COURT:  And I think just from reading the two

6    memos that were filed by defense counsel, I think you got

7    some alarms going that you were going somewhere else in your

8    memo here than you had in your plea agreement.  Is it a fair

9    statement then that the government's position is not look at

10   these large numbers of loss that we put in our memo and make

11   something out of that but rather accept that there is some

12   loss, it's indeterminate and that we should look to gain?

13           MR. ROSEN:  That's absolutely correct.  The only

14   issue, as I said at the beginning, is whether in our belief

15   one penny of gain in this massive nationwide scandal of fraud

16   and corruption counts as loss.  And I think it's

17   unequivocally correct.  All the different categories we put

18   out -- By the way, you don't have to agree with all the

19   categories.  We're giving you have a number of different ones

20   defined.

21           But from all of that information and evidence, and

22   even the statements of the victims themselves, that one penny

23   was lost.  Because if so, it's clearly impossible to divide

24   up by person.  And as such, under the guidelines you have to

25   go to gain, which in this case was the bribery amount.

1    THE COURT:  Your reference to the victim statements

2    just makes me -- I do want to clarify here for the record.

3    The victim statements were submitted, as they tend to be in

4    these things, under seal, confidentially, to the probation

5    office.

6    Is it fair to say, one, that your description of

7    the losses here are based on the government's own analysis

8    rather than anything in the victim impact statement, all your

9    dollar amounts and so forth?

10    MR. ROSEN:  Well, yes and no.  We've obviously been

11    working on this case for a really long time.  We know how the

12    victims had to react, what they had to do, costs that they

13    have incurred.

14    THE COURT:  That's my point.  It's your analysis of

15    it rather than their -- Again, I think the defendants were

16    wondering was there a piece of paper they didn't get in this

17    process.

18    MR. ROSEN:  It's both.  And, Judge, all the

19    defendants who have asked for the victim statements have

20    gotten the victim statements.  So they have gotten that.

21    It's both.  You look at the victim witness statement, for

22    example, from the ACT, they clearly state in there they

23    suffer --

24    THE COURT:  Let me just stop you.  I'm not sure

25    who's supposed to be keeping this confidential if you're

1 reading it into the record.

2      MR. ROSEN:  Okay.  I'll stop.

3      THE COURT:  For example, you have in your brief an

4 argument that colleges are going to lose money if the number

5 of applicants goes down.  And it would surprise me if any

6 college here wants to talk about their application fee as a

7 profit center.  I think that would make them pretty

8 uncomfortable, and they would say that covers the cost of

9 reviewing those applications, and it's not a source of

10 revenue.  So I don't think that's an argument they would

11 make.  It's an argument you're making.

12      MR. ROSEN:  That's correct.  I think it's based on

13 the studies that we found.  It's an accurate argument.  You

14 have to look at how applications are processed.  It's a fixed

15 cost largely to the universities.  They have a certain number

16 of applicants.

17      THE COURT:  They're not claiming lost revenue by

18 applications being down.

19      MR. ROSEN:  No.  It's not them.  It's the

20 government's analysis of the facts, yes.  Just to get back on

21 that, is that there's a certain number of college admissions

22 officers, they work at the school, and they review whatever

23 applications that come in.  They review 50,000, it's the same

24 cost to them, as whether they review 60,000, but they miss

25 out on those 10,000 application payments, which in the case

1    of when the application costs $85 is significant.

2           So I do think it is reasonable.  And I think it's

3    also reasonably foreseeable when you're corrupting an entire

4    admissions system that you would know that the number of

5    applications to a particular university would decrease the

6    following year, which is what the studies that we pointed out

7    show you.

8           THE COURT:  Okay.  So assuming I accept your

9    argument that there is some loss, that you can't determine

10   the exact loss, and then you're saying you should move to

11   gain.  Walk me through the applicable section that would tie

12   that gain to the amount paid by each of the parents here.

13          MR. ROSEN:  Again, we have to look at the facts of

14   the case.  The facts of the case show that each defendant

15   here pled guilty to conspiracy, an agreement with them and

16   with other people to pay bribes and to obtain property.  The

17   gain here is very simple.  The gain is the gain from the

18   offense as set forth in the offense conduct.

19          In some cases there was $250,000 that wasn't part

20   of the offense.  It was then paid out in the form of bribes

21   to co-conspirators of the defendants.  They're responsible

22   for --

23          THE COURT:  Do you have any precedent for -- I

24   understand your argument that it's a conspiracy, and so we

25   can look at what any person in the conspiracy gained.  But it

1    seems to me that the guidelines are saying what did this

2    defendant gain.  No?

3            MR. ROSEN:  I would absolutely disagree, Your

4    Honor, under 2B1.1, it's 3(B), the gain is very clearly

5    stated.  "The court shall use the gain that resulted from the

6    offense as an alternative measure of loss."  So it's not gain

7    to the defendant personally.  It's gain from the entire

8    offense.  And so we have to look at what other people that

9    were involved in the offense, the co-conspirators,

10   necessarily gained.

11           THE COURT:  If that was correct, if that's the

12   correct analysis, then why isn't it the total money that

13   Mr. Singer made?

14           MR. ROSEN:  Well, you have to look at the

15   reasonable foreseeability test.  No one is saying that they

16   were reasonably foreseeable for the $25 million because he

17   didn't tell them about everything.  He told them about, for

18   example, if there's -- the bribery at Georgetown, he said

19   other people did it in the past and these people were

20   successful and that type of thing.

21           So you have to -- there's multiple components here.

22   But at the end of the day, the one thing everyone is sure of,

23   the one thing all these defense counsel set forth in the plea

24   agreements, the eminent defense counsel of Boston and

25   elsewhere, is that the foreseeability aspect is equal to the

1     bribe amount.  And I think that's accurate.  And I think it's

2     the most honest way to do it and the easiest way to calculate

3     it going forward.

4                THE COURT:  It may be the easiest, and it may even

5     be the fairest, and we may end up there.  But I have to first

6     just make sure what we're doing is comporting with these

7     rules.

8                MR. ROSEN:  Correct.

9                THE COURT:  And I'm not in doing that saying in any

10    way that you're going to end up there or not there.  I just

11    have to get that first step right.  You're saying that for

12    the gain, we're going to look at the gain essentially of that

13    part of the enterprise with that transaction.

14                MR. ROSEN:  Correct.  I have two cases for you,

15    Judge.

16                THE COURT:  Yes.

17                MR. ROSEN:  The first is *United States v. Offill*,

18    that's O-F-F-I-L-L, and that's 666 F.3d 168.  That's the

19    Fourth Circuit 2011.  And then I have *United States v. Gordon*

20    at 710 F.3d 1124, and it's from the Tenth Circuit of 2013.

21    And they really just stand for the simple proposition that

22    the defendant is imputed with the gain of the conspiracy so

23    long as that gain was reasonably foreseeable to him.

24                We're not asking for the whole enchilada.  We're

25    asking for his particular order or her particular order.

```
 1              THE COURT:  What about those defendants who, and
 2    it's only a few of them, but who gave money to the university
 3    as part of the transaction?  Is that money that went to the
 4    university part of anybody's gain?
 5              MR. ROSEN:  Respectfully, Your Honor, I think we're
 6    past that now because we've already adjudicated guilt.  The
 7    parties have already agreed that the --
 8              THE COURT:  But I need to make the determination.
 9    You can argue that --
10              MR. ROSEN:  But they've admitted to that.
11              THE COURT:  They've admitted to paying that money,
12    and I need to determine the amount of gain.  So to say I'm
13    past that doesn't answer the question that I need to decide.
14              MR. ROSEN:  Respectfully, Your Honor, what matters
15    is the intent of the person in making the payment, not where
16    it goes.  And here they've admitted in this factual
17    stipulation beyond a reasonable doubt that it includes all
18    payments made.  The only one really at issue in this case is
19    the Devin Sloane payment because $50,000 of that went to
20    the -- oh, and Huneeus, too, my colleague just reminded me.
21    Just like some of the USC stuff, that is because $50,000 went
22    to the account controlled by one of the defendants in this
23    case Donna Heinel.
24              It doesn't matter for the testing, and it doesn't
25    matter for Georgetown where all the money went to Rick Singer
```

1   who then doled it out.  The point here is we've already --

2   from an intent point of view from the parent, that issue has

3   already been decided.  The parent has admitted to that.  I

4   don't think we can go back and say by a preponderance

5   standard that we relitigate that issue.

6           THE COURT:  I understand why you're feeling

7   urgently that this is where you have these deals and this is

8   where you got them.  I just need to go slowly through these

9   steps.  You're saying we have a loss.

10          MR. ROSEN:  Correct.

11          THE COURT:  We can't differentiate the different

12  parts of the loss.

13          MR. ROSEN:  Correct.

14          THE COURT:  So as a substitute for that, we're

15  looking at the gain.

16          MR. ROSEN:  Correct.

17          THE COURT:  And you're saying the gain is the total

18  dollar paid.  And my question was if some of that money was

19  paid to a university, as my colleague found in somewhat of a

20  different situation.

21          MR. ROSEN:  The government's position, and

22  obviously this will be an issue litigated at trial, for

23  purposes of this hearing, I don't think it is an issue, is

24  that the gain -- It doesn't matter where the money went at

25  the end of the day.  You can pay a bribe to anything, any

1  entity or any person.

2      THE COURT:  If we were under 4.1 and we were

3  talking about the amount of a bribe.  I'm under 1.1, and I'm

4  trying to figure out the amount of a loss, and I'm using a

5  gain as a substitute.

6      MR. ROSEN:  If your issue is simply did the school

7  somehow benefit from the $50,000, or whatever, that was

8  either paid or intended to be paid, the answer is absolutely

9  not.  There was no benefit to the school.  The schools are

10  trying to dissipate themselves of that money, trying to do it

11  in accordance with the law.  They're primarily, at least to

12  the best of my knowledge, working with the California State

13  Attorney General to do that because they are nonprofit

14  institutions.

15      But I don't think it's also correct to say that the

16  school benefited from 50 grand sitting in an account

17  controlled by a co-conspirator here who would then pay it out

18  to curry favor with athletes or coaches in the department.

19  There was no benefit here.  The schools have disavowed the

20  money and intend to dissipate it as quickly as they can,

21  according to what I know.

22      THE COURT:  Okay.  So at this point I don't know

23  whether -- I have a list of defense counsel who wanted to

24  speak.  I don't know if my telling you that we don't need to

25  have everyone speak will dissuade anybody, but I have no

particular order.  If anybody would like to address me at
this point?  Silence.  Okay.

I think that fleshes out the arguments unless there
is anything else anyone wants to add on that.  The only other
thing that I have is just a question that came up as I was
going through these papers, which I do have a sentencing
scheduled starting now on Friday.  Am I correct that there
has been no specific dollar amount for restitution requested?

MR. ROSEN:  Right.  That's correct.  We're still
waiting from one of the victims.  I think for the purposes of
Friday we can be assured that there won't be a restitution
request.  I don't want to surprise anything with the Court,
but I know it's coming up.

THE COURT:  All right.  I don't mean to make it too
anticlimactic, but that's what I needed to hear.  And I
appreciate everyone airing this.  And if the probation
officer will file that portion of the presentence report so
we have the arguments all on the record.  Thank you.

THE CLERK:  Court is in recess.  All rise.

(Court recessed at 3:18 p.m.)

- - - - - - - - - - -

CERTIFICATION


I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.



/s/ Joan M. Daly                    September 12, 2019


_____              _____

Joan M. Daly, RMR, CRR               Date
Official Court Reporter